**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

    - v. -

ROBERT BANDFIELD, et al.,

          Defendants.

No. 14-CR-00476 (ILG)

## MEMORANDUM OF LAW IN SUPPORT OF
## ROBERT BANDFIELD'S PRETRIAL MOTIONS

MORVILLO LLP
One World Financial Center
200 Liberty Street, 27th Floor
New York, New York 10017
(212) 796-6330

*Attorneys for Defendant Robert Bandfield*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND AND PROCEDURAL HISTORY ................................................................. 2

I.   Robert Bandfield's Background and the Undercover Operation ........................................ 2

    A.  IPC's Corporate and Trust Services ............................................................................. 3

    B.  The U.S.-Driven Undercover Operation ....................................................................... 3

II.  Procedural History Following Mr. Bandfield's Arrest in the United States ....................... 4

III. Procedural History of the Search and Related Court Actions in Belize ............................. 7

ARGUMENT ........................................................................................................................... 10

I.   The Court Should Suppress the Fruits of the Belize Searches and All Discovery Produced
    After the May 18, 2015 Court-Ordered Deadline ........................................................... 10

    A.  The Court Should Suppress the Fruits of the Belize Searches and the Late Discovery
       Based on the Government's Failure to Meet its Rule 16 Obligations ........................... 11

       1.  The Fruits of the Belize Searches Should Be Suppressed Because of the
           Government's Rule 16 Failure ................................................................................ 12

       2.  The Court Should Suppress the Late Discovery Because of the Government's
           Disregard of its Rule 16 Obligations ..................................................................... 16

    B.  The Court Should Suppress the Fruits of the Belize Searches Because Available
       Information Concerning the Searches Suggests They Were Unreasonable in Violation of
       the Fourth Amendment ............................................................................................... 18

       1.  Evidence Suggests the Belize Searches May Have Violated U.S. Notions of Due
           Process, but the Government has Failed to Provide Information to Make that
           Assessment.... ........................................................................................................ 18

       2.  Evidence Suggests that the Belize Searches May Have Violated Constitutional
           Restrictions Because of Substantial U.S. Involvement ........................................... 20

    C.  The Court Should Suppress the Fruits of the Belize Searches and the Late Discovery
       Because of the Government's Unreasonable Delay in Reviewing and Producing these
       Materials ..................................................................................................................... 25

       1.  The Reasoning in *Metter* and *Ganias* Requires the Court to Suppress the Fruits of the
           Belize Searches ..................................................................................................... 29

2. *Metter* and *Ganias* Also Require Suppression of the Late Discovery ....................... 32

D. The Court Should Suppress the Fruits of the Belize Searches Because of the Untenable Manner in which They Were Produced ......................................................... 32

II. The Defendant is Entitled to a Bill of Particulars ......................................................... 34

A. Applicable Legal Standard ...................................................................................... 34

B. The Court Should Order the Government to Provide the Requested Particulars .......... 35

1. All Co-Conspirators and the Time Periods of their Individual Involvement in Each of the Three Charged Conspiracies .................................................................. 35

2. Identities of the Cooperating Witnesses and the Dates They Began Cooperating ..... 36

3. Identity of John Doe 1 ...................................................................................... 36

4. Identities and Other Information Relating to the Corrupt Clients ............................ 37

5. Particulars Concerning the 5,000 Allegedly "Sham" or "Fraudulent" Companies .... 38

6. Any Available Information Concerning the "Unidentified Individual" Referenced in Paragraph 50(j) ............................................................................................. 38

7. Details Concerning CANA, VLNX, and CYNK Stocks ........................................... 39

8. Specific Information Concerning the Scheme and Securities at Issue in Count One .. 39

9. All Companies that IPC Created for Mulholland or Mulholland Group ................... 40

10. The Allegedly Fraudulent W8-BEN Forms Referenced in Count Two ..................... 41

11. Identify the Source of and the Manner in which Mr. Bandfield Participated In or Supported the Laundering of Funds ....................................................................... 41

12. Identify Details Developed in Support of the Undercover Agent's Identity and Background ........................................................................................................ 42

III. The Court Should Sever the Trials of Mr. Bandfield and Defendant Gregg Mulholland ………………………………………………………………………………...........43

A. The Indictment Fails to Allege Common Conspiracies .................................................. 44

B. The Risk for Spillover Prejudice Against Mr. Bandfield is Substantial ........................ 46

C. Mr. Bandfield's Right to a Speedy Trial will be Prejudiced .......................................... 47

D. Severance Would Not Impose an Unwarranted Burden on Judicial Economy .............. 48

IV.    The Court should Strike Surplusage from the Indictment ................................................ 49

    A.    Reference to the "term 'nominee' in the securities fraud context" ................................ 49

    B.    Reference to Penny Stocks being Easily Manipulated and Enabling Control Groups to Manipulate ........................................................................................................................ 50

    C.    References to "Sham" and "Fraudulent" Companies and Structures ............................ 51

    D.    Reference to "Corrupt" Clients ...................................................................................... 51

    E.    Reference to "inter alia" and "among others" ................................................................ 51

    F.    The Assertion that Mr. Bandfield Created Titan, Legacy, and Unicorn ........................ 52

V.    The Court Should Order a Schedule for Brady, Giglio, and Jencks Disclosures ........... 52

VI.    Mr. Bandfield Requests the Ability to File Additional Appropriate Motions and Join in Defendant Mulholland's Motions ...................................................................................... 55

CONCLUSION ............................................................................................................................ 55

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Brady v. Maryland*
    373 U.S. 83 (1963)…………………………………………………..    53

*Bruton v. United States*
    391 U.S. 123 (1968)…………………………………………………    44

*Giglio v. United States*
    405 U.S. 150 (1972)…………………………………………………    54

*Krulewitch v. United States*
    336 U.S. 440 (1949)…………………………………………………    45

*United States v. Burns*
    2008 WL 4542990 (N.D. IL. 2008)…………………………………….    27

*United States v. Carey*
    172 F.3d 1268 (10th Cir.1999)………………………………………    48

*United States v. Carrasco*
    968 F. Supp. 948 (S.D.N.Y. 1997)…………………………………..    48

*United States v. Cervone*
    907 F.2d 332 (2d. Cir. 1990)………………………………………...    44

*United States v. Cotroni*
    527 F.2d 708 (2d Cir. 1975)…………………………………………    18

*United States v. Crozzoli*
    698 F. Supp. 430 (E.D.N.Y. 1988)…………………………………..    53

*United States v. DeGroote*
    122 F.R.D. 131 (E.D.N.Y. 1988)……………………………………    35

*United States v. DeVillio*
    983 F.2d 1185 (2d Cir. 1993)………………………………………..    44

*United States v. Fishel*
    324 F. Supp. 429 (S.D.N.Y. 1971)…………………………………..    13

*United States v. Ganias*
    755 F.3d 125 (2d. Cir. 2014)………………………………………...    26, 28, 31, 33

*United States v. Juan Vincent Gomez Castrillon*
    2007 WL 2398810 (S.D.N.Y. 2007)………………………………….    12

iv

*United States v. Leung*
    40 F.3d 577 (2d Cir. 1994)………………………………………………………..     53

*United States v. Lino*
    2001 WL 8356 (S.D.N.Y. 2001)………………………………………………     35, 40

*United States v. Mango*
    1997 WL 222367 (N.D.N.Y. 1997)…………………………………………     52

*United States v. Maturo*
    982 F.2d 57 (2d Cir. 1992)………………………………………………..     20

*United States v. McDermott*
    245 F.3d 133 (2d Cir. 2001)………………………………………………     45

*United States v. McDonald*
    2002 WL 2022215 (E.D.N.Y. 2002)……………………………………...     55

*United States v. McVeigh*
    169 F.R.D. 362 (D. Colo. 1996)…………………………………………     49

*United States v. Metter*
    860 F. Supp. 2d 205 (E.D.N.Y. 2012)……………………………………     26, 27, 30, 32

*United States v. Miller*
    116 F.3d 641 (2d Cir. 1997)………………………………………………     11

*United States v. Miller*
    26 F. Supp. 2d 415 (N.D.N.Y. 1998)……………………………………...     50

*United States v. Miranda*
    526 F.2d 1319 (2d Cir. 1975)……………………………………………     11

*United States v. Moazzam*
    1993 WL 36175 (S.D.N.Y. 1993)…………………………………………..     36

*United States v. Morrison*
    515 F. Supp. 2d 340 (E.D.N.Y. 2007)……………………………………     11, 13, 15

*United States v. O'Connor*
    237 F.2d 466 (2d. Cir. 1956)……………………………………………..     35

*United States v. Oskowitz*
    294 F. Supp. 2d 379 (E.D.N.Y 2003)……………………………………     35

*United States v. Peelle*
    122 F. Supp. 923 (E.D.N.Y. 1954)……………………………………….. 35

*United States v. Pope*
    189 F. Supp. 12 (S.D.N.Y. 1960)……………………………………… 52

*United States v. Rajaratnam*
    753 F. Supp. 2d 299 (S.D.N.Y. 2010)………………………………… 47

*United States v. Sattar*
    314 F. Supp. 2d. 279 (S.D.N.Y. 2004)………………………………… 44

*United States v. Scarpa*
    913 F.2d 993 (2d Cir. 1990)…………………………………………… 50

*United States v. Tamura*
    694 F.2d 591 (9th Cir.1982)…………………………………………… 33

*United States v. Taylor*
    707 F. Supp. 696 (S.D.N.Y. 1989)…………………………………… 36

*United States v. Vilar*
    2007 WL 1075041 (S.D.N.Y. 2007)………………………………... 15, 19, 21, 22, 25, 32

*United States v. Whitfield*
    543 U.S. 209 (2005)…………………………………………………… 42

*Zafiro v. United States*
    506 U.S. 534 (1993)…………………………………………………… 44

**Rules**

Fed. R. Crim. Proc. 7(d)………………………………………………. 49

Fed. R. Crim. Proc. 7(f)………………………………………………... 34

Fed. R. Crim. Proc. 8(b)……………………………………………….. 43

Fed R. Crim. Proc. 16(a)(1)(E)………………………………………… 11

**Other Sources**

Chelsea Naso, *'Rudy' Drink Investor To Pay $5M Over Alleged Stock Scheme,*
    Law360 (Sept. 25, 2013)..………………………………………….. 47

Orin S. Kerr, *Searches and Seizures in a Digital World*
    119 Harv. L. Rev. 531 (2005)……………………………………….. 33

Defendant Robert L. Bandfield submits this memorandum of law in support of his pretrial motions for the following relief: (1) To suppress the fruits of the searches of defendants' offices in Belize and the discovery the Government belatedly produced after the discovery deadline; (2) to obtain a bill of particulars as specified herein; (3) to sever his trial from codefendant Gregg Mulholland; (4) to strike surplusage from the Indictment; (5) to require the Government to expediently provide *Brady* and *Giglio* materials, and to provide *Jencks* material sufficiently in advance of trial to avoid unnecessary delay.

## PRELIMINARY STATEMENT

The Government has charged Mr. Bandfield in a vague but sprawling indictment with three counts of conspiracy and two counts of securities fraud, specifically: (1) conspiracy to commit securities fraud; (2) conspiracy to defraud the Internal Revenue Service ("IRS"); (3) conspiracy to launder the proceeds of alleged securities fraud; (4) securities fraud relating to trading in VLNX; and (5) securities fraud relating to trading in CYNK.  The substantive securities fraud counts relate to trading in the United States in securities of which Mr. Bandfield had no knowledge.  The three alleged conspiracies involve multiple corporate entities, many individuals, and numerous allegedly corrupt clients, all of which are located in various countries around the globe and were caught up in a U.S.-driven undercover operation in the small Central American country of Belize.

In this case, the Government developed a significant amount of what it views as overwhelming evidence prior to Mr. Bandfield's indictment and arrest.  The thrust of this motion is focused on the evidence that was gathered *after* Mr. Bandfield's indictment—principally the staggering volume of evidence gathered at the Government's request in Belize, which constitutes more than ninety percent of the total volume of discovery in this case.  For perplexing reasons, the Government maintains that it should be able to use this evidence against Mr. Bandfield at

trial, yet that it is not obligated to produce documents or provide information to the defense concerning the genesis, circumstances, or basis of the searches in Belize, or the participants involved.  This inequitable position cannot stand, for it flies in the face of Mr. Bandfield's rights and the Government's obligations.

For these reasons, the Court should suppress the fruits of the searches of defendants' offices in Belize (the "Belize Searches" or the "Searches").  And, because the Government has failed to satisfy its discovery obligations throughout this case, the Court should also suppress all discovery the Government produced to Mr. Bandfield after the Court-ordered discovery deadline.  Lastly, because of the vague but expansive nature of the Indictment, Mr. Bandfield requests that the Court grant the following additional relief: order the Government to provide a bill of particulars; sever the trials of Mr. Bandfield and defendant Gregg Mulholland; strike numerous instances of irrelevant and prejudicial surplusage from the Indictment; and order the Government to produce *Brady*, *Giglio*, *and Jencks* material sufficiently in advance of trial to avoid unnecessary surprise or delay.

## BACKGROUND AND PROCEDURAL HISTORY

### I.    Robert Bandfield's Background and the Undercover Operation

Robert Bandfield is a citizen of the United States.  Born in Idaho and raised in Oregon, Mr. Bandfield is 72 years old and a dentist by trade.  Mr. Bandfield retired from dentistry nearly 35 years ago and began spending significant time in Belize.  Soon thereafter, Mr. Bandfield formed IPC Management Services, Inc., IPC Corporate Services Inc., and IPC Corporate Services, LLC (together, "IPC" or the "IPC Entities") to provide offshore corporate and trust services to a global clientele.  IPC has maintained its primary office in Belize City, Belize since about 2002.  Mr. Bandfield and his wife resided in Belize year-round beginning in about 2003.

2

### A. IPC's Corporate and Trust Services

The IPC Entities provided a variety of corporate and trust services for an international clientele, including offshore company formation, trust formation, corporate management services, and licensed trustee services.  IPC's website explained to potential clients that IPC used Licensed Company Agents to incorporate Belize-based International Business Corporations ("IBCs") for a variety of corporate purposes.  Mr. Bandfield and IPC informed potential clients that neither IPC nor Mr. Bandfield could personally provide tax or securities advice and that any associated obligations rested with the clients themselves.  In this regard, IPC provided limited corporate services similar to those provided by many U.S.-based businesses specializing in corporate and trust services, like those found most often in Delaware or Nevada.

Mr. Bandfield employed between 5 and 10 people at IPC who assisted in administrative and business-related tasks.  Prior to the Indictment in this case, IPC had been in business for twenty-four years without complaint and functioned as a good corporate citizen in Belize; it provided much-needed jobs and participated in raising funds for local foundations, including the Lifeline Foundation supporting Belizean children.  IPC's offices were shuttered after the September 9, 2014 Belize Searches, and the employees lost their jobs and sole means of income.

### B. The U.S.-Driven Undercover Operation

In approximately November 2012, an individual identifying himself by an alias made initial contact with defendant Kelvin Leach under the guise of seeking to open international companies and offshore brokerage accounts.  Though this individual represented himself as the principal of a stock marketing firm, he was in fact an undercover federal agent (the "Undercover Agent") working on behalf of the United States Government in connection with an investigation out of the U.S. Attorney's Office for the Eastern District of New York ("USAO").  Two months

after their initial introduction, the Undercover Agent expressed to Mr. Leach and defendant Andrew Godfrey that he wished to move forward with opening an offshore brokerage account through corporate defendant Titan Securities LLC ("Titan").  Mr. Godfrey informed the Undercover Agent that IPC—Mr. Bandfield's company—would assist him in establishing an offshore LLC and IBC under which he could then open offshore brokerage accounts.  IPC then proceeded to establish IBCs per the Undercover Agent's request and then opened up corresponding brokerage accounts in the names of those entities through Titan.

During the course of his dealings with Mr. Bandfield and others in Belize, the Undercover Agent recorded meetings and telephone calls that provided in part the basis for the Indictment and—presumably—for the Belize Searches.

## II.    Procedural History Following Mr. Bandfield's Arrest in the United States

At the end of a visit home to the United States, Mr. Bandfield was arrested at the airport in Miami, Florida on September 9, 2014 while returning to Belize.  He and his wife were both questioned and searched, after which their laptops and a flashdrive were seized.  Mr. Bandfield was arraigned in the District Court for the Southern District of Florida.  Though Mr. Bandfield is an older gentleman who is not accused of a violent offense, the court denied his bail application based on the Government's unsupported assertion that the alleged fraudulent scheme passed approximately $500,000,000 through clients' offshore accounts.  Mr. Bandfield was eventually transferred north where he has been incarcerated at the Metropolitan Detention Center ("MDC") in Brooklyn for nearly fifteen months.

Shortly before Mr. Bandfield's arrest on September 9, 2014, it appears from certain Belize court decisions in proceedings relating to this matter that the Belizean Attorney General's Ministry and its Financial Intelligence Unit ("FIU") received an urgent request for assistance

4

from the United States Department of Justice pursuant to the Mutual Legal Assistance Treaty ("Treaty") that exists between the two nations ("the MLAT request"). A copy of the Treaty is attached as Exhibit A to the Declaration of Eugene Ingoglia ("Ingoglia Decl.").

It appears that the Belizean authorities approved the U.S. MLAT request and issued a warrant for the Searches of the corporate defendants' offices—including IPC—and the seizure of evidence relevant to the offenses charged in the Indictment. The Belizean authorities conducted the Searches on September 9, 2014, during which they seized an enormous quantity of materials—quite literally everything in the offices except the carpet, chairs, filing cabinets, and desks. *See* Affidavit of Andrew Godfrey ¶ 13, attached as Exhibit B to the Ingoglia Decl.

According to verbal representations by the USAO, the Belizean authorities thereafter turned the seized materials in wholesale fashion over to United States agents on the ground in Belize. Following the Searches, the FIU obtained an *ex parte* order freezing the funds in various accounts of the defendants in this matter, including IPC and Mr. Bandfield.

After Mr. Bandfield was transferred to the MDC in mid-September, he was provided counsel from the Federal Defenders of New York. Over the next six months, the Government provided Mr. Bandfield and his then-counsel with only a fraction of the discovery materials in its possession. Indeed, Mr. Bandfield's then-counsel received two productions over the course of six months that included only Mr. Bandfield's post-arrest statements, a document setting forth his criminal history (he has none), video and telephone recordings of interactions with the Undercover Agent, emails from various providers obtained pursuant to a warrant dated February 3, 2014, and documents turned over by the Securities and Exchange Commission. Neither of these relatively small productions included the information provided to Belize by the U.S. Government in support of the MLAT request, or the warrant and supporting materials for the

Belize Searches, or the fruits thereof.  Nor did these productions include the imaged laptops taken from Mr. Bandfield and his wife at the time of his arrest.

Mr. Bandfield retained current counsel in early February 2015 and counsel requested Rule 16 discovery shortly thereafter.  The Court subsequently set a deadline of May 18, 2015 for Rule 16 discovery.  *See United States v. Bandfield*, No. 14-cr-486 (ILG), Dkt. No. 25.  To date, counsel has received eight additional Rule 16 productions—three of which were produced *after* the discovery deadline and *none* of which contained any information concerning the Belize Searches.

In response to questions about whether it intended to produce information concerning the Belize Searches, the Government informed Mr. Bandfield's counsel that the Belize Searches were conducted pursuant to an MLAT request, but that the Government will not produce the MLAT request or supporting materials because it does not believe it is required to do so.  The Government further informed Mr. Bandfield's counsel that it cannot produce the search warrant or any documents regarding the justification for or execution of the Belize Searches because the Government does not have them—the Belizean authorities purportedly have refused to turn them over.

What the Government has produced relating to the Belize Searches—eight months after Mr. Bandfield was arrested and only after the Court's order—is no fewer than *fourteen* 4-Terrabyte hard drives that represent the fruits of the Belize Searches.  When discussed in terms of sheets of paper, this production amounts to approximately *28,000,000,000 pages*.  Further, the Government produced this massive quantity of data to Mr. Bandfield apparently without conducting a review to segregate any potentially privileged, personal, exculpatory or irrelevant information belonging to Mr. Bandfield or any of the other defendants whose offices were also

6

searched.  And, adding insult to injury, the Government produced the voluminous fruits of the

Belize Searches without any inventory because the Government itself apparently does not know

from which office or which defendant the majority of the materials came.  This is in direct

contravention of the Treaty's provision that an inventory of seized items must be preserved and a

chain of custody of the evidence maintained.  *See* MLAT Article 14 and Form C, Ingoglia Decl.

Ex. A (explaining that every official who has custody of a seized item shall certify the continuity

of custody, the identity of the item, and the integrity of its condition).

To date, the Government still has not produced any information to justify the Searches,

explain their basis, or describe whether they were conducted in a manner consistent with the

terms of the search warrant, Belizean law, or international norms of decency.

### III.    Procedural History of the Search and Related Court Actions in Belize

Two weeks after Mr. Bandfield's arrest and the Belize Searches, the FIU of Belize made

an urgent *ex parte* application to the Supreme Court of Belize for an order freezing assets in

certain listed accounts and funds held in the names of many of the defendants here, including Mr.

Bandfield.  The request to freeze assets was granted on September 24, 2014 (the "Freezing

Order").

The defendants (respondents in the Freezing Order) each applied for a discharge of the

Freezing Order at some juncture over the next month.  On November 7, 2014, the Supreme Court

of Belize summarily discharged the Freezing Order.  *See* Nov. 7, 2014 Decision of the Supreme

Court of Belize (the "Belize Decision"), attached as Exhibit C to the Ingoglia Decl.

In discharging the Freezing Order with costs paid to defendants-respondents, the

Supreme Court of Belize found, in sum and substance, that the Freezing Order had been granted

and extended without any supporting evidence offered by Belizean authorities.  Significantly, the

Freezing Order appeared to be based solely on the U.S. Government's original Indictment here and the urgent MLAT request.  In support of its conclusion, the Supreme Court of Belize made numerous findings, including that "[n]ot a scintilla of evidence was provided to the Court" in support of the Freezing Order.  Belize Decision ¶ 59, Ingoglia Decl. Ex. C.  Moreover, the Court stated that "[n]o documentation was exhibited to enlighten the court as to the scheme referred to. Indeed, some of the allegations against the respondents appear to mirror allegations of fact made in the US District Court Indictment, which carried little weight in this application save for information purposes."  *Id*. ¶ 58.  The FIU first appealed the Decision vacating the Freezing Order, but later withdrew its appeal.

Approximately one month after the Supreme Court of Belize discharged the Freezing Order and awarded costs to the defendants-respondents, the same court granted defendant Unicorn's urgent application to return the materials seized from its office during the Belize Searches, including an award of costs.  *See* December 16, 2014 Order of the Supreme Court of Belize ("Order Returning Assets"), attached as Exhibit D to the Ingoglia Decl.  While Mr. Bandfield has been unable to obtain copies of the papers supporting the December 16, 2014 decision, it was based, upon information and belief, on certain violations of the Belize constitution that occurred during the Searches.

Indeed, several of the defendants here—including Mr. Bandfield and IPC—have initiated lawsuits in Belize for constitutional violations during the Searches.  IPC's action is based in part on the near-total removal of everything in IPC's office during the Searches in violation of the Belize constitution and the Treaty's requirement to seize only evidence of the alleged crimes. *See* Godfrey Aff. ¶¶ 15-16, Ingoglia Decl. Ex. B.  It is also based on the fact that the Searches resulted in the seizure of numerous personal items, both electronic and hard copy, which were

8

handed over wholesale to U.S. agents in Belize.  *See* Statement of Robert Bandfield ¶¶ 4-6, attached to the Ingoglia Decl. as Ex. E; Affidavit of Glenna Fay Bergey ¶¶ 5-8, attached to the Ingoglia Decl. as Ex. F; Godfrey Aff. ¶ 13, Ingoglia Decl. Ex. B.

It appears that these Searches were directed by the U.S. Government pursuant to its MLAT request.  Indeed, at least one news report recounts the activities of the Belize Searches on September 9, 2014 to include the presence of U.S.-labeled vehicles.  *See* 7 News Belize report dated September 11, 2015 and video footage of the Search, *available at* http://www.7newsbelize.com/sstory.php?nid=30012&frmsrch=1.  According to the news report and video, the Belize Searches involved the United States through the use of U.S.-labeled vehicles (depicted in the video) and the reported direction of the U.S.-funded anti-drug unit.[1] The report and video also illustrate the volume of information seized from the defendants' offices and the indiscriminate manner in which the materials were collected and dumped into vans and trucks before they were hauled away.

While the Government has failed to provide any information concerning the Belize Searches, the Government has confirmed one important fact:  the Belizean authorities executed the seizure of the contents of defendants' offices and delivered all of the materials to agents of the United States Government on the ground in Belize.  A subset of the seized materials was apparently flagged by U.S. agents thereafter, and the agents took only that subset back to the United States and subsequently produced it to the defendants.[2]  The seized items were turned

---

[1]  In response to questions from counsel, the U.S. Attorney's Office has represented that no U.S. personnel were involved in the Belize Searches, notwithstanding the news reports and video.  Mr. Bandfield is unaware of what steps, if any, the U.S. Attorney's Office undertook to familiarize itself with the circumstances of the Belize Searches.

[2]  It is unclear exactly what efforts the U.S. agents made onsite in selecting the subset of seized materials to ensure that any *Brady* or *Giglio* information was preserved and provided to defendants.  To date, Mr. Bandfield has not been provided with any *Brady* or *Giglio* material, even though Mr. Bandfield believes

9

over to U.S. agents to sort through as if the entire IPC office (and other defendants' offices) had simply been relocated for the U.S. agents' convenience.

## ARGUMENT

### I. The Court Should Suppress the Fruits of the Belize Searches and All Discovery Produced After the May 18, 2015 Court-Ordered Deadline

The Court should suppress the fruits of the Belize Searches for four reasons, each of which individually provides a sufficient basis for suppression and together render suppression a necessity. *First*, the Court should suppress the fruits of the Belize Searches based on the Government's failure to provide any information concerning the Searches—including the warrant itself—or the precedent MLAT request as part of its Rule 16 obligations. *Second*, the Court should suppress the fruits of the Belize Searches because the Searches appear to have violated Mr. Bandfield's Fourth Amendment rights. *Third*, the Court should suppress the fruits of the Belize Searches because, upon information and belief, the Government has yet to review but has retained the majority of materials seized in the Belize Searches, therefore rendering these as general searches in violation of the Fourth Amendment. *Finally*, the Court should suppress the fruits of the Belize Searches because of the untenable manner in which the Government produced the materials, which raises at a minimum serious concerns regarding chain-of-custody, evidence validity, and *Brady* obligations. For many of the same reasons applicable to the fruits of the Belize Searches, the Court should also suppress the discovery the Government belatedly produced after the May 18, 2015 discovery deadline.

---

that his and IPC's files contained exculpatory documents that, for example, advised clients about their continuing tax obligations, or documents that memorialized Mr. Bandfield's past cooperation with Canadian law enforcement investigations, including his testimony as a witness for Revenue Canada (the functional equivalent of the IRS) and in various Canadian courts in tax fraud cases.

**A.** **The Court Should Suppress the Fruits of the Belize Searches and the Late Discovery Based on the Government's Failure to Meet its Rule 16 Obligations**

Federal Rule of Criminal Procedure 16 requires the Government, upon request, to disclose documents and tangible objects that are material to preparing a defense, intended for use as part of its case in chief, or obtained from or belonging to the defendant.  Fed. R. Crim. P. 16(a)(1)(E).  When the Government fails to meet its Rule 16 obligations, a district court has broad discretion to determine the appropriate remedial action.  *See United States v Morrison*, 515 F. Supp. 2d 340, 352-353 (E.D.N.Y. 2007).  The court "may order [the Government] to permit the discovery or inspection, grant a continuance, or prohibit the [Government] from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances."  Fed. R. Crim. P. 16(d)(2); *United States v. Miller*, 116 F.3d 641, 681 (2d Cir. 1997).

In instances when the court determines that the Government has not met its Rule 16 obligations, the court must then determine "whether such failure calls for the imposition of sanctions against the Government."  *United States v. Miranda*, 526 F.2d 1319, 1324 (2d Cir. 1975),  "Whether or not sanctions for nondisclosure should be imposed depends in large measure upon the extent of the Government's culpability for failure to make disclosable material available to the defense, on the one hand, weighed against the amount of prejudice to the defense which resulted, on the other."  *Id*. at 1324-1325.  This Court ordered the Government to produce all materials subject to Rule 16 disclosure by May 18, 2015.  To date, the Government has failed produced numerous requested items relating to the Belize Searches and MLAT request, and has produced other items far past the discovery deadline.  Both these categories of items should be suppressed due to the Government's Rule 16 failure.

### 1. The Fruits of the Belize Searches Should Be Suppressed Because of the Government's Rule 16 Failure

Mr. Bandfield has requested on numerous occasions—both before and after the May 18 deadline—that the Government produce its MLAT request and supporting materials it submitted to the Belizean authorities and any documents relating to the MLAT request (the "MLAT Materials").[3]  Mr. Bandfield has also requested the search warrant and supporting materials the Belizean authorities used in justifying and executing the Belize Searches, and any documents and information that detail how and by whom the search was conducted, including information sufficient to demonstrate the degree of U.S. involvement (the "Search Materials").  Though the MLAT and Search Materials should have been produced as part of Rule 16 discovery by the Court-ordered deadline, the Government has produced nothing relating to the MLAT request or the Belize Searches except the fruits themselves.  The Government's stated reasons for its failure are two-fold:  (1) the Government refuses—after several requests—to provide the MLAT Materials because it asserts that it is not required to do so; and, (2) the Government claims that Belize—which executed the Searches on U.S. request and willingly turned over the seized materials—purportedly refuses to turn over the search warrant or other documents detailing how and by whom the search was conducted, and thus the U.S. Government is not in possession of the Search Materials.

Courts have previously suppressed evidence when the Government has failed or been unable to provide a defendant with discovery materials necessary to the defendant's evaluation

---

[3]   The Government argues that it is not required to produce the MLAT Materials as part of its Rule 16 obligations or otherwise.  However, courts have ordered the Government to produce MLAT requests and related materials.  *See United States v. Catroneves*, 2009 WL 528251, at *2 (S.D. Fla. 2009) (ordering Government to produce MLAT-related documents in response to defendants' motion to compel); *United States v. Juan Vincent Gomez Castrillon*, 2007 WL 2398810, at *5 (S.D.N.Y. 2007) (admonishing Government that discovery obligations required it to produce MLAT requests and related materials well in advance of trial).

of his case or preparation of his defense.  *See*, *e.g.*, *Morrison*, 515 F. Supp.2d 340 (E.D.N.Y. 2007) (suppressing defendant's statements when government failed to produce them after Rule 16 demand); *United States v. Fishel*, 324 F. Supp. 429, 431 (S.D.N.Y. 1971) (suppressing one recording of a conversation between the defendant and an undercover agent where the Government claimed that two additional recordings were unavailable, violating Rule 16 and defendant's Fifth and Sixth Amendment rights).

The Court should suppress the fruits of the Belize Searches here because of the Government's combined Rule 16 failure and constitutional violations (discussed in detail below). But even the Rule 16 failure alone warrants suppression because the Government's failure renders Mr. Bandfield unable to evaluate whether his constitutional rights were violated. Because of such serious prejudice, the Government's unjustifiable refusal to produce the MLAT Materials and its explanation that it simply does not have the Search Materials is insufficient on the facts of this case.

It appears that the Belize Searches were directed by the U.S. through its MLAT request and that U.S. involvement in the Searches was substantial.  It appears that the Government traveled to Belize, reviewed what Belizean authorities had relocated from defendants' offices (essentially all the contents of defendants' offices) to an unidentified location for an unidentified period, and thereafter returned with *billions* of pages of seized evidence in electronic and hard copy form.[4]  Yet the Government has not supplied the Search Materials—including the warrant—that made the Searches possible and refuses to supply the MLAT Materials, any of which would give Mr. Bandfield some criteria to evaluate the legality of the Searches.

---

[4]   The willingness of the Belizean authorities to turn over the fruits of the Searches to the U.S., but not simultaneously or subsequently provide copies of the Search Materials is striking.  Did U.S. agents ask for such documents while in Belize?  Is the unwillingness of the Belizean authorities to turn over these documents related to the deficiencies in the Searches themselves as highlighted in the ongoing litigation in Belize?

The Government's assertion that it has no documents about how the search in Belize was conducted also reveals the extraordinary narrowness of their interpretation of "documents" and of their obligations under the discovery rules.  If U.S. agents travelled to Belize and communicated with their counterparts there, and then were involved in the Searches and in the review of seized documents, then there must be documents in the United States that detail the extent of that involvement and whether the Searches were conducted in a manner in keeping with Mr. Bandfield's constitutional rights.  Because relevant law instructs that the degree of U.S. involvement in the Search is a critical factor in determining whether a U.S citizen abroad has constitutional protections (discussed in detail below), the documents detailing the extent of U.S. involvement in the initiation and execution of the Searches are plainly required by Rule 16 in order for Mr. Bandfield to evaluate the case against him and prepare his defense.

Without any documents evidencing the support for and execution of the Belize Searches, Mr. Bandfield is entirely in the dark with regard to the basis for and propriety of these Searches. If the Government is permitted to use the fruits of the Belize Searches at trial under such circumstances, the Court would essentially be condoning the use of the fruits as evidence while withholding *all* of the details and supporting information concerning the authorization, execution, and review of those Searches and their resultant evidence—a highly inequitable result that does not honor the high tradition of honesty and fair play to which the USAO should adhere.

Finally, the Government's Rule 16 failure is prejudicial to Mr. Bandfield because the MLAT and Search Materials are essential to the most fundamental aspect of his defense: without them, he cannot ensure the protection of his constitutional rights.  The manner in which the Belize Searches were requested, authorized, conducted, and subsequently reviewed has serious implications for Mr. Bandfield's Fourth and Fifth Amendment rights as a U.S. citizen living

abroad.[5]  Without the MLAT and Search Materials, Mr. Bandfield cannot truly assess the degree of U.S. involvement in the Belize Searches; he cannot assess whether probable cause supported the Belize Searches; he cannot assess the manner in which the Searches were conducted; and he cannot assess the subsequent handling of materials seized in the Searches.  Significantly, there is no alternative to or replacement for the MLAT and Search Materials.  Their absence from this case leaves Mr. Bandfield entirely without the ability to evaluate—much less enforce—his fundamental constitutional rights.  Accordingly, the Court should suppress the fruits of the Belize Searches.

Importantly, the feasibility of "neutraliz[ing]" the Government's failure with a continuance and opportunity to remedy is slim at best.  *Morrison*, 449 U.S. 361, 365 (1981).  While the Court may order the Government to produce the MLAT Materials that are within its possession, those materials provide only a small part of the picture.  Mr. Bandfield is entitled to evaluate the basis for and propriety of the Belize Searches, which requires the Search Materials.  The Government has purportedly been unable to obtain the Search Materials in the nearly *fifteen months* that have passed since the Belize Searches.  And Mr. Bandfield has no reason to believe the Government will be able to obtain the Search Materials in any identifiable period of time in the future, if ever.

Moreover, the Government's refusal to produce any of the documents that it does possess—including the MLAT Materials, which were requested by the defense again as recently as November 2015—does not warrant a second chance.  The Court set a Rule 16 discovery deadline for May 18, 2015, and that deadline has long since passed.  The USAO has chosen to

---

[5]  The protections afforded under the Fourth and Fifth Amendments extend under certain circumstances to U.S. citizens living abroad, including instances in which the United States' involvement in an investigation or search is sufficient to render foreign authorities as agents of the United States Government.  *See United States v. Vilar*, 2007 WL 1075041, *54 (S.D.N.Y. 2007).  The extension of Mr. Bandfield's constitutional rights to the Belize Searches is discussed in detail below.

view its obligation regarding the Belize Searches extremely narrowly, in the manner of a private litigant in a commercial dispute.  This choice should not be rewarded with an opportunity to cure.

Mr. Bandfield is under no illusion that the suppression of the fruits of the Belize Searches would fatally injure the Government's prosecution.  Mr. Bandfield was indicted before the Belize Searches took place, in part based on video evidence involving the Undercover Agent. Indeed, the Government has represented to Mr. Bandfield that it has overwhelming evidence against him even without the fruits of the Belize Searches.  Suppression, though a severe remedy that sends a strong message, would not impact the Government's case according to its own view of the evidence.  Instead, suppression would have the salutary effect of reducing the overwhelming volume of discovery in this case and allow for a more expeditious path forward for a case that has moved at a glacial pace to date.

## 2. *The Court Should Suppress the Late Discovery Because of the Government's Disregard of its Rule 16 Obligations*

The Court should suppress the three productions the Government made *after* the Court-ordered discovery deadline of May 18, 2015 (together, the "Late Discovery") for the same Rule 16 failure articulated above.  These three productions can be summarized as follows:

1) **August 10, 2015**:  This production consist of documents provided to the government by a cooperating witness ("CW-1");

2) **September 10, 2015**:  This production consists of (a) Recordings of telephone calls between the Undercover Agent and Mr. Bandfield and/or accomplices (though most are voicemails or messages); and (b) Emails between the Undercover Agent and Mr. Bandfield and/or accomplices (though most are duplicative to those emails previously disclosed);

3) **November 3, 2015**:  This production consists of (a) images from the iPad of Delia Mulholland; (b) search warrants for Gregg Mulholland's laptop and cell phone; (c) emails from the account 'introbuzz@gmail.com' provided to the Government by a cooperating witness ("CW-2"); (d) documents provided to the Government by a cooperating witness ("CW-1"); (e) documents provided to the Government

by a cooperating witness ("CW-2"); and (f) ***the contents of two laptops and a flash drive seized at the time of Mr. Bandfield's arrest pursuant to a search warrant dated May 15, 2015***.

Most egregiously, the Government produced for the first time on November 3, 2015 the images of Mr. Bandfield's and his wife's laptops and flashdrive that were seized during his arrest on September 9, 2014—*nearly fourteen months after the fact*.  Moreover, the Government did not even obtain a search warrant for the laptops and flashdrive until May 15, 2015—three days before the discovery deadline and eight months after it seized the laptops and drive.  And lastly, after obtaining a search warrant on May 15, 2015, the Government waited six more months to produce the data to Mr. Bandfield even though it was already late.  Compounding the lateness of the searching, imaging, and production of the laptops and flashdrive is the fact that Mr. Bandfield and his wife kept numerous personal items on these devices, which have now been in the Government's possession for well over one year.  *See* Bergey Aff. ¶¶ 9-12, Ingoglia Decl. Ex. F.; Bandfield Statement ¶¶ 7-10, Ingoglia Decl. Ex. E.  In addition, Ms. Bergey spoke with U.S. agents about the return and search of her personal laptop back in October 2014 and suspects that the laptop was searched or at least accessed before a search warrant was issued.  Bergey Aff. ¶¶ 12-15.

Further, the remaining portions of all three of these productions are highly suspect.  Mr. Bandfield has requested and been denied particulars regarding the dates on which the cooperating witnesses first began cooperating, making it difficult to ascertain any possible explanations for the Government's delay.  The Government should have made some effort to produce whatever information from the cooperating witnesses was available by the May 18, 2015 discovery deadline or as soon as practical thereafter.  It did not.  Nor did the Government alert Mr. Bandfield that it would produce—four months late—near duplicates of emails it previously produced and "unsuccessful" recordings in a manner that has forced Mr. Bandfield to

17

parse through additional discovery to ferret out the "minority" of emails or recordings that are neither duplicates nor "unsuccessful," as the Government claims.

The Government has offered no reasonable excuse for failing to comply with the Court's Rule 16 discovery deadline with regard to these items.  Mr. Bandfield is unaware of any efforts the Government made to seek approval from the Court for such a delay.  Truly, there is no excuse.  The Court should suppress the Late Discovery.

### B.  The Court Should Suppress the Fruits of the Belize Searches Because Available Information Concerning the Searches Suggests They Were Unreasonable in Violation of the Fourth Amendment

It is generally accepted that the "exclusionary rule is intended to inculcate a respect for the Constitution in the police of our own nation.  Since it has little if any deterrent effect upon foreign police, it is seldom used to bar their work product."  *United States v. Cotroni*, 527 F.2d 708, 712 (2d Cir. 1975) (citations omitted).  *Seldom*, however, is not *never*.  The Second Circuit recognizes two exceptions to the instruction against the application of the exclusionary rule to extraterritorial searches: "First, where the conduct of foreign officials in acquiring the evidence is 'so extreme that they shock the judicial conscience,' a federal court in the exercise of its supervisory powers can require exclusion of the evidence so seized;" and "[s]econd, where [U.S.] cooperation with foreign law enforcement officials may implicate constitutional restrictions, evidence obtained by foreign officials may be excluded."  *United States v. Vilar*, 2007 WL 1075041, *54 (S.D.N.Y. 2007).

### 1.  *Evidence Suggests the Belize Searches May Have Violated U.S. Notions of Due Process, but the Government has Failed to Provide Information to Make that Assessment*

Mr. Bandfield is unclear whether foreign officials engaged in conduct that "shocks the conscience" during the Belize Searches.  But the reason for his uncertainty underscores the problem: the Government has not produced *any* information concerning the Belize Searches that

would provide Mr. Bandfield with any mode of evaluating them.  As discussed above, the Government has refused to provide information relating to the MLAT Materials and further informed counsel that it cannot produce the Search Materials because it purportedly does not have such information in its possession because the Belizean authorities will not turn it over. This explanation falls flat.

The curious and suddenly-uncooperative behavior of the Belizean authorities is enough to suggest that some aspects of the Belize Searches are highly questionable to say the least. Publicly available documents from the Supreme Court of Belize such as the Belize Decision vacating the Freezing Order (Ingoglia Decl., Ex. C) and the Order Returning Assets (Ingoglia Decl. Ex. D) based on insufficient evidence and constitutional violations suggest that the Belize Searches should be scrutinized for conduct that shocks the conscience.

The Second Circuit explains that circumstances that shock the conscience are limited to conduct that violates U.S. notions of due process or fundamental international norms of decency. *See United States v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992).  This is, admittedly, a high bar for the defense.  Yet the Government's failure to provide any information concerning the Belize Searches has left Mr. Bandfield unable to truly assess the Searches under this standard, which is highly disturbing in light of the Supreme Court of Belize's findings that call into question the presence of due process violations during the Searches.  While a violation of Belizean law by itself is not enough to establish a violation of fundamental international norms of decency, the combination of procedural failures during the Searches and the refusal of Belize to turn over any documents about the Searches—a total reversal of its cooperative posture after turning over the fruits of the Searches—raises troubling constitutional and fairness questions.

As described in the accompanying affidavits of Mr. Bandfield, Glenna Fay Bergey, and Andrew Godfrey, the Belize Searches were conducted as general searches that captured everything in IPC's office except carpet, chairs, filing cabinets and desks.  *See*  Godfrey Aff. ¶¶ 9, 11, 13, Ingoglia Decl. Ex. B.  Moreover, the overbroad Searches captured personal items belonging to Mr. Bandfield, Ms. Bergey, and other IPC employees.  *See* Bandfield Statement ¶¶ 5-7, Ingoglia Decl. Ex. E; Bergey Aff. ¶¶ 5-8, Ingoglia Decl. Ex. F.  Indeed, it appears that the Belizean authorities behaved more like moving men than like agents of the foreign sovereign employed to use discretion in executing an official search.  And now that some of the materials have been returned to the corporate defendants' offices in Belize, Mr. Bandfield's associates have relayed that truckloads of materials were returned—some to the wrong entities' offices— without any indication that an inventory had been prepared.  At least for IPC, two servers and two back-ups remain missing.

These facts raise issues concerning due process violations that may shock the conscience, but Mr. Bandfield cannot assess the circumstances surrounding the Belize Searches to determine whether this is true without the MLAT and Search Materials the Government has failed to produce.  It would be fundamentally unfair for the Government to be able to use the fruits of the Belize Searches as a sword in this case and then withhold the MLAT and Search Materials as a shield from scrutiny and possible judicial review.  This is tantamount to allowing fruits from a warrantless, general search.  Above all, that result would shock the conscience.

### 2.    *Evidence Suggests that the Belize Searches May Have Violated Constitutional Restrictions Because of Substantial U.S. Involvement*

In assessing the second exception to the rule against excluding evidence of a foreign search—namely, whether the foreign search implicated constitutional restrictions—the Second Circuit has found that "constitutional requirements may attach in two situations: (1) where the

20

conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials." *Vilar*, 2007 WL 1075041, *54 (S.D.N.Y. 2007).

In *Vilar*, the court found that United Kingdom officials were acting as agents of the United States Government because the U.K. officials sought a warrant pursuant to the U.S. Government's MLAT request and—in the absence of such request—the U.K. authorities would not have sought a warrant to search and seize records from the defendant's business.  Further, the U.K. officials conducting the search waited for the presence of U.S. officials in the jurisdiction before conducting the search and turned over seized materials directly to U.S. officials.  Because the court concluded that the U.K. officials were acting as agents of the U.S. Government, the court found that the Fourth Amendment's reasonableness requirement extended to the foreign search and that the search must therefore comply with the law of the foreign jurisdiction in order to be reasonable.  *Vilar*, at *54 (citing *United States v. Juda*, 46 F.3d 961, 968 (9th Cir. 1995)).

In *Vilar*, however, even after that finding, the court declined to suppress the fruits of the search because all evidence suggested that the search was conducted pursuant to a lawfully obtained search warrant that received sufficient judicial scrutiny, and the subsequent search was handled by experienced U.K. postal inspectors under the watch of a supervising sergeant detective who made determinations about which materials could rightfully be seized pursuant to the warrant.

As in *Vilar*, the Belizean authorities in this case were acting as agents of the U.S. Government.  The Belize Searches were conducted at the request of the U.S. Government pursuant to its MLAT request.  There is no indication that the Belizean authorities would have

initiated a request for a warrant and searched the defendants' offices absent the U.S. MLAT request. Indeed, we expect that the USAO will concede this point.

Even more like *Vilar*, it appears that Belizean authorities executed the Searches in order to turn all the materials over to U.S. agents present in the jurisdiction. It even appears from news reports and video that U.S.-labeled vehicles were present at the scenes of the Searches, thus indicating a direct level of U.S. involvement. Moreover, the Government has verbally informed Mr. Bandfield's counsel that the Belize Searches were conducted in two parts: (1) the Searches were initiated pursuant to the U.S. MLAT request, and (2) the seized materials—all of them— were thereafter turned directly over to the U.S. agents in Belize.

This is where the similarities to *Vilar* cease and why this Court should reach a different conclusion by suppressing the fruits of the Belize Searches. In the process of executing this two-part search and seizure, Belizean officials entered the defendants' premises and seized virtually everything that was not nailed to the floor—including photocopy machines—without first conducting any search for relevant evidence under the warrant (which the Government has not produced). When the Belizean authorities turned *all* of these materials over to the U.S. agents in Belize, the U.S. agents then selected what they wanted to bring back to the U.S. without, it appears, receiving or preparing an inventory of the source of the items or taking any precautions to preserve *Brady* information. The U.S. Government also imaged all the computers seized from the defendants' offices and, to this day, we have no indication to suggest that the imaged computers have been searched to segregate privileged, personal, exculpatory or irrelevant items. As Andrew Godfrey, the IPC office manager, notes: "At no time did the [Belizean] persons conducting the seizure of IPC's office ever conduct a search or inspection . . . . They simply seized the entire contents of our office . . . . I understand . . . that all the items seized from IPC's

office on September 9, 2014 were turned over to agents for the United States."  Godfrey Aff. ¶¶

9, 17, Ingoglia Decl. Ex. B.  This statement demonstrates that the Belize Searches were

controlled by the U.S.:  unlike *Vilar* where British agents conducted a search for what was

permitted by the warrant and then turned only those items over to the U.S., the Belizean

authorities merely relocated IPC's office so that U.S. agents could then conduct a search for

evidence that interested them.  Because the Government has not provided details about how the

U.S review was conducted, it is not clear whether that review was conducted in accordance with

the search warrant that the Government has not produced.

Given the degree of U.S. presence and control regarding the Searches, the determination

of whether the Belize Searches was reasonable under Fourth Amendment standards turns on

Belizean law.  Without any concrete information from the Government concerning the Belize

Searches, it is impossible to ascertain whether the Belizean authorities were in fact acting as

agents of the U.S. Government or if the Search itself ran afoul of Mr. Bandfield's Fourth

Amendment rights as they would be determined in Belize.[6]  However, the secondary evidence

that Mr. Bandfield has obtained through public sources in Belize strongly indicates that both

these conditions are met.  Under the highly unusual circumstances of this case, the fruits of the

Belize Searches should be suppressed for this reason.

Unlike the circumstances in *Vilar*, the information Mr. Bandfield has obtained from

Belizean sources suggests that the Searches were not reasonable under Belizean law.  *See*

Godfrey Aff. ¶¶ 9, 15-17, Ingoglia Decl. Ex. B (noting claims brought by defendants for

constitutional violations during Searches and the success of prior actions on this basis).  The

Supreme Court of Belize appears to have found at least some of these violations credible because

---

[6]  Preliminary discussions with Belizean legal sources indicate that Belize, a legal system also based in
the English system, has constitutional provisions similar to the U.S. to guard against unreasonable
searches and seizures.

it ordered the return of all seized evidence with costs paid to defendants and found that the

corresponding Freeze Order lacked an evidentiary basis entirely.  *See* Belize Decision (vacating

Freezing Order) and Order Returning Assets, Ingoglia Decl. Exs. C, D.

Further, in vacating the Freeze Order against defendants, the Supreme Court of Belize

implied that the information provided in the MLAT request—which appears to have been the

basis for the Freezing Order—was insufficient.  The court noted that:

> No documentation was exhibited to enlighten the court as to the scheme referred to.
> Indeed, some of the allegations against the respondents appear to mirror allegations of
> fact made in the US District Court Indictment, which carried little weight in this
> application save for information purposes.

Belize Decision ¶ 58, Ingoglia Decl. Ex. C.  Further, "[n]ot a scintilla of evidence was provided

to the Court."  *Id*. ¶ 59 (indicating that the application for the Freezing Order and subsequent

extensions were based solely on the United States Government's case and not on evidence

provided by Belizean authorities).

Finally, the court indicated that the Indictment provided by the U.S. Government in

connection with the MLAT request *did not make out criminal conduct under the laws of Belize*:

> By reference to the US District Court Indictment, ***paragraphs 16 and 17 of the***
> ***fourth affidavit purported to place the elements of conspiracy to commit securities***
> ***fraud and conspiracy to defraud the United States as being elements of the offences***
> ***of fraud and false accounting under the laws of Belize.***  With the greatest of respect
> to the Director, he has not established the expertise to render such an opinion ***which is***
> ***devoid of any reasoning and the source of his belief has not been disclosed***.

*Id*. ¶ 61.[7]

_____

[7]   According to preliminary consultations with Belizean legal sources, conspiracy is not a crime in
Belize.  While the superseding Indictment charges two substantive counts of securities fraud, the original
indictment upon which the MLAT request and Searches was based only charged three counts of
conspiracy:  Conspiracy to Defraud the United States, Conspiracy to Commit Securities Fraud, and
Conspiracy to Commit Money Laundering.  These charges appear to have been insufficient as a matter of
Belizean law.

In addition, hanging over the entire analysis like a noxious cloud is the Government's refusal to provide any information concerning the Belize Searches to contradict or confirm the apparent truth of these circumstances.  And, the Belizean authorities' purported refusal to provide the U.S. Government with any of the Search Materials undercuts what, in normal circumstances, might be "reasonable reliance" by the Government on any representations it may have received regarding the lawfulness of the Belize Searches.  *See Vilar*, at *58 ("Where ... a foreign agent represents to an American official that their activity is lawful, and the American reasonably relies on it, the exclusionary rule does not serve its purpose as a deterrent." (citing *United States v. Scarfo,* 1988 WL 115805, at *4 (E.D.PA. 1988)).  Accordingly, under the highly unusual circumstances of this case, the fruits of the Belize Searches should be suppressed.

### C.  The Court Should Suppress the Fruits of the Belize Searches and the Late Discovery Because of the Government's Unreasonable Delay in Reviewing and Producing these Materials

It is a matter of well-established Fourth Amendment principle that "it is generally unconstitutional to seize any item not described in the warrant."  *United States v. Ganias*, 755 F.3d 125, 134-35 (2d. Cir. 2014) (citing *Horton v. California*, 496 U.S. 128 (1990)).  These Fourth Amendment protections apply equally to modern computer files—"[i]f anything, even greater protection is warranted."  *Id*. at 135 (internal citations omitted).  Accordingly, while off-site review of computer files has been generally acceptable, "it is still subject to the rule of reasonableness."  *Id*. (citing *United States v. Ramirez*, 523 U.S. 65, 71 (1998)).  Courts have recently grappled with the length of time that is reasonable for the Government to retain and review seized electronic evidence before such retention constitutes a general search in violation of the Fourth Amendment.  *See Ganias*, 755 F.3d 125 (2d. Cir. 2014); *United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012).

In *United States v. Metter*, another court in this District held that the Government's retention of and failure to examine a defendant's imaged hard drives for fifteen months after they were seized was an unlawful seizure in violation of the Fourth Amendment.  860 F. Supp. 2d 205, 216 (E.D.N.Y. 2012) (Irrizary, J.).  Specifically, the Government failed to review the imaged hard drives to determine whether the seized evidence fell within the scope of the warrant while simultaneously indicating that it would readily make imaged copies of the seized electronic data available to all defendants.  *Id*. at 214-15.

The *Metter* court found that the multiple search warrants in that case comported with "modern standards of reasonableness" with regard to their provisions for the seizure of hard drives to be searched offsite.  *Id*. at 214.  The court also noted that the Government acted reasonably by promptly imaging the hard drives and returning the originals.  *Id*.  The court took issue, however, with the Government's conduct after that point: it concluded that the Government may not "seize and image electronic data and then retain that data with no plans whatsoever to *begin* review of that data to determine whether any irrelevant, personal information was improperly seized."  *Id*. (emphasis in original).  The Court saw fit to wholly suppress the imaged hard drives based on the unreasonable delay in reviewing the data, noting that the Government's "blatant disregard for its responsibility in this case is unacceptable and unreasonable."  *Id*.

Significantly, the *Metter* court focused on the distinction between the period of time in which the Government *completed* its review and the period of time that lapsed *prior to beginning* a review at all.  The court compared the facts in *Metter*—where the Government had yet to review the hard drives after fifteen months—with the facts in *United States v. Burns*, 2008 WL 4542990 (N.D. IL. 2008), where a period of ten months was found to be lengthy but reasonable

for the *completion* of the review of seized hard drives.  *Id*. at 214.  The court also focused on the

government's willingness to wholesale provide copies of these hard drives to attorneys of other

defendants in the case, which could have broadly disseminated privileged, personal, or irrelevant

data.  The court viewed the Government's failure to first triage these hard drives for irrelevant

information to be damning:

> [T]he government repeatedly asserted its intent to release indiscriminately the imaged
> evidence to *every* defendant, prior to conducting any review to determine if it
> contained evidence outside the scope of the warrants.  The . . . release to the co-
> defendants of any and all seized electronic data without a predetermination of its
> privilege, nature or relevance to the charged criminal conduct only compounds the
> assault on [defendant's] privacy concerns.  It underscores the government's utter
> disregard for and relinquishment of its duty to insure that its warrants are executed
> properly.

*Metter* at 215 (emphasis in original).

The Second Circuit recently took one step further by vacating a defendant's conviction

for tax evasion because of the lower court's errant denial of the defendant's motion to suppress

electronic evidence that had been seized in a prior investigation and retained for two years, only

to be later searched in connection with the tax evasion investigation.  *United States v. Ganias*,

755 F.3d 125, 141 (2d. Cir. 2014).  In *Ganias*, the Government seized three computers from the

defendant in connection with an investigation of defendant's clients.  The Government properly

reviewed and segregated the documents relating to the warrant from other personal, privileged,

or irrelevant documents within a reasonable time frame of about one year.  But the Government

improperly retained the remainder of the defendant's data.  When a subsequent investigation

suggested the defendant may have committed tax violations with regard to his personal taxes, the

Government obtained a second warrant for the personal data it had retained from its prior search.

The Second Circuit concluded that the Government in *Ganias* violated the defendant's

Fourth Amendment rights by seizing personal files and retaining them for a prolonged period of

time and using them in a future criminal investigation.  *Ganias* at 138.[8]  In next determining whether to vacate the defendant's conviction and exclude the fruits of the violative search and seizure, the Second Circuit noted that "suppression is required when (1) there is a widespread seizure of items not covered by the warrant and (2) agents do not act in good faith."  *Id*. at 140 (citing *United States v. Shi Yan Liu,* 239 F.3d 138, 141 (2d Cir.2000)).  Further "[t]here must also be a weighing of (3) the benefits of deterrence against (4) the costs of suppression."  *Id*. (internal citations omitted).  The Second Circuit held that the Government effected a widespread general seizure of files beyond the warrant's scope and the lengthy retention of those files violated the defendant's Fourth Amendment rights.  Turning to the good faith analysis, the court was "not persuaded that the agents  . . . reasonably concluded that the [original warrant] authorized their search of [defendant's] personal records and their retention for more than two years."  *Id*.  Coupled with the agents' view of the data as the Government's property, the court found that there was no good faith basis for retaining the files.  *Id*.  Finally, the court determined that the deterrent effect of suppression in light of the Government's increasing use of forensic imaging outweighed the minimal cost of suppression against a non-violent offender.  *Id*.  Accordingly, the court vacated the conviction and excluded the seized evidence from any subsequent trial.  *Id*. at 141.

The precedent set in this District and Circuit by *Metter* and *Ganias* applies to the fruits of the Belize Searches and the Late Discovery in this case.

---

[8]  The Second Circuit granted the Government's request for rehearing *en banc*, argued on September 29, 2015.  *See United States v. Ganias*, 755 F.3d 125 (2d Cir. 2014) *reh'g en banc granted,* No. 12-240-CR, 2015 WL 3939426 (2d Cir. June 29, 2015).  The Second Circuit's *en banc* decision is pending.

### 1. *The Reasoning in* **Metter** *and* **Ganias** *Requires the Court to Suppress the Fruits of the Belize Searches*

The fruits of the Belize Searches warrant the same treatment as the computer evidence seized in *Metter* and *Ganias*.  As in *Metter*, the Government—acting through the Belizean authorities—seized numerous computers from several different entities' offices in Belize on September 9, 2014.  The Government immediately imaged the hard drives and copied other materials in order to bring them back to the U.S., though the originals were not returned to their owners until a Belizean court order mandated their return (even after that court order, two of IPC's servers and two back-up servers have yet to be returned and no one seems to know where they are).

At the time this Court ordered the Government on April 18, 2014 to provide the hard drive images to Mr. Bandfield, the Government indicated to the Court that it would need to first begin imaging the data to provide it to Mr. Bandfield—seven months after the data was seized. The Government produced imaged copies of the hard drives, along with other items from the Belize Searches, prior to the Court's May 18, 2015 deadline—eight months after the Belize Searches and eight months after Mr. Bandfield was first arrested.  Now—*more than one year* after the Belize Searches and Mr. Bandfield's imprisonment—nothing has occurred to indicate that the Government has completed (or even begun) its review of the seized electronic files, and the Government has declined our request to tell us what, if any, review it has conducted.

The instant case is like *Metter* in that a time period of fifteen months has passed and the Government, upon information and belief, has not completed (and may not have begun) its review of data it seized during the Belize Searches.  The Government has thus failed to determine whether the images contain personal or privileged material, or material that falls outside the scope of the warrant—it has simply retained what amounts to *billions* of pages worth

29

of data for more than one year.  As the court found in *Metter*, "there can be no doubt under these circumstances that this is a 'general search'" in violation of the Fourth Amendment.  *Metter* at 216.  Further, the *Metter* court's concern about the dissemination of indiscriminately seized data to other defendants has already been realized here, though from a different perspective.  Mr. Bandfield was the only defendant in this case in U.S. custody until Mulholland was arrested and detained almost one year after Mr. Bandfield.  While none of the other codefendants have been arrested or are otherwise in a position to challenge the use of the fruits of the Belize Searches as Mr. Bandfield does here, these codefendants may be interested to know that their electronic data was "release[d] indiscriminately" to Mr. Bandfield, apparently "without a predetermination of its privilege, nature or relevance to the charged criminal conduct."  *Id.*

This case also invokes the reasoning from *Ganias* with regard to the number of personal items that Mr. Bandfield and his wife maintained on certain computers that were seized during the Belize Searches, including but not limited to their wills, personal tax returns and supporting documentation, family and personal photographs, and medical records.  *See* Bergey Aff. ¶¶ 5-8, Ingoglia Decl. Ex. F; Bandfield Statement ¶¶ 5-7, Ingoglia Decl. Ex. E.  Like *Ganias*, the seizure of all of these items was "widespread [and presumably] not covered by the warrant and [the] agents d[id] not act in good faith."  *Ganias* at 140.   Based on the Government's conduct in *Ganias* when it retained items not covered by the warrant and searched them two years later in connection with a new investigation, Mr. Bandfield is not unreasonably concerned about the possibility of an unlawful review that may occur of the extensive data seized in Belize.

Also like *Ganias*, the Government cannot establish any good faith basis[9] for indiscriminately retaining the fruits of a wide-spread general search.  The Court should take this opportunity to further deter the Government from such conduct where, as in *Ganias*, the cost of suppression in this matter is nil given that Mr. Bandfield is not a violent offender (though he remains incarcerated in any event) and these items are generally preserved elsewhere.  *See Ganias* at 141 (noting that suppression must be weighed against the cost of possibly releasing a dangerous defendant or losing irreplaceable evidence like guns or drugs).  Further, suppressing the fruits of the Belize Searches does not prejudice the Government, which, by its own estimate, has sufficient evidence to convict without the mountain of evidence it moved from Belize.

It bears noting that the problems identified in *Metter* and *Ganias* are compounded in this case by the Government's failure to produce any information concerning the search and seizure of this data in Belize.  Aggregating the instances in which the Government has neglected its obligations in this case—from the moment it issued its MLAT request until today as it continues to retain generally seized records—further supports suppression of the fruits of the Belize Searches.  As the court in *Metter* observed:

> The Court cannot, in the interest of justice and fairness, permit the government to ignore its obligations. Otherwise, the Fourth Amendment would lose all force and meaning in the digital era and citizens will have no recourse as to the unlawful seizure of information that falls outside the scope of a search warrant and its subsequent dissemination. . . . [T]he government's significant delay in conducting off-site searches of the imaged evidence merits blanket suppression of all seized and imaged evidence as routine delays of this duration would eviscerate the Fourth Amendment's privacy protections.

*Metter* at 216.  For the same reasons, the Court should suppress the fruits of the Belize Searches.

---

[9]   The Government cannot establish a good faith basis for retaining the seized electronic data without review because the Government is on specific notice of the issue given that the *Metter* ruling comes from a sister court in this District and involves the same investigatory agency.

### 2.   Metter *and* Ganias *Also Require Suppression of the Late Discovery*

For the reasons stated above, the Court should also suppress the Late Discovery described and considered above in Section I.A.2 (pg. 17).  As previously noted, there is no excuse and no reason that the Government could not and should not have produced at least Mr. Bandfield's laptops, flashdrive, and the allegedly duplicative emails or "unsuccessful" recordings by the May 18, 2015 discovery deadline.  These items have been in the Government's possession since September 9, 2014 (in the case of the laptops and flashdrive) and *well before that date* in the case of the emails and recordings.  This delay in reviewing and producing these items falls squarely within the circumstances in *Metter* and *Ganias* that illustrate what happens when the Government orchestrates a general search and seizure and then sits on the fruits.  Moreover, the Government's delay with regard to these items is illustrative of its carefree attitude toward its discovery obligations throughout its execution of this prosecution.  The Court should therefore suppress the Late Discovery.

### D.   The Court Should Suppress the Fruits of the Belize Searches Because of the Untenable Manner in which They Were Produced

As discussed in detail above, the search and seizure of computers have historically raised unique Fourth Amendment issues. *See, e .g., United States v. Vilar*, 2007 WL 1075041, *35 (S.D.N.Y. 2007); *United States v. Carey,* 172 F.3d 1268 (10th Cir.1999); *United States v. Tamura,* 694 F.2d 591 (9th Cir.1982).  For example, a single computer is capable of storing immense amounts of information: "Computer hard drives sold in 2005 generally have storage capacities of about eighty gigabytes, roughly the equivalent to forty million pages of text—about the amount of information contained in the books on one floor of a typical academic library." Orin S. Kerr, *Searches and Seizures in a Digital World,* 119 HARV. L. REV. 531 (2005).

Computers also often contain significant "intermingling" of relevant documents with documents that the government has no probable cause to seize. *Ganias*, 755 F.3d 125, 134 (2d Cir. 2014).

Here, the United States Government—acting through and in concert with Belizean officials—seized and imaged computers that housed nearly 56 terabytes of data. As Kerr notes above, 80 gigabytes is the rough equivalent of about forty million pages—roughly 500,000 pages per gigabyte. Kerr, at 542. By this calculation, 56 *terabytes* (1 terabyte equals about 1,000 gigabytes) amounts to approximately *28,000,000,000 pages*. If 1,000 pages stacked is approximately four inches thick—like two standard reams of paper—then the 56 terabytes of imaged data stacked in this manner would reach well over 9 million feet into the air, or approximately 1,704 miles. This stack of paper would reach well into outer space.[10]

Notwithstanding the unfathomable volume of data imaged from the computers seized in the Belize Searches, the Government has produced it on fourteen 4-terabyte hard drives that are not searchable—for instance, one cannot enter search terms across the entire universe of data.[11] Further, the Government did not provide any inventory for the hard drives. If the Government cannot identify from precisely which office or which files the materials were seized (and it appears it cannot), the Government should not be able to use any of these materials at trial.

The fact that the Government does not appear to have an inventory of the Belize Searches in and of itself violates the Treaty that formed the basis for the Searches in the first place. Article 14 of the MLAT requires that "every official who has custody of a seized item shall certify, through the use of Form C appended to this Treaty, the continuity of custody, the identity of the item, and the integrity of its condition." MLAT Article 14, Ingoglia Decl. Ex. A. Unless

---

[10] Indeed, the Karman line delineates the threshold of space to be approximately 62 miles above sea level.

[11] As of this week, the Government has agreed, after Mr. Bandfield's request, to produce the documents to defense counsel in a more readily-searchable format.

the Government is withholding this inventory or Form C along with the other MLAT Materials it has refused to provide, Mr. Bandfield must conclude that no such inventory was prepared. This not only makes the manner in which the fruits of the Belize Searches were produced untenable, it also raises serious questions about chain of custody and authenticity that further warrant suppression.

## II.     The Defendant is Entitled to a Bill of Particulars

### A.  <u>Applicable Legal Standard</u>

Federal Rule of Criminal Procedure 7(f) permits the Court to direct the Government to file a bill of particulars when it appears that the indictment does not inform the defendant with sufficient particularity of the conduct underlying the charges he will have to defend at trial. *See United States v. Peelle*, 122 F. Supp. 923, 924 (E.D.N.Y. 1954) (ordering the Government in a tax evasion case to supply defendants with, among other items, the specific dividends, interest, and amounts of income that the individual and corporate defendants failed to report, in addition to supplying them with the specific allegedly fraudulent tax returns on consent); *see also United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *United States v. Oskowitz*, 294 F. Supp. 2d 379 (E.D.N.Y 2003). Indeed, where a charge is "couched in such language that the defendant is liable to be surprised and unprepared," then the defendant "may demand [a bill of particulars] as a matter of right" even if the indictment sets forth facts sufficiently establishing the elements of the crime. *Peelle* at 924.

Bills of particulars are especially warranted in prosecutions for financial crimes like tax evasion or securities fraud because of their complexity, variant theories, and quantity of evidence. *See*, *e.g.*, *United States v. DeGroote,* 122 F.R.D. 131, 141 (E.D.N.Y. 1988) ("A more liberal approach to [motions for a bill of particulars] has been permitted in criminal tax cases

because of their complexity and the use of indirect methods of proof."); *United States v. Lino*, 2001 WL 8356, at *7 (S.D.N.Y. 2001) (courts "consistently order the filing of particulars directed to the details of misrepresentations or fraudulent acts" in securities-related cases). Because of the complexity of such matters, "it is no answer to say that [the defendant] should have kept better records, or that his memory should have been better. . . . [W]here he generally lacks knowledge, he should not be denied information relevant to his defense by a restrictive interpretation" of Rule 7(f).  *United States v. O'Connor*, 237 F.2d 466, 476 (2d. Cir. 1956) (intimating that the denial of a bill of particulars in a tax evasion case was errant, but ordering a new trial on other grounds).

Here, Mr. Bandfield is faced with a vague indictment that does not clearly set forth the Government's theory as to Mr. Bandfield's role in the charged conspiracies, or what alleged conduct makes him liable for securities fraud in connection with the purchase or sale of securities that he had no involvement in purchasing or selling.  Accordingly, a bill of particulars as specified below is necessary so that Mr. Bandfield can prepare his defense, avoid surprise at trial, and efficiently use what are, under circumstance of incarceration, exceptionally limited resources.  Counsel for Mr. Bandfield has requested particulars from the Government with respect to each category below and the Government has declined to provide information for any of the requests, with few exceptions noted below.

### B.   The Court Should Order the Government to Provide the Requested Particulars

#### 1.   *All Co-Conspirators and the Time Periods of their Individual Involvement in Each of the Three Charged Conspiracies*

Defendants are generally entitled to know the names and other relevant information concerning coconspirators in order to properly defend criminal charges.  *See, e.g., United States v. Moazzam*, 1993 WL 36175 (S.D.N.Y. 1993) (Government conceding the defendant is entitled

35

to the names of coconspirators); *United States v. Taylor*, 707 F. Supp. 696, 700 (S.D.N.Y. 1989) (granting bill of particulars as to names of known coconspirators, dates each joined conspiracy, and dates and locations of conspiratorial meetings).

The Indictment charges three distinct conspiracies. Each conspiracy carries a different object and covers a distinct time period. Mr. Bandfield is entitled to know the identities of those individuals with whom he allegedly formed agreements in order to provide the basis for each charged conspiracy and the time period of their alleged involvement. In addition, to the extent that any of the co-conspirators are non-U.S. residents, the Government should be required to identify what it is that subjects those individuals to the jurisdiction of the United States securities, tax, and money-laundering laws.

### 2. *Identities of the Cooperating Witnesses and the Dates They Began Cooperating*

The discovery letters from the Government dated August 10, 2015 and November 3, 2015 reference two cooperating witnesses who provided information and documents to the Government (referred to, respectively, as CW1 and CW2). These cooperating witnesses are not referenced in the Indictment and only surfaced as recently as the time the Government superseded the Indictment and brought defendant Mulholland into the case. Because the cooperating witnesses appear to provide some nexus between Mr. Bandfield and Mulholland— whom Mr. Bandfield only met for the first time post-arrest—Mr. Bandfield is entitled to know the cooperating witnesses' identities and the dates from which they began cooperating.

### 3. *Identity of John Doe 1*

The Indictment alleges that an individual identified as "John Doe 1" introduced the Undercover Agent to a purportedly fraudulent stock scheme orchestrated by Titan and Legacy. *See* Indictment ¶ 19. However, the Indictment includes *no information* to suggest that John Doe

1 provided the Undercover Agent with any connection to Mr. Bandfield specifically. Because John Doe 1 appears to be the genesis of the investigation that led to Mr. Bandfield's Indictment, Mr. Bandfield is entitled to know John Doe's identity and his connection to Mr. Bandfield.

### 4. *Identities and Other Information Relating to the Corrupt Clients*

The Indictment alleges that Mr. Bandfield and his codefendants created bank accounts through which passed approximately $500 million connected to the defendants' clients, which purportedly include more than 100 U.S. citizens and residents. Indictment ¶ 22. The Indictment goes on to define that group as the "Corrupt Clients" with whom Mr. Bandfield and his codefendants were engaged in tax and securities fraud schemes. *Id*. ¶ 35. Mr. Bandfield is entitled to know whether these 100-plus Corrupt Clients are the same U.S. clients previously identified in paragraph 22 of the Indictment, and whether this means that the Government is alleging that *all* of Mr. Bandfield's U.S. clients were in fact corrupt. Mr. Bandfield is further entitled to know the identities of these U.S. clients and why the Government believes them to be corrupt.

The Indictment further names eight specific Corrupt Clients (without identifying them) that are known to the grand jury in this matter. *See* Indictment ¶¶ 36-38, 40, 50(a). The Government recently provided Mr. Bandfield with the names of these eight Corrupt Clients, though it did not indicate whether it considers them to be coconspirators. Several of these names belong to individuals Mr. Bandfield knows to be citizens of nations other than the U.S., which is significant both because the Indictment defines Corrupt Clients to mean U.S. citizens and residents (*see* Indictment ¶ 35) and because non-U.S. citizens and residents may not be subject to U.S. tax or securities laws. Accordingly, Mr. Bandfield requests that the Government supplement this list with the nationalities and residencies of each of the eight Corrupt Clients. Further, because these eight Corrupt Clients provided information to the grand jury either

directly or indirectly, Mr. Bandfield is entitled to summaries of the information they provided to

the grand jury.  Finally, to the extent the Indictment alleges contact between Mr. Bandfield and

only *three* of the eight Corrupt Clients, the Government should disclose what, if any, connection

or relationship the eight Corrupt U.S. Clients are alleged to have to Mr. Bandfield.

### 5.  *Particulars Concerning the 5,000 Allegedly "Sham" or "Fraudulent" Companies*

The Indictment alleges that Mr. Bandfield, through IPC, created more than 5,000 "sham"

or "fraudulent" companies.  *See* Indictment ¶¶ 17, 26, 28, 29, 30, 31, 33, 34, 35, 37, 38, 40.  This

cannot possibly be known to the Government.  Mr. Bandfield operated IPC as a lawful business

for more than 24 years, over which time he created more than 5,000 corporate entities for

numerous international clients, including nationals of America, England, Germany, China,

Indonesia, Canada, Mexico, Australia, and New Zealand.  Indeed, very few of these clients

would have been subject to the tax or securities reporting that the Government alleges to form

the basis for IPC's companies being "shams" or "fraudulent."   Therefore, the Government

should be required to particularize why each of the 5,000-plus companies is indeed a sham or a

fraud, or remove such reference from the Indictment as requested in the Motion to Strike

Surplusage below.

### 6.  *Any Available information Concerning the "Unidentified Individual" Referenced in Paragraph 50(j)*

The Indictment alleges an "unidentified individual" sold shares of CANA in what is more

broadly alleged as a pump-and-dump scheme.  *See* Indictment ¶ 50(j).  To the extent the

Government intends to introduce evidence of trading in CANA and of this individual's trading in

particular, Mr. Bandfield is entitled to know the individual's identity so that he can fully explore

this individual's relationship with IPC or with himself, if any.  Mr. Bandfield is also entitled to

know if the Government cannot identify the individual, in which case the Government should be prohibited from offering evidence of this individual's trading in CANA at trial.

### 7. *Details Concerning CANA, VLNX, and CYNK Stocks*

The Indictment alleges that the IPC-TIS-LGM Wiretaps reveal the defendants' involvement in a conspiracy to manipulate the stocks of Cannabis-Rx, Inc. ("CANA"), Vision Plasma Systems, Inc. (VLNX"), and Cynk Technology Corp. ("CYNK"). *See* Indictment ¶¶ 39, 41, 44. But the Indictment does not allege the nature of the scheme to manipulate these stocks, nor does it specifically allege Mr. Bandfield's role or knowledge of the schemes. Mr. Bandfield is entitled to understand whether and how the Government intends to implicate him in the CANA, VLNX, and CYNK schemes in order to defend against such an implication. Mr. Bandfield is particularly entitled to specific information about these three stock schemes because VLNX and CYNK also form the basis for the substantive securities fraud charges in Counts IV and V. The Government should thus be ordered to provide a bill of particulars stating the nature of the manipulative schemes for these three stocks, what (if any) statements or omissions were in fact manipulative, and whether and how Mr. Bandfield is connected to the these three schemes.

### 8. *Specific Information Concerning the Scheme and Securities at Issue in Count One*

It is common in prosecutions for securities fraud for courts to order the Government to file a bill of particulars detailing the misrepresentations, omissions, or otherwise fraudulent acts. *See Lino*, 2001 WL 8356, at *7 (S.D.N.Y. 2001). The Indictment charges Mr. Bandfield with conspiracy to commit securities fraud, but it fails to provide any meaningful information concerning the relevant misrepresentations or omissions as they relate to Mr. Bandfield. The overt acts pertaining to Mr. Bandfield in Count I are merely factual assertions, none of which provide any indication that Mr. Bandfield knowingly participated in a conspiracy to commit

securities fraud.  Indeed, the Indictment lacks any allegation that Mr. Bandfield was aware of or understood the objective of the alleged securities fraud conspiracy.  Mr. Bandfield is thus entitled to a description of how the Government intends to prove that he allegedly participated in a securities fraud conspiracy.

Further, the Indictment previously alleges that Mulholland and his Group manipulated the stocks of over 40 U.S. publicly traded companies.  Indictment ¶ 23.  The Government recently agreed to provide Mr. Bandfield with a list of ticker symbols that were manipulated as part of the charged conspiracy, with the caveat that the list will not be exhaustive and can be supplemented. This is insufficient.  Mr. Bandfield is entitled to know whether he will need to prepare to defend himself against allegations that he was personally involved in Mulholland's activities relating to 40 or more stocks, and he should not have to learn about and prepare to defend against new stocks on a moment's notice.  Accordingly, the Government should provide in its bill of particulars a list of all the stocks Mulholland allegedly manipulated and whether or not it intends to implicate Mr. Bandfield in any of those alleged schemes.

### 9.  *All Companies that IPC Created for Mulholland or Mulholland Group*

Paragraphs 22-23 of the Indictment allege that Mr. Bandfield's company, IPC, created corporations for Mulholland and that the Mulholland Group manipulated the stocks of over 40 companies.  But the Indictment does not allege whether the stocks of these 40-plus companies were held in corporations created by IPC.  In order for Mr. Bandfield to adequately prepare his defense, the Government should provide in its bill of particulars a list of all companies for which Mulholland or the Mulholland Group were beneficial owners and identify which of those corporations were created by IPC.

**10.** *The Allegedly Fraudulent W8-BEN Forms Referenced in Count Two*

Count Two purports to allege the manner in which Mr. Bandfield and others conspired to defraud the United States through detrimentally impacting the Governmental functions of the IRS in the ascertainment, computation, assessment, and collection of taxes, specifically by causing the preparation of allegedly fraudulent Forms W-8BEN.  Indictment ¶ 36.  The Indictment then alleges, without more, that Mr. Bandfield informed the Undercover Agent that the Undercover Agent would not be subject to the IRS's reporting requirements because IPC Corp's designated nominee would sign the Form W-8BEN for the Agent's IBCs and LLCs.  The Indictment further alleges that Mr. Bandfield emailed a Form W-8BEN to Corrupt Client 1.  The Court should order the Government to identify all the W8-BEN Forms that it identifies as false and indicate whether there is any other conduct beyond the Forms W8-BEN that the Government will contend renders Mr. Bandfield liable for the charge in Count Two.

While the Government has indicated in response to Mr. Bandfield's request for particulars that it will identify some but not all of the Bates ranges associated with W8-BEN forms that it argues render Mr. Bandfield guilty, this offer (not yet actualized) is insufficient.  By now, fifteen months after Mr. Bandfield's arrest, the Government has had enough time to figure out its own case.  Mr. Bandfield is entitled to know the universe of W8-BEN Forms he will have to defend against.

**11.** *Identify the Source of and the Manner in which Mr. Bandfield Participated In or Supported the Laundering of Funds*

Count III, which charges Mr. Bandfield with conspiracy to commit money laundering, is particularly vague as to Mr. Bandfield.  18 U.S.C. § 1956(h) does not require the Government to prove an overt act in order to convict for conspiracy to commit money laundering, and the Indictment contains no such over acts.  *See United States v. Whitfield*, 543 U.S. 209 (2005).  As a

result, Mr. Bandfield is not on notice as to what he is alleged to have done to be guilty of agreeing to launder money.  The Government should therefore be required to provide a bill of particulars describing Mr. Bandfield's role and involvement in the alleged money laundering conspiracy.  The Government has declined the defense's request to elaborate on these charges and offered no details beyond the language of the Indictment.

The Government's bill of particulars should describe, at a minimum, evidence of Mr. Bandfield's agreement; evidence that he was aware of the object of the alleged conspiracy; and an explanation as to why the money laundering conspiracy—which is by its terms purportedly based on the securities fraud scheme—dates back to 2009 when the securities fraud conspiracy that provides the source of the allegedly unlawful funds first began in 2011.  *See* Indictment ¶¶ 33, 38.  Further, the Government should be required to provide detailed information concerning the $500,000,000 allegedly laundered as the proceeds of criminal activity, including the names, citizenship and residencies of all clients whose funds are included in the $500,000,000 calculus and why these proceeds constitute funds derived from illegal activity.

### 12. *Identify Details Developed in Support of the Undercover Agent's Identity and Background*

The Government should identify the website, due diligence documents, and all other information created to support the identity of the Undercover Agent and his "firm."  This information is essential to assessing Mr. Bandfield's knowledge of the alleged intent of the Undercover Agent's purported scheme to defraud.  Further, Mr. Bandfield relied on this fabricated information in accepting the Undercover Agent as a client and conducting due diligence on him and his firm.  Accordingly, the Government should identify this information.  Moreover, to the extent there are documents on this subject in existence (as one would expect),

those should have been produced to Mr. Bandfield long ago.  To the extent these documents were not produced, the Government should provide an explanation for its Rule 16 failure.

### III.    The Court Should Sever the Trials of Mr. Bandfield and Defendant Gregg Mulholland

Rule 8(b) of the Federal Rules of Criminal Procedure permits joinder of defendants in a single indictment if they are alleged to have participated "in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. Proc. 8(b).  It is not sufficient that transactions common to a group of defendants are simply similar or related in some way.  *See United States v. Sattar*, 314 F. Supp. 2d, 279, 316 (S.D.N.Y. 2004) ("separate transactions do not constitute a 'series' within the meaning of Rule 8(b) 'merely because they are of a similar character or involve one or more common participants.'") (citations omitted).  Instead, they must "arise out of a common plan or scheme" or be "unified by some substantial identity of facts or participants."  *United States v. Cervone*, 907 F.2d 332, 340-341 (2d. Cir. 1990).

Even when defendants are properly joined, this Court has "discretion to grant a defendant's request for severance under Rule 14 if it appears that the joinder with other defendants will result in undue prejudice."  *United States v. DeVillio*, 983 F.2d 1185, 1192 (2d Cir. 1993).  To that end, though joint trials may help "promote economy and efficiency," courts must take great care that "these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial."  *Bruton v. United States*, 391 U.S. 123, 131 n. 6 (1968) (citations omitted).

A district court should sever defendants where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro v. United States*, 506 U.S. 534, 539

(1993).  A central concern for the courts is "spillover evidence," where a defendant's rights are compromised when "evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a co-defendant."  *Id*.  That is, a jury may erroneously consider evidence of a codefendant's wrongdoing in concluding that a defendant is likewise guilty.  *Id*.  Particularly in a joint conspiracy trial, "[t]here generally will be evidence of wrongdoing by somebody.  It is difficult for the individual to make his own case stand on its own merits in the minds of the jurors who are ready to believe that birds of a feather are flocked together."  *Krulewitch v. United States*, 336 U.S. 440, 454 (1949) (Jackson, J., concurring).

Mr. Bandfield seeks severance from his codefendant Gregg Mulholland for three reasons: (1) the Indictment fails to allege common securities fraud and money laundering conspiracies as between Mr. Bandfield and Mulholland; (2) the severe risk of spillover prejudice to Mr. Bandfield is substantial and unfair; and (3) any delay in waiting for Mulholland to be ready for trial will prejudice Mr. Bandfield's constitutional right to a speedy trial.

A.   **The Indictment Fails to Allege Common Conspiracies**

Severance is required because the Government has improperly joined Mr. Bandfield and Mulholland in this matter.  While the Indictment charges Mr. Bandfield and Mulholland in the same counts for conspiracy to commit securities fraud (Count I) and conspiracy to commit money laundering (Count III), the Indictment does not allege facts to establish that they agreed to become part of the same conspiracies.

"The essence of conspiracy is the agreement and not the commission of the substantive offense."  *United States v. McDermott*, 245 F.3d 133, 134 (2d Cir. 2001) (quoting *United States v. Gore*, 154 F.3d 34, 40 (2d. Cir. 1998).  Commonality of purpose, without agreement, is not

sufficient to maintain a conspiracy charge. *See id.* Here, the Indictment merely alleges that Mr. Bandfield's company, IPC, created corporations for Mulholland (Indictment ¶ 22), and that Mulholland and his group of a dozen individuals known as the "Mulholland Group" manipulated the stock of over forty U.S. publicly traded companies (Indictment ¶ 23). The Indictment does not allege that Mr. Bandfield and Mulholland agreed that these companies would aid in Mulholland's alleged securities fraud scheme, nor does it allege that Mr. Bandfield knew anything about Mulholland's intentions. Count I itself fails to allege any overt acts that involve both Mr. Bandfield and Mulholland. *See* Indictment ¶¶ 48-50(a-n). Thus they cannot be said to have agreed to any sort of common purpose.

Count III also fails to allege that Mr. Bandfield and Mulholland specifically agreed to the common purpose of laundering money. In fact, the Indictment otherwise alleges that Mulholland passed $300 million in proceeds from unlawful securities trading through 5 offshore law firms— *not* IPC. Indictment ¶ 23. Moreover, the money laundering conspiracy alleged in Count III spans the time period of January 2009 through September 2014. Indictment ¶ 25. But, the Indictment specifically alleges that the money laundering conspiracy involves the proceeds of securities fraud; yet the dates relating to the securities fraud conspiracy and substantive counts merely span from June 2011 through September 2014. Rather than establishing a common purpose between Mr. Bandfield and Mulholland, the Indictment instead appears rather confused about the scope of the money laundering conspiracy.

For the foregoing reasons, Mr. Bandfield and Mulholland cannot be properly joined for purposes of the securities fraud and money laundering conspiracies.

### B.  The Risk for Spillover Prejudice Against Mr. Bandfield is Substantial

Severance is required as to all counts in the Indictment under Rule 14 because of the substantial risk of spillover prejudice to Mr. Bandfield resulting from the introduction of evidence against Mulholland that will unfairly taint Mr. Bandfield, including evidence relating to: (1) the alleged fraudulent manipulation of over 40 U.S. publicly traded securities; (2) the alleged earning of outrageous profits from unlawful trading activities; (3) the alleged laundering of over $300 million by Mr. Mulholland alone; and (4) Mulholland's previous trouble with the SEC.  By contrast, Mr. Bandfield is alleged to have created corporations for relatively small fees, after which those corporations were allegedly used by their beneficial owners for nefarious purposes.

In certain cases relating to financial crimes, trying charges involving "dozens of different stocks" and other issues that do not concern the co-defendant would create the risk that the "'jury is subjected to weeks of trial dealing with dozens of incidents of criminal misconduct which do not involve [the codefendant] in any way' such 'that mounting proof of the guilty of one is likely to affect another.'"  *United States v. Rajaratnam*, 753 F. Supp. 2d 299, 316 (S.D.N.Y. 2010) (granting severance) (quoting *United States v. Branker*, 395 F.2d 881, 888 (2d Cir. 1968).

This concern applies with force in this case.  Mr. Bandfield had no knowledge of the above-listed integral aspects of the Government's case against Mulholland.  Indeed, Mr. Bandfield never even met Mulholland until the date of Mulholland's arraignment in this case on August 10, 2015.  If Mr. Bandfield is tried together with Mulholland, he will be forced to contend with the prejudicial spillover from evidence pertaining to numerous other stocks and alleged manipulative trading arrangements of which Mr. Bandfield had no knowledge, and profit sizes that will be mind-boggling to the jury and thus impossible to separate from Mr. Bandfield.

To be clear, Mr. Bandfield and IPC incorporated companies—they did not market, promote, or trade stock, and did not receive proceeds from stock trading.  To comingle these defendants who engaged in such vastly different conduct would be confusing for the jury and prejudicial toward Mr. Bandfield.

Moreover, Mr. Bandfield may be tainted by evidence (if admissible) that Mulholland was previously found liable in a stock manipulation scheme charged by the SEC back in 2008—a scheme Mr. Bandfield was unaware of until he found himself charged in the same Indictment as Mulholland.  *See* Chelsea Naso, '*Rudy' Drink Investor To Pay $5M Over Alleged Stock Scheme*, Law360 (Sept. 25, 2013), http://www.law360.com/articles/475374/rudy-drink-investor-to-pay-5m-over-alleged-stock-scheme.  This prejudicial spillover will confuse the jury and prevent them from making a fair and reliable judgment regarding Mr. Bandfield based on his conduct in simply creating companies through which—unbeknownst to him—some of this alleged activity was occurring.  Severance is accordingly necessary to ensure each defendant is afforded a fair and untainted trial.

### C. <u>Mr. Bandfield's Right to a Speedy Trial will be Prejudiced</u>

Severance is also warranted to preserve Mr. Bandfield's right to a speedy trial.  The Sixth Amendment is clear: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  The right to a speedy trial is a substantial and specific trial right that can serve as grounds for a severance.  *See United States v. Byrd*, 466 F. Supp. 2d 550 (S.D.N.Y. 2006) (granting severance based on speedy trial concerns); *United States v. Carrasco*, 968 F. Supp. 948, 951-52 (S.D.N.Y. 1997).

Mr. Bandfield has been imprisoned since September 9, 2014 and he is ready to proceed to trial.  Mulholland, who was first arrested on June 23, 2015, is grappling with an enormous

volume of discovery and appears unlikely to be in a position to proceed to trial as expeditiously as Mr. Bandfield.  Additionally, Mr. Bandfield is not involved in the securities-related charges and thus does not need extensive time to review discovery relating to those transactions.  Finally, Mr. Bandfield is a 72-year-old man who had been incarcerated in the harsh conditions at the MDC for nearly fifteen months; he would like to move forward and put this period of his life behind him.

The Government, which chose the timing of Mr. Bandfield's and Mulholland's arrests and indictments, cannot possibly claim that it will be prejudiced by a speedy trial for Mr. Bandfield as it has had years since the inception of the investigation to prepare.  Accordingly, the trials of Mr. Bandfield and Mulholland should be severed as to all counts.

### D. <u>Severance Would Not Impose an Unwarranted Burden on Judicial Economy</u>

The Government's case appears to center on distinct issues for Mr. Bandfield and Mulholland.  For Mr. Bandfield, the Government appears to be focused on his creation through IPC of companies as a vehicle for alleged tax and securities fraud and money laundering.  The Government's case will presumably turn on Mr. Bandfield's knowledge of the purpose for which IPC's companies were used.  With regard to Mulholland, however, the Government will be required to demonstrate evidence of substantial securities trading, market manipulation, and money laundering.  The evidentiary and proof lines for these two defendants will vary substantially among relevant and admissible events, witnesses, and documents, which will be difficult to monitor and distinguish in what promises to be a complex, lengthy, and document-intensive trial.  *See United States v. McVeigh*, 169 F.R.D. 362, 370 (D. Colo. 1996) (discussing "efficiencies and advantages in single focused trials. . . . It is easier to apply the rules of evidence when there is a trial of one defendant, particularly with regard to . . . proof of motive,

opportunity, intent, preparation, plan, knowledge and identity under Rule 404(b).").  Indeed, separate trials may enhance judicial economy through streamlining these defendants' respective cases.  Mr. Bandfield's and Mulholland's trials should thus be severed.

## IV.    The Court should Strike Surplusage from the Indictment

Rule 7(d) of the Federal Rules of Criminal Procedure provides that "[t]he Court on motion of the defendant may strike surplusage from the indictment or information."  Fed. R. Crim. Proc. 7(d).  This rule "introduces a means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however, be prejudicial." Fed. R. Crim. P. 7(d) Advisory Committee Note; *see also United States v. Miller*, 26 F. Supp. 2d 415, 420 (N.D.N.Y. 1998) ("The purpose of Rule 7(d) is to protect the defendant against prejudicial allegations of irrelevant facts.").  A motion to strike surplusage should be granted when it is clear that the challenged allegations or terms are "not relevant to the crime charged and are inflammatory and prejudicial."  *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (citing *United States v. Napolitano*, 552 F. Supp. 465, 480 (S.D.N.Y. 1982)).

The Indictment here is rife with surplusage attached to common transactional terms and the descriptive nature of Mr. Bandfield's business in an effort to cast shade over what are equally as likely to be legitimate business activities and discussions.  Indeed, when these surplus terms are removed, the Indictment as it relates to Mr. Bandfield reads as if it were describing legitimate business relations.  The surplusage is inflammatory and prejudicial and should be stricken as requested below.

### A.  Reference to the "term 'nominee' in the *securities fraud context*"

Paragraphs 14 through 20 of the Indictment purport to set forth relevant regulatory principles and definitions.  Paragraph 17 claims that the term "nominee" has a specific meaning within "the securities *fraud* context."  Indictment ¶ 17 (emphasis added).  First, the term nominee

is used throughout the securities industry in perfectly legitimate ways.  Second, neither Mr. Bandfield nor his counsel are aware of any regulatory framework or definitions that apply only in the "securities *fraud* context."  The term "fraud" should be stricken from this phrase as improper and misleading.  Relatedly, the phrase in the same paragraph that reads "[t]he use of nominees and nominee accounts was designed to conceal the true ownership interest of the customer" should be stricken for the reason stated above—the term nominee is used throughout the securities context with lawful meaning and is not necessarily designed to conceal ownership. This phrase is thus misleading and prejudicial.

### B. <u>Reference to Penny Stocks being Easily Manipulated and Enabling Control Groups to Manipulate</u>

Similar to the above request, paragraph 18 of the Indictment claims that penny or microcap stocks are often controlled by small groups, "which enabled those in the group to control or orchestrate manipulative trading in those stocks."  Indictment ¶ 18.  This phrase should be stricken as overly broad and misleading.  In 2008 and 2009, the stock of Citigroup traded below $5, which may have met the definition of a penny stock.  Numerous other stocks trade at similarly low prices or have low market capitalization.  Yet these companies trade daily without allegations of manipulation or fraud.  To allege that microcap or penny stocks are manipulatively traded as a general matter is overly-broad and misleading.  Indeed, one wonders what the evidentiary foundation for such an assertion might be.  Moreover, the fact that the stocks at issue in the Indictment are allegedly penny stocks has no bearing on whether any of the codefendants manipulated these stocks in the manner the Government alleges.  Accordingly, this paragraph should be stricken from the Indictment.

### C.   References to "Sham" and "Fraudulent" Companies and Structures

The Indictment is replete with references to over 5,000 "sham" or "fraudulent"

companies created through IPC.  *See* Indictment ¶¶ 17, 26, 28, 29, 30, 31, 33, 34, 35, 37, 38, 40.

The terms "sham" and "fraudulent" are misleading in the broad manner in which they are used.

Numerous lawful reasons exist for the creation and use of offshore entities and not all offshore

entities are "sham" companies or "fraudulent" structures as the Indictment implies.

IPC created over 5,000 companies over the course of 24 years.  The Government does not

allege—and cannot possibly be alleging—that all of the companies throughout this quarter-

century time span are "sham" or "fraudulent."  Without alleging specific detail with regard to

each allegedly "sham" or "fraudulent" company, the Government should not be permitted to so

broadly use this term.  Accordingly, the terms "sham" and "fraudulent" should be stricken as

misleading, prejudicial, unfair surplusage from the paragraphs cited above.

### D.   Reference to "Corrupt" Clients

Similar to the above request, the Court should also strike references to the Corrupt

Clients in the Indictment and refer to these individuals only as Clients.  *See* Indictment ¶¶ 35-37,

40, 50(k).  Until the Government has proven that that the 100-plus clients referenced in the

Indictment are indeed "corrupt," the term is prejudicial, misleading, and permits the assumption

that Mr. Bandfield is guilty simply because his clients may have been engaged in unlawful or

unsavory activity.  This form of prejudice should not stand, and the Court should therefore strike

reference to "corrupt" clients in favor of a more neutral term.

### E.   Reference to "inter alia" and "among others"

The Indictment repeatedly alleges that defendant committed certain specified acts

"among others" or *"ínter alia."  See* Indictment ¶¶ 1, 3, 4, 20, 21, 23, 30, 35, 37, 50, 53.  Mr.

Bandfield has asked the Court to order the Government to particularize these open-ended

allegations by describing its theory regarding Mr. Bandfield's involvement in the alleged schemes.  However, a bill of particulars will not cure the prejudice that arises from the needless broadening language in the Indictment.

Courts have recognized that the inclusion of phrases like "among other things" and *inter alia* creates a danger that the jury may infer that the defendant is accused of crimes beyond those actually charged.  *See*, *e.g.*, *United States v. Pope*, 189 F. Supp. 12, 25-26 (S.D.N.Y. 1960) (striking broadening language and noting that "[t]he words 'among other things' add nothing to the charges and give the defendants no further information with respect to them."); *United States v. Mango*, 1997 WL 222367, *16-*17 (N.D.N.Y. 1997) (striking similar broadening language). The risk of prejudicial inferences is certainly present here where the Government uses such broadening language no fewer than a dozen times.  Accordingly, the broadening surplusage should be stricken.

### F.  <u>The Assertion that Mr. Bandfield Created Titan, Legacy, and Unicorn</u>

Paragraphs 5 and 28 of the Indictment allege that Mr. Bandfield claimed to have created Titan, Legacy, and Unicorn.  This assertion is inaccurate and misleading.  Mr. Bandfield may have assisted in forming the corporate entities that became Titan, Legacy, and Unicorn, but he did not exercise any degree of ownership or control over those entities.  Yet the Indictment implies that Mr. Bandfield created these entities in a manner that depicts him as the founder of these entities, which the Government knows is not the case.  Accordingly, this language is misleading, irrelevant, and prejudicial and should be stricken from the Indictment.

### V.  The Court Should Order a Schedule for *Brady*, *Giglio*, and *Jencks* Disclosures

It is well understood that information subject to disclosure under *Brady v. Maryland* must be produced promptly upon request by the defendant.  *See United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) ("It is well established that upon a request by a defendant, the

Government has a duty to turn over all material exculpatory evidence in its possession . . ..");

*United States v. Crozzoli*, 698 F. Supp. 430, 436 (E.D.N.Y. 1988) ("To permit the prosecution to

withhold exculpatory evidence . . . until such time as the prosecutor chooses to disclose it, is to

permit the prosecutor to control, to some extent, the preparation of a defense.".

 To date, the Government has informed Mr. Bandfield's counsel that it is unaware of any

*Brady* material that it would be required to produce.  However, Mr. Bandfield's counsel

understands that certain exculpatory information does in fact exist.  For example, as mentioned

above, in or around 2013, Canadian securities enforcement called upon Mr. Bandfield to testify

for the Canadian government in connection with a pending trial of a defendant charged with

running a Ponzi scheme.  Mr. Bandfield willingly made himself available to the Canadian

authorities and testified via video conference.  Mr. Bandfield was set to testify again in Canadian

court via video conference on September 23, 2014—two weeks after his arrest.  Even after being

incarcerated in this case, Mr. Bandfield indicated he was still prepared to testify for the Canadian

government and assist in its efforts, though apparently the Government would not allow him to

do so for fear that he would reveal the identity of the Undercover Agent in this case.  Such

information is directly relevant to Mr. Bandfield's intent.  The Government, however, indicates

that it has no information regarding Mr. Bandfield's prior assistance or current willingness to

assist the Canadian authorities in this manner.  However, defense counsel understand there were

at least some communications with the Government about the possibility of his testimony.  The

Government should therefore undertake a review of what communications were made between

Canadian authorities and any U.S. Government personnel about this issue and produce the results

of that inquiry as *Brady* material.

Further, Mr. Bandfield's codefendants who worked with Titan determined at some point to sever Titan's relationship with the Undercover Agent because they suspected that the Undercover Agent was engaging in potentially unlawful activity.  Mr. Bandfield requests any information in the Government's possession relating to this subject matter or any other exculpatory information immediately.

The complexity and breadth of the charges in this case and the volume of discovery materials warrant an order directing the Government to produce impeachment material under *Giglio v. United States* and prior witness statements subject to the Jencks Act no later than 120 days before the trial date set for this case.  Mr. Bandfield's counsel requested disclosure of these materials in this time frame from the Government, which stated that it would only produce *Jencks* material two weeks in advance of trial per the policy of the USAO in complex cases. While Mr. Bandfield appreciates this courtesy, two weeks is insufficient.  The subject matter of this case—offshore avoidance of tax and securities regulations plus alleged international laundering of derivative funds—is extremely complex.  Important witnesses and documents are located overseas.  The trial will be lengthy.  When the Government produces any particular prior witness statement or impeachment materials, counsel will likely require substantial time to seek and obtain other evidence to enable the defense to make use of such material.  For example, *Giglio* material frequently identifies acts of misconduct by witnesses, but provides only a partial recitation of the underlying facts.  The same is true of prior witness statements.  Defense counsel requires time to fully investigate and develop such information.  Ordering the Government to produce *Giglio* and *Jencks* material 120 days in advance of trial will avoid unnecessary delay and is in line with orders set in other complex securities and tax fraud cases.  *See United States v. McDonald*, 2002 WL 2022215 (E.D.N.Y. 2002) (ordering the disclosure of all *Giglio* and *Jencks*

material well in advance of trial "in view of the scope of the indictment, the number of defendants and the documentary evidence implicated in [the] case.").

## VI.     Mr. Bandfield Requests the Ability to File Additional Appropriate Motions and Join in Defendant Mulholland's Motions

One outstanding issue impacts the substance of Mr. Bandfield's pretrial motions filed today:  Mr. Bandfield has yet to receive any information concerning the authority for and execution of the Belize Searches.  Because of the critical impact that this development (or lack thereof) may have on Mr. Bandfield's defense, Mr. Bandfield reserves the right to make additional motions as appropriate.

Further, Mr. Bandfield joins in defendant Gregg Mulholland's pretrial motions to the extent they are applicable to Mr. Bandfield.  Mr. Bandfield understands that Mulholland similarly joins in Mr. Bandfield's motions to the extent they are applicable to Mulholland.

**CONCLUSION**

For the foregoing reasons, Robert Bandfield respectfully requests that the Court grant the relief requested herein.

Dated:  New York, New York
          December 2, 2015

                    Respectfully submitted,

                    MORVILLO LLP


                    By: _____
                    Eugene Ingoglia
                    Savannah Stevenson
                    200 Liberty Street, 27th Floor
                    New York, New York 10017
                    (212) 796-6330

                    *Attorneys for Defendant Robert Bandfield*

55