WMP:JMK/MTK
F. #2013R00505

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                        14 CR 476 (ILG)

ROBERT BANDFIELD and
GREGG MULHOLLAND,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## THE GOVERNMENT'S MEMORANDUM OF LAW
## IN RESPONSE TO THE DEFENDANTS' PRE-TRIAL MOTIONS

ROBERT L. CAPERS
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

JACQUELYN M. KASULIS
WINSTON M. PAES
MICHAEL T. KEILTY
Assistant U.S. Attorneys
      (Of Counsel)

<u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS .........................................................................................2

    I.    The Fraudulent Scheme ...............................................................................2

        A.    The Defendants and Relevant Entities ........................................................2

        B.    Overview of the Scheme ..........................................................................2

        C.    The Undercover Operation .......................................................................3

        D.    The Mulholland Group and Other Corrupt Clients .......................................4

    II.    Procedural History ....................................................................................7

        A.    The Initial Indictment and Bandfield's Arrest ..............................................7

        B.    The Searches in Belize .............................................................................7

            1.    The MLAT Request ...........................................................................7

            2.    The Evidence from the Belize Searches ..................................................8

        C.    The Government's Discovery Productions ..................................................10

        D.    Mulholland's Arrest and the Superseding Indictment ...............................12

ARGUMENT - POINT ONE: EVIDENCE OBTAINED THROUGH THE USE OF
    JUDICIALLY AUTHORIZED WIRETAPS SHOULD NOT BE SUPPRESSED .........13

    I.    Applicable Law .......................................................................................13

    II.    The McGuire Affidavit Plainly Demonstrates Necessity .....................................16

            1.    Certain Alternative Investigative Techniques Were Not
                Feasible ..........................................................................................16

            2.    Additional Email Search Warrants Would Not Have Met All the
                Goals of the Investigation .................................................................18

ARGUMENT - POINT TWO: EVIDENCE OBTAINED THROUGH THE BELIZE
    SEARCHES AND DISCOVERY PRODUCED AFTER MAY 18, 2015 SHOULD NOT
    BE SUPPRESSED ....................................................................................20

I.    Rule 16 Does Not Compel the Production of the MLAT Request or the Belizean
      Search Warrant Materials ..................................................................................20

      A.    Applicable Law ..........................................................................................20

      B.    Discussion ..................................................................................................21

            1.    The MLAT Request ..........................................................................21

            2.    The Belize Search Warrant and Supporting Materials .................25

II.   The Belize Searches Did Not Violate the Defendants' Fourth Amendment
      Rights ................................................................................................................27

      A.    Applicable Law ..........................................................................................27

      B.    Discussion ..................................................................................................27

            1.    Shocks the Conscience Exception .................................................27

            2.    Constitutional Restrictions Exception............................................29

III.  The Government Did Not Produce the Evidence From the Belize Searches in an
      Untenable Manner ............................................................................................33

IV.   The Government Did Not Delay in Reviewing and Producing Evidence From the
      Belize Searches and Discovery Produced after May 18, 2015 ............................34

      A.    Applicable Law ..........................................................................................35

      B.    The Evidence Obtained from the Belize Searches....................................35

      C.    Discovery Produced After May 18, 2015 .................................................37

ARGUMENT - POINT THREE: THE REQUEST FOR A BILL OF PARTICULARS SHOULD
      BE DENIED.........................................................................................................41

I.    Applicable Law ..................................................................................................42

II.   Discussion .........................................................................................................44

      A.    Information Provided To the Defendants Provides Them with Sufficient
            Notice of the Pending Charges .................................................................44

      B.    The Defendants' Requests Lack Merit ......................................................45

            1.    Bandfield's Specific Requests .......................................................46

            2.    Mulholland's Specific Requests ....................................................54

ARGUMENT - POINT FOUR: THE REQUEST FOR A SEVERANCE SHOULD BE
DENIED ................................................................................................................... 61

    I.        Applicable Law ................................................................................................ 61

            A.       Rule 8(b) .............................................................................................. 61

            B.       Rule 14 ................................................................................................ 63

    II.      Discussion ....................................................................................................... 64

            A.       The Superseding Indictment Alleges a Common Scheme and
                   Participants ......................................................................................... 64

            B.       Joinder Of The Defendants Is Not Prejudicial to Bandfield ..................... 67

            C.       Severance Is Not Warranted To Protect Bandfield's Speedy Trial Right .. 69

ARGUMENT - POINT FIVE: THE REQUEST FOR STRIKING SURPLUSAGE IN THE
INDICTMENT SHOULD BE DENIED ........................................................................ 71

    I.        Applicable Law ................................................................................................ 71

    II.      Discussion ....................................................................................................... 72

            A.       Bandfield Fails to Satisfy the Exacting Standard For Striking Surplusage
                   in the Superseding Indictment ................................................................ 72

            B.       Mulholland Fails to Satisfy the Exacting Standard For Striking Surplusage
                   in the Superseding Indictment ................................................................ 76

ARGUMENT - POINT SIX: THE GOVERNMENT'S FIREWALL PROCESS WAS
SUFFICIENT TO PROTECT ANY APPLICABLE PRIVILEGE ................................. 78

    I.        Applicable Law ................................................................................................ 78

    II.      The Government's Firewall Process ................................................................. 79

ARGUMENT - POINT SEVEN: OTHER DISCOVERY AND EVIDENTIARY REQUESTS
SHOULD BE DENIED ................................................................................................ 81

    I.        The Government Has Not Identified Any Brady Material ................................... 81

    II.      The Government Will Comply With Its Jencks and Giglio Obligations .............. 81

    III.    The Government Will Timely Disclose Rule 404(b) Evidence ........................... 82

    IV.    The Government Will Timely Disclose Expert Witness Information ................... 83

V.      The Government Will Timely Disclose Its Witness List........................................83

CONCLUSION........................................................................................................................84

## PRELIMINARY STATEMENT

The government submits this memorandum of law in response to (1) the defendant Robert Bandfield's memorandum of law, dated December 2, 2015, in support of his pre-trial motions ("Bandfield Br."), and (2) the defendant Gregg Mulholland's memorandum of law, dated December 7, 2015, in support of his pre-trial motions ("Mulholland Br.").

Bandfield argues for the following: (i) suppression of the fruits of the Belize searches and all discovery produced after the May 18, 2015 court-ordered deadline; (ii) a bill of particulars; (iii) severance of the trials of co-defendants Bandfield and Mulholland; (iv) striking surplusage in the superseding indictment; and (v) an expedited schedule for Brady, Giglio and Jencks disclosures.  Mulholland argues for the following: (i) suppression of the evidence obtained through the March 17, 2014 wiretap application; (ii) suppression of the fruits of the Belize searches; (iii) specificity of procedures the government took to safeguard the attorney-client privilege; (iv) a bill of particulars; (v) striking surplusage in the superseding indictment as to the Foreign Account Tax Compliance Act (FATCA); and (vi) various discovery and evidentiary demands.

For the reasons set forth below, the government respectfully submits that the defendants' motions, except as noted below, are without merit and should be denied.[1]

---

[1]     To the extent there is overlap between Bandfield's and Mulholland's arguments, the government addresses them together.

1

## STATEMENT OF FACTS

I.      **The Fraudulent Scheme**

      A.      **The Defendants and Relevant Entities**

            Robert Bandfield, a U.S. citizen who lived and worked in Belize City, Belize, founded and controlled IPC Management Services, LLC, IPC Corporate Services Inc. and IPC Corporate Services LLC (collectively, "IPC Corp").   (Superseding Indictment "SI" ¶¶ 1, 5) Bandfield marketed IPC Corp as offshore management companies that provided, <u>inter alia</u>, the following services: (a) offshore company formation; (b) nominee services; (c) trust formation; (d) licensed trustee services; (e) full banking services; (f) offshore credit cards; and (g) offshore brokerage (securities) accounts.   (<u>Id.</u>).   Bandfield also claimed to have created three offshore brokerage firms: Legacy Global Markets S.A. ("Legacy"), Titan International Securities Inc. ("Titan") and Unicorn International Securities LLC ("Unicorn").  (SI ¶¶ 2-5).

            Gregg Mulholland, also known as "Stamps" and "Charlie Wolf," a dual citizen of the U.S. and Canada and a resident of California during the relevant period, was one of IPC Corp's largest clients.  (SI ¶ 6).  By June 2011, Mulholland had moved cash and a substantial amount of his securities to Legacy, and from approximately February 2012 through September 2014, Mulholland secretly owned and controlled Legacy.  (<u>Id.</u>).

      B.      **Overview of the Scheme**

            The defendants Bandfield and Mulholland, together with others, devised and engaged in three inter-related conspiracies: (a) securities fraud – defrauding investors and potential investors in various U.S. publicly traded companies through, <u>inter alia</u>, the fraudulent concealment of the true beneficial ownership interests in the various U.S. publicly traded companies, and the engineering of artificial price movements and trading volume in the stocks of

2

the various U.S. publicly traded companies; (b) tax fraud – defrauding the United States by impeding, impairing, obstructing and defeating the lawful governmental functions of the Internal Revenue Service ("IRS") in the ascertainment, computation, assessment and collection of revenue, specifically federal income taxes; and (c) money laundering – laundering money by facilitating financial transactions to and from the United States, which transactions involved proceeds of fraud in the sale of securities.  (SI ¶ 21)  Specifically, Mulholland and his group of stock manipulators (the "Mulholland Group") fraudulently manipulated the stock of more than forty U.S. publicly traded companies through the use of Bandfield's shell structures and offshore brokerage firms, and then transferred, through attorney escrow accounts associated with five offshore law firms, the fraudulent proceeds into, inter alia, accounts controlled by the Mulholland Group in the U.S. and Canada.  (SI ¶¶ 22-23).

### C.      The Undercover Operation

Beginning in January 2013, Bandfield and co-conspirators revealed to a law enforcement agent posing as a stock promoter engaged in fraudulent trading activity (the "Undercover Agent") the fraudulent structure and scheme that Bandfield had fashioned to enable IPC Corp's clients, including Mulholland, to evade U.S. securities and tax laws.  (SI ¶ 24-32). Specifically, co-defendant Andrew Godfrey, who was Bandfield's right-hand man, informed the Undercover Agent that IPC Corp could establish a corporate structure that concealed the Undercover Agent's ownership interest in his brokerage account at Titan, which would provide the Undercover Agent with the desired protection he sought from the U.S. Securities and Exchange Commission ("SEC") and the IRS.  (SI ¶¶ 25-26).  In this fraudulent structure designed to conceal the Undercover Agent's control and ownership, an international business corporation ("IBC") in the name of an IPC Corp employee (a "nominee") would open the

3

Undercover Agent's brokerage account at Titan.  (SI ¶ 26).  That IBC would be owned by a limited liability company ("LLC") in the name of a nominee designated by IPC Corp, and the Undercover Agent's name would not be associated with either the IBC or the LLC.  (Id.).

Almost a year later, in November 2013, the Undercover Agent met with Bandfield and Godfrey at IPC Corp's office in Belize.  (SI ¶ 28).  During this meeting, Bandfield and Godfrey explained, in great detail, how IPC Corp assisted U.S. citizens like the Undercover Agent in evading U.S. laws and regulations, including the IRS's reporting requirements, by establishing sham IBCs and LLCs, and Bandfield bragged that he had incorporated more than 5,000 sham companies.  (Id.).  Additionally, Bandfield suggested means by which the Undercover Agent could circumvent the SEC's reporting requirements by concealing his beneficial ownership of more than five percent of a public company's stock through nominee accounts, and the IRS's reporting requirements by having a nominee sign IRS Forms W-8BEN[2] for the Undercover Agent's IBCs and LLCs.  (Id.).

A few months later, in March 2014, the Undercover Agent met again with Bandfield and Godfrey at IPC Corp's office in Belize.  (SI ¶ 30).  During this meeting, Bandfield and Godfrey explained, inter alia, that their "slick" IBC and LLC structure was specifically designed to counter U.S. laws and advised the Undercover Agent that the designated nominees, including a security guard and courier, would sign any stock purchase agreements on behalf of the IBCs at the Undercover Agent's direction.  (Id.).

### D.    The Mulholland Group and Other Corrupt Clients

Between March 21, 2014 and May 30, 2014, law enforcement authorities conducted five judicially-authorized wiretaps of telephone lines for IPC Corp, Titan and Legacy.

---

[2]    An IRS Form W-8BEN is a form which notifies the IRS that a foreign individual is the beneficial owner of funds that are subject to tax withholding.

(SI ¶ 34).  The wiretaps, together with the fruits of grand jury subpoenas, materials received from regulators and emails obtained through judicially-authorized search warrants, demonstrated that Bandfield was engaged in a scheme with more than 100 clients, including the Mulholland Group, to evade U.S. securities and tax laws and conceal their fraudulent activity and illegal proceeds through IPC Corp's fraudulent IBC and LLC structure.  (SI ¶¶ 34-35).  As with the Undercover Agent, the investigation revealed that Bandfield's structure enabled IPC Corp's clients to conceal their fraudulent trading activities at brokerage firms, such as Legacy and Titan, through the use of nominees and then transfer the proceeds of their fraudulent trading activity through attorney escrow accounts and unmarked debit cards.  (SI ¶¶ 36-37).  The use of the nominee accounts at the brokerage firms provided U.S. clients with the additional benefit of evading the payment of taxes on their fraudulent trading proceeds.  (Id.).

The Mulholland Group utilized IPC Corp's fraudulent IBC and LLC structure to open brokerage accounts in the names of the IBCs at offshore brokerage firms such as Legacy, Titan and Unicorn.  Through those brokerage accounts, the Mulholland Group fraudulently manipulated the stock of more than forty U.S. publicly traded companies, including Vision Plasma Systems, Inc. ("Vision Plasma" or "VLNX") and Cynk Technology Corp. ("CYNK" or "Introbuzz").  (SI ¶¶ 38, 41-47).  Specifically, in June 2011, approximately 84 million shares of Vision Plasma were issued to nine IBCs created by IPC Corp for Mulholland.  Thus, the Mulholland Group beneficially owned and controlled at least 84 percent of the free trading shares of VLNX, which was concealed from the investing public in violation of SEC rules and regulations.  (SI ¶ 42).  A year later, in August 2012, a promotional campaign was orchestrated to manipulate VLNX stock.  (SI ¶ 43).  Prior to August 16, 2012, there was no trading activity in VLNX.  (Id.).  On August 16, 2012, the daily trading volume was 308 million shares and the

stock price, which opened at $0.14, increased to an intraday high of $0.39 before closing at $0.30.  (Id.).  That same day, the nine IBCs beneficially owned and controlled by the Mulholland Group sold more than 83 million shares of VLNX, primarily through Legacy, which was secretly owned by Mulholland, resulting in approximately $21 million in proceeds.  (Id.).

Additionally, the Mulholland Group also fraudulently manipulated the price and volume of CYNK's stock.  Between April 2012 and September 2012, the Mulholland Group wire transferred $1,524,000 from an account controlled by the Mulholland Group to Introbuzz's account at Bank of America.  (SI ¶ 45).  In June 2012, approximately 75 percent of Introbuzz's initial public offering of stock was purchased by associates of the Mulholland Group.  (Id.). Throughout 2013, the associates of the Mulholland Group who had purchased shares through the initial public offering of CYNK stock sold their CYNK shares to three IBCs controlled by the Mulholland Group.  (SI ¶ 46).  Mulholland had paid IPC Corp for the three IBCs that ended up owning the vast majority of CYNK's free trading shares.  (SI ¶ 45).  By May 2014, the Mulholland Group was ready to commence the manipulation of CYNK's stock.  (SI ¶ 47).  On or about May 15, 2014, after no trading for 24 days, the stock closed at $0.06 per share following trading of 1,900 shares.  (Id.).  From approximately June 17, 2014 through July 10, 2014, despite CYNK having no revenue or assets, more than 2 million of its shares were traded, its share price increased from a closing price of $2.25 per share to a closing price of $13.90 per share, and CYNK was valued at more than $4 billion as a result of the fraudulent manipulation by the Mulholland Group.  (Id.).  A number of offshore brokerage firms, including Legacy and Titan, traded in CYNK stock.  (Id.).

## II.     Procedural History

### A.     The Initial Indictment and Bandfield's Arrest

On September 5, 2014, a grand jury sitting in the Eastern District of New York returned an indictment that charged the defendant Robert Bandfield (and others) with conspiracy to commit securities fraud (Count One); conspiracy to defraud the United States – tax fraud (Count Two); and money laundering conspiracy (Count Three).   On September 9, 2014, Bandfield was arrested at the airport in Miami, Florida.

### B.     The Searches in Belize

#### 1.     The MLAT Request

On the same day of Bandfield's arrest, the Office of International Affairs of the U.S. Department of Justice, Criminal Division ("OIA") transmitted a request to the Central Authority of Belize pursuant to the Treaty Between the Government of the United States of America and the Government of Belize on Mutual Legal Assistance in Criminal Matters (the "MLAT Request").   In that submission, the government requested that the Belizean authorities execute searches of IPC, Titan, Legacy and Unicorn's offices in Belize City, Belize.[3]   The government also requested that the Belizean authorities treat the request as urgent and execute it on an expedited basis to prevent the destruction of evidence that may result from Bandfield's arrest earlier that day.   The government also asked permission from the Belize government to have U.S. law enforcement present during the search.

Following the transmittal of the MLAT Request, the Central Authority of Belize did not contact OIA to discuss the information contained in the MLAT Request or the requested searches, and it did not confirm whether it had decided to act upon the MLAT Request.   The

---

[3]        While Legacy operated primarily in Panama, it maintained a desk at IPC Corp's office in Belize City, Belize.

government only learned that the Belizean authorities had decided to execute the requested searches through news reports later that day and that IPC's, Titan's, Legacy's and Unicorn's offices were being searched by members of the Belize Police Department and the Belize Financial Intelligence Unit (the "Belize searches") and later through confirmation by U.S. authorities assigned to the region who were told by the Belizean authorities that the searches were underway.[4]  As the government has repeatedly communicated to counsel for Bandfield and Mulholland, U.S. law enforcement officials were not present or consulted during the Belize searches.  In fact, the agents who had participated in the investigation of Bandfield, Mulholland and their co-conspirators were not in Belize when the searches were executed.[5]

### 2.    The Evidence from the Belize Searches

Following the Belize searches, the Central Authority of Belize contacted OIA and stated that it would make the evidence obtained from the Belize searches available to U.S. law enforcement for review and copying in Belize.  During approximately two weeks in late September/early October 2014, U.S. law enforcement personnel traveled to Belize to review the seized evidence and copy any relevant materials (the Belizean authorities did not allow U.S. law

---

[4]     Prior to the Belize searches, American law enforcement officials were aware that Belizean law enforcement had initiated an investigation into Titan for its involvement in the scheme to manipulate CYNK in the summer of 2014.  Following the Belize searches, the Belizean authorities stated that they had expanded their investigation.  (See, e.g., Bandfield Br., Exhibit C, at 6-7).

[5]     An Assistant Regional Security Officer for Investigations with the Diplomatic Security Service, U.S. Department of State assigned to the U.S. Embassy in Belize has confirmed that U.S. personnel did not participate in and were not consulted prior to the Belize searches.  Additionally, the Assistant Regional Security Officer explained that the U.S. government donated approximately 60 vehicles to the Belize Police Department in the spring of 2014 to support Belize's anti-drug initiatives.  Belize law enforcement agents frequently use those vehicles, and approximately 50 of the vehicles have U.S. flag decals on them.  Notably, in the news video that both Mulholland and Bandfield heavily rely upon to allege U.S. personnel involvement in the Belize searches, the vehicles that have a U.S. flag decal also have a "C.I.B" (Criminal Investigation Branch of the Belize Police Department) decal on their doors.  Additionally, the individual seen on the video loading materials into a CIB vehicle with an American flag decal during the Belize searches is wearing a t-shirt with "A.D.U." (Belize's Anti-Drug Unit) written in large type on the back of the shirt.

enforcement to take original documents or electronic evidence).  At that time, the Belizean authorities represented to U.S. law enforcement that the evidence seized from the Belize searches was obtained pursuant to a Belizean search warrant.  U.S. law enforcement neither reviewed nor was provided with the search warrant and supporting materials.[6]

        The Belizean authorities maintained custody and control of the evidence – which included approximately 250 boxes of documentary evidence and approximately 56 computers/ electronic media – and tracked which boxes/electronic media were being reviewed or copied at the time by U.S. law enforcement on a log that the Belizean authorities had prepared of the hard copy and electronic materials obtained from the Belize searches.  U.S. law enforcement scanned any hard copy documents determined to be relevant, and imaged the seized computers/electronic media into a Forensic Toolkit ("FTK") format.  While U.S. law enforcement noted at the time that the Belize searches had been broad, the breadth of the searches did not seem unusual considering that IPC Corp's, Titan's, Legacy's and Unicorn's operations were primarily criminal in nature.[7]

        Upon U.S. law enforcement's return to the United States in October 2014, the Computer Analysis Response Team ("CART") of the Federal Bureau of Investigation ("FBI")

---

[6]     The government has not stated that Belize has refused to provide copies of the Belize search warrant and supporting materials.  The government has repeatedly conferred with OIA regarding the defendants' requests for the Belize search warrant and supporting materials over the past year, and OIA has stated that requesting such materials is unusual in the context of MLAT requests (such a request was not contained in the government's September 9, 2014 MLAT Request), and that it is improper to use the MLAT to request material on behalf of a defendant, as set forth in more detail below.  Additionally, OIA has noted that making requests outside the scope of the MLAT could have adverse consequences for the relationship between the U.S. and Belize.

[7]     Both Mulholland and Bandfield detail ongoing litigation in Belize related to the Belize searches and the freezing of certain assets in Belize by the Belizean government.  As set forth in detail later in this opposition, the legality of the Belize searches does not bear on whether the defendants' Fourth Amendment rights were violated.  In any event, the Belize search warrant has not been declared illegal by the Belize courts.

began processing the imaged computers/electronic media obtained from the Belize searches so that it could upload all electronic documents into the Bureau Investigative Document Management and Analysis System ("BIDMAS") system, which allows for web-based searching and review of electronic evidence.  As CART processed the images, the FBI sent the processed materials to its computer forensics laboratory in Washington, D.C. for uploading into BIDMAS.  The FBI loaded the first batch of computers/electronic media resulting from the Belize searches into BIDMAS in February 2015, and has uploaded the remaining computers/electronic media into BIDMAS on a rolling basis since that time.  The FBI has also uploaded the scanned hard copy documents obtained from the Belize searches into the BIDMAS system.  Since February 2015, the FBI has been able to search – and has repeatedly searched – the BIDMAS database of the evidence obtained from the Belize searches.

### C.      The Government's Discovery Productions

Following Bandfield's arrest and removal to the Eastern District of New York, the government began to produce discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure ("Rule 16") on a rolling basis.  Bandfield was initially represented by counsel from the Federal Defenders, who repeatedly represented to the government and the Court that Bandfield was in the process of retaining new counsel.  (See, i.e., February 2, 2015 Letter from Michelle Gelernt, Esq., Docket Entry No. 14, "Mr. Bandfield is in the process of retaining private counsel and believes he will finalize that decision within the next few weeks.").  In late February/early March 2015, counsel from Morvillo LLP filed their notices of appearance on behalf of Bandfield.  (Docket Entry Nos. 16, 17, 21).  The government then discussed the production of discovery thus far with Bandfield's new counsel, and ensured that Bandfield's new attorney had obtained a copy set of the government's prior discovery productions.

The government also raised the production of the evidence obtained from the Belize searches with Bandfield's new attorneys.  The government requested that Bandfield's counsel provide the government with 13 4-terabyte hard drives to provide the FTK-formatted versions of the computers/electronic media obtained from the Belize searches.[8]  Bandfield's counsel provided those hard drives to the government by the end of March 2015, and the government produced the computers/electronic media obtained from the Belize searches by May 13, 2015.[9]  (Docket Entry Nos. 27 and 28).  Contrary to Bandfield's assertion, the government provided counsel with an index of the hard drives to assist his review.  Bandfield's counsel requested assistance in opening the FTK-formatted images at the end of June 2015, which the FBI provided.

While the Court set a discovery deadline of May 18, 2015, the government's discovery obligations are ongoing pursuant to Rule 16, and the government has continued to produce discovery in its possession as additional evidence is obtained and reviewed.

---

[8]    FBI CART had imaged the computers/electronic media from the Belize searches onto 13 4-terabyte hard drives.  In order to create a copy of the hard drives to produce to Bandfield in discovery, CART requested that the government ask for 13 4-terabyte hard drives from defense counsel (the cost differential between 4-terabyte hard drives and hard drives with less storage capacity is negligible).  Thus, as discussed in more detail below, the request for 13 4-terabyte hard drives from defense counsel does not reflect that the government "imaged computers that housed nearly 56 terabytes of data." (Bandfield Br. at 33).  Instead, the total size of the imaged computers/electronic data obtained from the Belize searches is approximately 13.2 terabytes, which includes large program files.  Of those 13.2 terabytes, the total number of electronic documents produced from the computers/electronic media obtained from the Belize searches is approximately 2.1 million – less than 2 terabytes of data.

[9]    The government provided Bandfield with the scanned hard copy documents from the Belize searches in discovery on March 4, 2015.

**D.     Mulholland's Arrest and the Superseding Indictment**

On June 23, 2015, Mulholland was arrested pursuant to a complaint at an airport in Phoenix, Arizona.[10]  On July 31, 2015, a grand jury sitting in the Eastern District of New York returned a superseding indictment that charged the defendants Robert Bandfield and Gregg Mulholland (and others) with conspiracy to commit securities fraud (Count One); money laundering conspiracy (Count Three); securities fraud as to VLNX (Count Four); and securities fraud as to CYNK (Count Five).   Additionally, Bandfield was charged with conspiracy to defraud the United States – tax fraud (Count Two).

The government began producing discovery to Mulholland on August 7, 2015. (Docket Entry No. 37).[11]  Both defendants were arraigned on the superseding indictment on August 10, 2015.  (Docket Entry No. 36).  No trial date has been set in this case.

---

[10]     Mulholland had traveled from Vancouver, Canada to Phoenix, where he was waiting to board a plane bound for Mexico.

[11]     The government has repeatedly requested that Mulholland provide the government with hard drives necessary to produce the computers/electronic media from the Belize searches and Mulholland and Bandfield's computers.  The government renewed its request as recently as December 2, 2015.  (Docket Entry No. 71).  Mulholland has yet to provide those hard drives to the government.

## ARGUMENT

## POINT ONE

## EVIDENCE OBTAINED THROUGH THE USE OF JUDICIALLY AUTHORIZED WIRETAPS SHOULD NOT BE SUPPRESSED

Mulholland argues that the electronic communications evidence obtained from the government's wiretap applications should be suppressed because the applications failed to establish the requisite necessity under 18 U.S.C. § 2518. (Mulholland Br. at 15-28). In the alternative, Mulholland requests that a Franks hearing be held to determine the sufficiency of the government's affidavit in support of its wiretap application. (Id.). As discussed in detail below, the affidavits of FBI Special Agent Thomas McGuire dated March 17, 2014 and April 23, 2014 (collectively, the "McGuire Affidavit")[12] clearly demonstrate that normal investigative techniques were either unsuccessfully tried or were not reasonably likely to succeed if tried. Accordingly, the defendant's motion to suppress the wiretaps and for a Franks hearing should be denied.

## I.   Applicable Law

Title 18, United States Code, Section 2518(1)(c) requires that an application for the interception of telephonic communications include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Similarly, Section 2518(3)(c) requires the judge reviewing a wiretap application to determine, as a condition of authorizing the

---

[12]   The March 17, 2014 affidavit is attached as Exhibit B to Mulholland's Brief. The government has not attached the April 23, 2014 affidavit because the relevant sections are essentially identical to the corresponding sections in the March 17, 2014 affidavit. However, upon the Court's request, the government will provide the Court with a copy of the April 23, 2014 affidavit.

wiretap, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

These requirements ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n.12 (1974).  The Second Circuit explained the significance of these statutory requirements:

> The purpose of the statutory requirements of § 2518 is not to preclude the Government's resort to wiretapping until after all other possible means of investigation have been exhausted by investigative agents; rather, the statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.

United States v. Diaz, 176 F.3d 52, 111 (2d Cir. 1999) (citing United States v. Torres, 901 F.2d 205, 231 (2d Cir. 1990)) (internal quotation marks and brackets omitted).  Thus, the statute's "alternative investigative techniques" provisions do not establish a requirement "that any particular investigative procedure [must] be exhausted before a wiretap may be authorized." United States v. Miller, 116 F.3d 641, 663 (2d Cir. 1997) (quoting United States v. Young, 822 F.2d 1234, 1237 (2d Cir. 1987)).  Rather, the government's application must only "provide some basis for concluding that less intrusive investigative procedures are not feasible."  United States v. Lilla, 699 F.2d 99, 103 (2d Cir. 1983).

The legislative history of the statute further makes clear that Section 2518(1)(c) is not designed to force the government to exhaust all "other investigative techniques."  As the Senate Report concerning the statute explained:

> Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. What the provision

> envisions is that the showing be tested in a practical and commonsense fashion.

S. Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.C.C.A.N. 2112 at 2190 (citations omitted); see also Torres, 901 F.2d at 231-32 (quoting legislative history); United States v. Ruggiero, 726 F.2d 913, 924 (2d Cir. 1984) (explaining that affidavits in support of wiretap applications are viewed in common sense and realistic fashion).  "To be sure, the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance."  United States v. Concepcion, 579 F.3d 214, 218 (2d Cir. 2009).  The Second Circuit has applied this "common sense approach" in approving wiretaps of "complex and sprawling criminal cases involving large conspiracies."  Id.

Once wiretapping authority has been granted, significant deference is owed to the issuing court by any reviewing court.  See, e.g., Ruggiero, 726 F.2d at 924 (noting the "deference properly accorded to the issuing judge").  Specifically, the Second Circuit has stated that:

> [W]e accord deference to the district court because "[t]he role of an appeals court in reviewing the issuance of a wiretap order . . . is not to make a de novo determination of sufficiency as if it were a district judge, but to decide if the facts set forth in the application were minimally adequate to support the determination that was made."

United States v. Miller, 116 F.3d at 663 (quoting Torres, 901 F.2d at 231); see also Diaz, 176 F.3d at 109 (same); United States v. Wagner, 989 F.2d 69, 72 (2d Cir. 1993) ("A reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists.  The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause.") (Internal citations omitted).

## II.      The McGuire Affidavit Plainly Demonstrates Necessity

Mulholland's arguments in support of suppression are twofold: (1) an MLAT request to Belize to perform certain alternative investigative techniques should have been made prior to resorting to a wiretap; and (2) the government could have solely relied on email search warrants to capture the evidence it subsequently procured through its wiretaps. Both of these arguments are belied by the plain language of the McGuire Affidavit and the dictates of prevailing Second Circuit case law.

### 1.      Certain Alternative Investigative Techniques Were Not Feasible

As an initial matter, Mulholland concedes that the McGuire Affidavit discussed the feasibility of utilizing alternative investigative techniques. (Mulholland Br. at 18-19). Mulholland takes issue, however, with the government's characterization of the feasibility of these various investigative techniques. Specifically, Mulholland argues that the government's failure to conduct surveillance, trash pulls, mail covers and subpoena issuances was solely based on the inconvenience and difficulty of performing these investigatory techniques in Belize. (Mulholland Br. at 19-21). Mulholland states that an MLAT request to Belize "arguably put all those methods readily within the government's reach." (Id.). The government, however, is not required to conduct every technique that is "arguably" or "theoretically" within its power. See Concepcion, 579 F.3d at 218. Rather, the law is clear that the government is only required to provide some basis as to why a particular investigative technique is not feasible. See Lilla, 699 F.2d at 103. The McGuire Affidavit is clear that certain alternative investigative techniques were not feasible for reasons that go far beyond the location of the investigation. With respect to surveillance, the McGuire Affidavit states:

> surveillance would not accomplish all of the goals of the investigation because it would not reveal the substance of any of

16

> the Subject Individuals' discussions with their accomplices, which is key to establishing their knowledge of the aforementioned illegal activities.   In addition, IPC, Titan and Legacy's clientele are believed to be in different locations and therefore likely discuss their illegal activities over the telephone.

(McGuire Affidavit ¶ 131).  With respect to mail covers, Special Agent McGuire reasoned that they would not reveal the content of communications between the target individuals and their accomplices and thus would not further the goals of the investigation.  (Id. ¶ 136).  With respect to trash pulls, Special Agent McGuire informed the court that based on his training and experience in investigating white collar fraud, it was "unlikely that relevant items, if any, in the trash would be sufficient to fulfill all of the goals of the investigation."  (Id. ¶¶ 1, 135).  With respect to subpoenas, Special Agent McGuire opined that such legal process would undoubtedly alert the target individuals to the presence of law enforcement scrutiny and hamper the investigation.  (Id. ¶¶ 132, 140).  Moreover, the target individuals would likely be uncooperative and invoke their Fifth Amendment rights should they be called to testify as part of a parallel SEC investigation.  (Id.).

Finally, Mulholland's argument that physical searches of the offices of IPC, Legacy and Titan would have provided sufficient evidence to meet the goals of the investigation is also belied by information contained in the McGuire Affidavit.  As discussed more fully below, critical information regarding the various schemes was communicated over the telephone. While a physical search may have assisted in identifying certain corrupt clients and IBCs, it would not have revealed the full nature of how those IBCs were being utilized in various market manipulation schemes.  (McGuire Affidavit ¶ 138).  Additionally, executed search warrants may have alerted targeted individuals to the government's investigation and resulted in the destruction of evidence, without conclusively obtaining proof against all members of the scheme.  (Id.).  In

sum, Special Agent McGuire's analysis with respect to the feasibility of alternative investigative techniques is wholly in line with the common sense and realistic approach espoused by the Second Circuit.  See Ruggiero, 726 F.2d at 924.

Furthermore, as the Court is well aware, the process for requesting international assistance through an MLAT is lengthy and can involve sensitive diplomatic maneuvering. Requesting MLAT assistance to conduct all possible investigative techniques in a foreign country is neither effective nor a proper utilization of an international treaty.  Indeed, the government cannot reasonably be expected to request MLAT assistance in every foreign-based investigation simply to "check the box" in its wiretap applications.  Despite Mulholland's contention to the contrary, not every potential investigative technique is feasible in "complex and sprawling criminal cases involving large conspiracies."  See Concepcion, 579 F.3d at 218.

Thus, Mulholland's argument that feasible alternative investigative means were not utilized is without merit and should be rejected.

> 2.    Additional Email Search Warrants Would
>        Not Have Met All the Goals of the Investigation

Mulholland next argues that email search warrants "were producing the type of information that the government sought through the use of wires."  (Mulholland Br. at 22). Mulholland is wrong.  The McGuire Affidavit notes that although "e-mail search warrants have provided valuable information to the investigation," they would not fulfill all of the goals of the investigation because, among other things, "the e-mails do not disclose the individuals' motivation for transferring money or requesting stock trades."  (McGuire Affidavit ¶ 137). Indeed, most, if not all, of the trading activity flowing through the three indicted brokerage firms was executed over the telephone.  As such, the continued use of email search warrants would not have revealed the fraudulent trading activities of the target subjects of the investigation.  For

example, the orchestrated stock trades involving the shares of Cannabis-Rx, Inc. ("CANA") would not have been discovered simply by reviewing emails.  (See SI ¶¶ 39-40).

The McGuire Affidavit also notes that many of the target individuals simply refrained from communicating the extent of their illegal activities over email. (McGuire Affidavit ¶ 137).  Indeed, multiple members of the conspiracy, including Bandfield and Godfrey, cautioned the Undercover Agent (and other clients) about the use of emails.  (Id. ¶¶ 36, 74, 80). Even if email was utilized, the email addresses often contained non-identifying information or aliases.  This made determining the true identity of a client extremely difficult, if not impossible. (Id. ¶ 137).  In telephone calls, however, IPC Corp's clients were more willing to identify themselves and discuss matters that they would otherwise not detail in emails.

Accordingly, it is clear that additional email search warrants would not have met all the goals of the investigation.

**POINT TWO**

**EVIDENCE OBTAINED THROUGH THE BELIZE
SEARCHES AND DISCOVERY PRODUCED AFTER
MAY 18, 2015 SHOULD NOT BE SUPPRESSED**

In his motion, Bandfield argues that the Court should suppress the evidence obtained from the Belize searches because: (i) the government allegedly violated its Rule 16 obligations by failing to provide any information concerning the Belize searches – including the search warrant itself – or the MLAT Request; (ii) the Belize searches allegedly violated Bandfield's Fourth Amendment rights; (iii) the government has allegedly not reviewed the majority of the materials seized from the Belize searches, rendering them as general searches in violation of the Fourth Amendment; and (iv) the government allegedly produced the materials obtained from the Belize searches in an untenable manner.  (Bandfield Br. at 10).  Bandfield also argues that, for many of the same reasons that the evidence obtained from the Belize searches should be suppressed, the Court should also suppress the discovery produced after May 18, 2015.  (Id.).  Mulholland joins in Bandfield's motion to suppress the Belize materials.  (Mulholland Br. at 29-35).  As set forth below, the defendants' arguments fail on their merits.

**I.      Rule 16 Does Not Compel the Production of the MLAT
        Request or the Belizean Search Warrant Materials**

      **A.      Applicable Law**

Contrary to the defendants' assertions, the government is not obligated pursuant to Rule 16 to produce the MLAT Request or the Belize search warrant and supporting materials.[13]  Specifically, Rule 16(a)(1)(E) mandates only that the government:

---

[13]      The government has reviewed the contents of the MLAT Request for any potentially exculpatory material as defined by Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

[P]ermit the defendant to inspect and to copy or photograph . . . papers [or] documents . . . if the item is within the government's possession, custody, or control and:

(i)     the item is material to preparing the defense;

(ii)    the government intends to use the item in its case-in-chief at trial; or

(iii)   the item was obtained from or belongs to the defendant.

Thus, to demonstrate that they are entitled to information pursuant to Rule 16(a)(1)(E), the defendants must show both that the information is within the government's possession, custody or control, and that the information is material to the preparation of their defense.[14]  "Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case."  United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1991) (citing United States v. Ross, 511 F.2d 757, 762-63 (5th Cir. 1975)) (citations omitted).  Evidence is "material" if pre-trial disclosure would enable the defendant "significantly to alter the quantum of proof in his favor."  Id.  A defendant must make a prima facie showing of materiality.  United States v. Reddy, 190 F. Supp. 2d 558, 573 (S.D.N.Y. 2002).

**B.     Discussion**

1.     The MLAT Request

Here, the defendants have failed to show how the MLAT Request is material to their defense.[15]  In their motions, the defendants speculate that U.S. authorities collaborated with

---

[14]     The government does not intend to use the MLAT Request itself or the Belize search warrant and supporting materials in its case-in-chief at trial, and the materials at issue were neither obtained from nor belong to the defendants.

[15]     Notably, third parties to the treaty between the U.S. and Belize – such as Bandfield and Mulholland – do not have standing to challenge the legal sufficiency of a request made pursuant to the treaty.  (See Bandfield Br., Exhibit A, Treaty Between the United States of America and Belize, signed on September 19, 2000 ("MLAT"), at Article 1(4) ("The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the

Belizean law enforcement authorities to such an extent that an agency relationship existed, based on such evidence as a few trucks with U.S. flag decals being present at the search sites (which the government explained above), and a citation to a Belizean judicial opinion in which the court recounts an affidavit of a Belizean authority in which he stated that the Belize FIU collaborated with "unnamed foreign competent authorities," which the judge interpreted as "presumably related to the MLAT Request" because the affidavit recounts that "a United States District Court indictment was shared."   (See Bandfield Br. at 9, 22; Mulholland Br. at 32-34).    Such speculative examples of the U.S. law enforcement's supposed involvement in the Belize searches does not provide a sufficient basis to challenge the government's recitation of the United States' involvement (or lack thereof) in the Belize searches.   Simply put, the defendants' conjecture upon conjecture does not establish the materiality of the MLAT Request such that production of the request is required pursuant to Rule 16.

Additionally, the MLAT Request is not relevant to the defendants' motion to suppress the evidence obtained from the Belize searches on Fourth Amendment grounds because foreign-gathered evidence obtained pursuant to a foreign search warrant, such as the Belize searches, in which an agency relationship does not exist between U.S. law enforcement and its foreign counterpart is only subject to suppression if the search "shocks the judicial conscience." United States v. Lee, 723 F.3d 134, 140 (2d Cir. 2013) (citing United States v. Maturo, 982 F.2d 57, 60-61 (2d Cir. 1992)).   Conduct does not shock the judicial conscience "when it is simply illegal; rather, it must be egregious."   United States v. Getto, 729 F.3d 221, 228 (2d Cir. 2013) (citations and internal quotations omitted).   As explained in Getto, conduct does not shock the

---

execution of a request.")).   Thus, the defendants do not have standing to argue for the suppression of evidence obtained from the Belize searches on the basis of some perceived violation of the terms of the MLAT, such as an alleged failure to complete Form C of the MLAT or an alleged failure to maintain evidentiary logs of the Belize searches, as Bandfield alleges.   (See Bandfield Br. at 33-34).

judicial conscience when, for example, the conduct at issue does not involve acts "of torture, terror, or custodial interrogation of any kind," or when there is "no claim of rubbing pepper in the eyes or other shocking conduct." Id. at 229 (citations and internal quotation marks omitted). The Getto court further noted that "[t]he shocks the judicial conscience standard is meant to protect against conduct that violates fundamental international norms of decency." Id. (citing United States v. Emmanuel, 565 F.3d 1324, 1331 (11th Cir. 2009)).

Here, assuming arguendo, the credibility of the facts of the search as contained in Andrew Godfrey's affidavit,[16] the Belize searches do not come close to shocking the judicial conscience. Godfrey's primary complaints regarding the Belizean authorities' search of IPC Corp's corporate office, which took place predominantly during daytime hours, appear to be that the search was overbroad in his opinion, and that the Belizean authorities were not documenting the search in the way that he would have liked. (Bandfield Br., Exhibit B, Affidavit of Andrew Godfrey). Godfrey also complains that the IPC Corp employees present during the search were not allowed to leave until 7:00 p.m. (instead of their usual 4:00 p.m.) and that they could not use their cellular telephones or visit the restroom for a few hours. Again, these allegations do not come close to the acts of torture or "rubbing pepper in the eyes" that would warrant a finding that the search of IPC Corp's offices violated fundamental international norms of decency.

Additionally, MLATs generally anticipate that the fact of the request, the information contained therein and any associated communications are not to be disclosed. For example, Article 5(5) of the MLAT requires the parties to use best efforts to maintain confidentiality, and reflects a longstanding practice of the confidentiality of communications

---

[16]    Notably, Godfrey fails to include in his affidavit that he is an indicted co-conspirator in this case, and that he would benefit substantially from the suppression of the evidence obtained from the Belize searches.

between sovereigns and law enforcement agencies.  (MLAT at Article 5(5)).  Further, Article 7 of the MLAT explicitly recognizes that disclosure of an MLAT request is permissible where there exists "an obligation to do so under the Constitution of the Requesting State in a criminal prosecution."  (Id. at Article 7(3)).  The Technical Analysis of the Mutual Legal Assistance Treaty between the United States and Belize explains that Article 7 was inserted to permit U.S. prosecutors to comply with their obligations under Brady v. Maryland, 373 U.S. 83 (1963),  by providing exculpatory evidence to a defendant in a criminal prosecution.  (Executive Report 107-15, Report on the Treaty between the Government of the United States of America and the Government of Belize on Mutual Legal Assistance in Criminal Matters (Treaty Doc. 107-13)). Since its inception, the MLAT contemplated that the requirement of confidentiality would be breached to meet constitutional obligations only, and not for purposes of routine discovery. Accordingly, Rule 16 does not compel the government's production of the MLAT Request.[17]

---

[17]    Both defendants cite to United States v. Castroneves, No. 08-CR-20916, 2009 WL 528251 (S.D. Fl. Mar. 2, 2009), and United States v. Gomez Castrillon, No. 05-CR-156, 2007 WL 2398810 (S.D.N.Y. Aug. 15, 2007), in support of their contention that the government is obligated to produce the MLAT Request as Rule 16 discovery.  (Bandfield Br. at 12 n.3; Mulholland Br. at 30).  Both cases are distinguishable.  In Castroneves, the district court ordered the production of MLAT-related materials because the defendants wanted to challenge the validity of a court order that tolled the statute of limitations in the case based on the government's pending MLAT request to Brazil.  2009 WL 528251, at *2.  Here, the government does not rely upon the MLAT Request to toll the statute of limitations.  Thus, Castroneves is inapposite.

       In Gomez Castrillon, the government voluntarily provided multiple MLAT requests in discovery related to Colombian wiretaps.  2007 WL 2398810 at *1.  The defendants argued that the government had violated Rule 16 by failing to produce all of the documents necessary for the defendants to challenge the legality of the Colombian wiretaps, including additional MLAT requests.  Notably, the court determined that any additional MLATs would be "of no relevance" to the defendants' "doomed motion," because the defendants had "no basis under the Fourth Amendment to challenge the legality of the Colombian wiretaps."  Id. at *5.  The same logic applies here, rendering the MLAT Request that Bandfield and Mulholland seek outside the scope of Rule 16.  Without citing to any legal support, the Gomez Castrillon court ultimately ordered the government to produce any additional documentation relating to the Colombian wiretaps, including any additional MLAT requests, in the government's possession so that the defense could challenge how the Colombian wiretaps "came to be installed, how they were conducted and how the recorded conversations were preserved."  Id.  It is not clear from the court's opinion how the

2.    <u>The Belize Search Warrant and Supporting Materials</u>

Additionally, Rule 16 does not compel the government to produce the Belize search warrant and supporting materials.  First, the requested documents are not in the government's possession, custody or control.  Second, the defendants have failed to show how the documents are material to their defense, other than to speculate without basis that U.S. law enforcement is hiding an agency relationship that it cultivated with Belizean law enforcement, despite the fact that the government has maintained over and over again that no such relationship existed.  <u>See</u>, <u>e.g.</u>, <u>United States v. Morrow</u>, 537 F.2d 120, 140 (5th Cir. 1976) (noting that excluding foreign evidence would not deter unlawful conduct by United States law enforcement and that "[n]ormal lines of communication between the law enforcement agencies of different countries are beneficial without question and are to be encouraged"); <u>cf.</u> <u>United States v. Rose</u>, 570 F.2d 1358, 1361-62 (9th Cir. 1978) (noting that the exclusionary rule does not apply to foreign searches by foreign law enforcement because of the "doubtful deterrent effect on foreign police practices that might follow from a punitive exclusion of the evidence by an American court") (citations omitted).

As noted above, requesting copies of foreign search warrant documents is not typical of MLAT requests, and to request these documents from Belize pursuant to an MLAT request on behalf of the defendants would be improper under the terms of the treaty.  (<u>See</u> MLAT at Article 1(4)).  To submit such a request on the defendants' behalf would be, at best, in disharmony with the MLAT and a basis for denial by Belize and, at worst, an effort to unilaterally change the terms of the MLAT, a basis for terminating the treaty.  (<u>See</u> <u>id.</u> at Article

---

government's MLAT requests would contain such information such that their production would be warranted.

25

1(1) ("The Contracting Parties shall provide mutual assistance, in accordance with the provisions of this Treaty, in connection with the investigation, prosecution, and prevention of criminal offenses, and in proceedings related to criminal matters."); Article 19(4) ("Either Party may terminate this Treaty by means of written notice to the other Party. Termination shall take effect six months following the date of receipt of the notification.")). Likewise, any court order requiring the government to use the MLAT on behalf of the defendants is arguably an action tantamount to an effort to expand the treaty, which authority is constitutionally vested with the executive branch. See, e.g., Oetjen v. Central Leather Co., 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative – 'the political' – departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.") (citations omitted).

Though the defendants may not use the MLAT themselves, nor may the government be required to use it on their behalf, the defendants are not without other effective means to obtain what they seek. For example, Bandfield and Mulholland may request, and this Court may grant, the use of a letter rogatory, i.e., a request from a U.S. court to a foreign court asking the foreign court to use its powers, including compulsory process, to secure the evidence at the behest of the U.S. court. 28 U.S.C. § 1781(a)(2), (b)(2); United States v. Jefferson, 594 F. Supp. 2d 655, 675 (E.D. Va. 2009) ("the decision to issue letters rogatory lies within a district court's sound discretion"); United States v. Rosen, 240 F.R.D. 204, 215 (E.D. Va. Feb. 14, 2007) (same). Accordingly, the defendants' argument that Rule 16 compels the government's production of the Belize search warrant and supporting materials fails.

26

## II.    The Belize Searches Did Not Violate the Defendants' Fourth Amendment Rights

In their pre-trial motions, the defendants claim that the evidence obtained from the Belize searches should be suppressed because the searches of IPC, Titan, Legacy and Unicorn's offices were unlawful and violated the Fourth Amendment.  (Bandfield Br. at 18-25; Mulholland Br. at 32-35).  As set forth below, the defendants' arguments are unavailing.

### A.    Applicable Law

The exclusionary rule generally does not apply to searches conducted by foreign government officers.  Getto, 729 F.3d at 227; United States v. Lee, 723 F.3d 134, 140 (2d Cir. 2013) ("suppression is generally not required when the evidence at issue is obtained by foreign law enforcement officials"); United States v. Janis, 428 U.S. 433, 455 n.31 (1976) ("It is well established, of course, that the exclusionary rule, as a deterrent sanction, is not applicable where . . . a foreign government commits the offending act").  The Second Circuit has noted "two circumstances where evidence obtained in a foreign jurisdiction may be excluded[:] [f]irst, where the conduct of foreign officials in acquiring the evidence is so extreme that it shocks the judicial conscience and second, where cooperation with foreign law enforcement officials may implicate constitutional restrictions."  Getto, 729 F.3d at 228 (citing Lee, 723 F.3d at 140).

### B.    Discussion

#### 1.    Shocks the Conscience Exception

As discussed above, the actions of the Belizean authorities during the execution of the Belize searches do not shock the conscience.  Bandfield's allegations in his affidavit, if accepted as true, detail searches conducted pursuant to a search warrant that were, at most, overbroad, and resulted in the seizure of a comparatively few number of items that Bandfield

alleges were personal in nature.[18]  This is legally insufficient to shock the judicial conscience.

See Getto, 729 F.3d at 229 (finding that defendant's allegation that Israeli law enforcement officials may not have obtained a warrant under Israeli law prior to conducting searches or surveillance "hardly violate[d] fundamental international norms of decency") (quoting United States v. Mitro, 880 F.2d 1480, 1484 (1st Cir. 1989) (internal quotation marks omitted)).  Even if evidence was obtained in violation of foreign law, as the defendants allege in their motions, that alone does not necessarily shock the conscience.  See Lee, 723 F.3d at 142 (noting that, in considering the defendant's challenge to the legality of the use of Jamaican wiretaps, even if Jamaican law enforcement officers "somehow operated improperly under Jamaican law in obtaining the electronic surveillance" of the defendant, there was no showing of a departure from the norms of decency);  see also Mitro, 880 F.2d at 1483 n.2 (rejecting argument that "evidence derived from a foreign search is not admissible in an American prosecution if the foreign search violated foreign law").  Indeed, the Supreme Court has stated that a "court's inherent power to refuse to receive material evidence is a power that must be sparingly exercised [only in cases of] manifestly improper conduct by federal officials."  Getto, 729 F.3d at 230 (quoting Lopez v. United States, 373 U.S. 427, 440 (1963)).  The Belizean authorities exhibited no such conduct during the Belize searches.[19]

---

[18]  Notably, many of the items that Bandfield and his wife allege are solely personal in nature, such as their tax return information, have evidentiary value in this case.

[19]  Bandfield argues in his motion that the Belize searches were so broad that they constituted "general searches that captured everything in IPC Corp's office except carpet, chairs, filing cabinets and desks."  (Bandfield Br. at 20).  Bandfield even laments that the Belizean authorities took photocopy machines.  (Id. at 22).  While the Belize searches were certainly broad in scope, when considering the fact that the entire purpose of IPC Corp, Titan, Legacy and Unicorn was to perpetrate crimes such as securities fraud, money laundering and tax evasion, the seizure of the vast majority of documents and computers/electronic media from those offices is not unreasonable, and certainly does not shock the conscience.  Indeed, even photocopiers – many of which contain hard drives that retain scanned images of documents – can contain evidence of the defendants' criminal conduct in this case.

2.      Constitutional Restrictions Exception

The second exception to the general rule that suppression is not required when the evidence at issue was obtained by foreign law enforcement is when "cooperation with foreign law enforcement officials may implicate constitutional restrictions."  Getto, 729 F.3d at 230 (quoting Lee, 723 F.3d at 140).  "[C]onstitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials."  Id.  In Getto, the Second Circuit found that foreign law enforcement agents became "virtual agents" of U.S. law enforcement authorities in instances where "American officials [ ] play some role in controlling or directing the conduct of the foreign parallel investigation."  Id.  The Getto court further explained that "[i]t is not enough that the foreign government undertook its investigation pursuant to an American MLAT request."  Id.

Here, the record makes clear that U.S. officials neither controlled nor directed the Belizean authorities prior to or during the Belize searches.  As set forth above, U.S. law enforcement authorities made a request to the Central Authority of Belize to search the offices at issue pursuant to the procedures set forth in the MLAT.  U.S. law enforcement did not assist the Belizean authorities in obtaining the search warrant in Belize, and it did not control or direct Belizean law enforcement during the execution of the searches.  In fact, the Belizean government declined without discussion the government's request to allow U.S. law enforcement members to be present during the searches.  The law makes clear that the MLAT Request alone does not render the Belizean authorities "virtual agents" of U.S. law enforcement.  See Getto, 729 F.3d at 232; United States v. Lira, 515 F.2d 68, 71 (2d Cir. 1975) ("where the United States Government

29

plays no direct or substantial role in the misconduct and the foreign police have acted not as United States agents but merely on behalf of their own government, the imposition of a penalty would only deter United States representatives from making a lawful request . . . and would not deter any illegal conduct").

The Second Circuit's analysis in <u>Getto</u> – a case that Bandfield fails to cite in his motion – is particularly relevant here.  In <u>Getto</u>, American law enforcement authorities requested through the MLAT that the Israeli National Police ("INP") investigate Getto and his co-conspirators for their participation in a conspiracy that had defrauded American victims through a lottery telemarketing scheme operated out of boiler rooms located in Israel.  <u>Getto</u>, 729 F.3d at 225-26.  As part of the MLAT request, the FBI provided the INP with the details of the investigation in the United States, which ultimately led to the INP requesting and receiving Israeli court authorization to install a clandestine surveillance device in one of the boiler rooms and to search it.  The defendant alleged that news reports stated that a "live feed" allowed American law enforcement officials to view surveillance footage in real time.  <u>Id.</u> at 231.  Based in part on the evidence shared by the INP with American law enforcement, Getto was arrested in the United States.  <u>Id.</u> at 226.

The <u>Getto</u> court found that the collaboration between U.S. law enforcement officials and the INP, which was far more extensive than any collaboration between U.S. and Belizean authorities in this case, did not make the INP "virtual agents" of the U.S. authorities. <u>Id.</u> at 231-32.  Nor did the fact that the INP shared the fruits of their investigation with U.S. agents mean that an agency relationship had been created.  Indeed, the <u>Getto</u> court found that "[w]e have long allowed foreign authorities to share the fruits of an investigation with their American counterparts without suggesting or assuming that the latter controlled the

30

investigation." Id. at 231.  Notably, the Getto court was not concerned that the INP shared evidence with American law enforcement officials almost instantaneously, noting that "[t]he ability of modern law enforcement agencies, aided by global telecommunications, to share information across borders without delay is not a significant departure from the traditional method of sharing surveillance after-the-fact and does not, in and of itself, give rise to an inference of agency." Id. at 232 (citing Morrow, 537 F.2d at 140).[20]

The record also makes clear that the government's MLAT Request was not designed to evade constitutional requirements applicable to American officials.  See Lee, 723 F.3d at 140.  "[T]his method of fulfilling the 'constitutional restrictions' exception requires some intent to evade American constitutional requirements."  Getto, 729 F.3d at 232 (citations omitted).  Here, the government requested the searches at issue because there was no legal mechanism whereby U.S. law enforcement officials could effect the searches on their own, and there is certainly no demonstration of intent to circumvent constitutional requirements.  See id. at 232-33 ("the record demonstrates that the decision to request INP assistance was motivated by

---

[20]     The Getto opinion appears to have fatally undermined the district court's analysis in United States v. Vilar, No. 05-CR-621, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007), a case upon which Bandfield heavily relies.  (See Bandfield Br. at 21-22).  In Vilar, in considering the defendant's motion to suppress evidence seized during a search in the United Kingdom conducted pursuant to the government's MLAT request, the district court assumed, without objection from the government, that the U.K. authorities acted as agents of U.S. law enforcement in executing its MLAT request.  This assumption appears to be in error in light of the Getto court's finding that an MLAT request alone does not trigger an agency relationship. See also United States v. Aleem, 88 F. Supp. 3d 110, 115 (N.D.N.Y. 2014) (finding that "U.S. authorities' mere initiation of an investigation by a foreign police force, or a request for assistance, is not sufficient to demonstrate control or direction such that an agency or virtual agency exists") (citing Getto, 729 F.3d at 232).  Notably, the district court in United States v. Adler, 605 F. Supp. 2d 829 (W.D. Tx. 2009), expressly declined to follow the Vilar Court's finding of an agency relationship between U.K. and American law enforcement officials because of the U.S.'s MLAT request; instead, it found the analysis in Gomez Castrillon more persuasive, citing to the Gomez Castrillon court's holding that Colombian law enforcement officials "were acting as agents of their own, sovereign government responding to a request made under a bilateral treaty.  Responding to an MLAT by conducting an investigation in one's own country does not render foreign officials agents of the United States." Adler, 605 F. Supp. 3d at 837.

the inability of American law enforcement agents to further investigate criminal activity occurring substantially within the territory of a foreign sovereign").

Because neither exception to the rule against suppression of foreign evidence applies in this case, the evidence obtained pursuant to the Belize searches should not be suppressed.[21]

---

[21]     Even if the Belizean authorities acted as "agents" or "virtual agents" of U.S. law enforcement so as to implicate the Fourth Amendment, the Belize searches were reasonable.  The Second Circuit has found that the warrant requirement of the Fourth Amendment does not apply to searches overseas, even where the search is conducted by U.S. agents on U.S. citizens.  Instead, such a search need only satisfy the Fourth Amendment's requirement of reasonableness.  In re Terrorist Bombings of U.S. Embassies in East Africa (Fourth Amendment Challenges, United States v. Odeh), 552 F.3d 157, 167-172 (2d Cir. 2008) (holding that U.S. agents conducting searches abroad of U.S. citizens need only satisfy the Fourth Amendment's reasonableness requirement); see United States v. Juda, 46 F.3d 961, 968 (9th Cir. 1995) (holding that the Fourth Amendment's reasonableness standard applies to U.S. officials conducting searches affecting U.S. citizens in foreign countries, and a foreign search is reasonable if it conforms to requirements of foreign law).  As set forth above, the Belize searches were reasonable because they complied with Belizean law in that the Belizean authorities obtained a search warrant prior to searching the offices at issue.

        Additionally, if the Belizean authorities ultimately did not comply with Belizean law during the Belize searches, the good faith exception to the exclusionary rule precludes suppression of the evidence.  See United States v. Barona, 56 F.3d 1087, 1092-93 (9th Cir. 1995); see also United States v. Peterson, 812 F.2d 486, 491-92 (9th Cir. 1987) (where American law enforcement agents rely upon the representations of foreign law enforcement officers that there has been compliance with foreign law, there is no suppression of the evidence even if the foreign law was violated and no authorization was obtained); Vilar, 2007 WL 1075041 at *58.  Here, U.S. law enforcement reasonably relied upon the Belizean authorities' representation that the evidence seized during the Belize searches was lawfully obtained pursuant to a valid warrant.  As discussed above, the American agents who reviewed the materials obtained from the Belize searches after they had been made available to U.S. law enforcement did not view the search as fatally overbroad.  "Moreover, requiring American law enforcement officials to make extensive pre-search inquiries about the legality of a foreign government official's conduct would be diplomatically delicate, to say the least."  Id. (noting that, in a typical extraterritorial search, "American law enforcement officers [are] not in an advantageous position to judge whether the search was lawful and holding them to a strict liability standard for failings of their foreign associates would be even more incongruous" than "[h]olding [them] to a strict liability standard as to the adequacy of domestic warrants") (internal quotation marks and citations omitted).  Accordingly, the good faith exception applies, and the evidence obtained pursuant to the Belize searches should not be suppressed.

### III.    The Government Did Not Produce the Evidence
### From the Belize Searches in an Untenable Manner

In his motion, Bandfield argues that the government, "acting through and in concert with Belizean officials," seized and imaged computers that housed "nearly 56 terabytes of data," which amounts to "approximately *28,000,000,000 pages.*" (Bandfield Br. at 33) (emphasis in original).  Bandfield further complains that the government's production of the computer/electronic media evidence obtained from the Belize searches is "not searchable" and that "one cannot enter search terms across the entire universe of data."  (Id.).  Bandfield also argues that the government did not provide an inventory for the hard drives produced.  (Id.).

Bandfield's dramatic characterization of the government's production of the electronic materials obtained from the Belize searches is, at best, misguided.  As set forth above, the government did not seize the computer/electronic evidence at issue during the Belize searches; instead, it copied these materials after they were made available for imaging by the Belizean authorities following the searches.  Additionally, the government never produced 56 terabytes of data to Bandfield; in fact, the government produced 13.2 terabytes of data on the hard drives Bandfield provided to the government.[22]  After removing the operating system files, approximately 2.1 million documents are available for Bandfield's review from the Belize searches, constituting *2 terabytes* – not 56 terabytes – of data.  And contrary to Bandfield's representation, the government provided Bandfield with an inventory of the electronic evidence produced from the Belize searches.

Additionally, the government is not obligated to produce the computers/electronic media obtained from the Belize searches in a searchable format.  The government provided the

---

[22]    Bandfield appears to have come up with the 56 terabytes figure by adding the total potential storage available on all of the hard drives he provided to the government.  The hard drives produced to Bandfield were by no means filled to capacity.

images of the computers/electronic media obtained from the Belize searches in FTK format to Bandfield, which are exact forensic copies of the evidence and standard practice for production of electronic evidence. There is nothing preventing Bandfield from uploading the images into a commercially-available search tool that he can then utilize to review the materials in the manner he so desires.

The government first learned of Bandfield's dissatisfaction with the manner in which the electronic evidence from the Belize searches had been produced in his pre-trial motion. Had Bandfield previously raised his concerns about the electronic evidence obtained from Belize, the government would have been more than willing to consider ways in which it could facilitate his review of the evidence at issue. For example, the government can export the 2.1 million files currently in the FBI's BIDMAS database and provide those files to Bandfield for review. Alternatively, the government can run keyword searches in the BIDMAS database and provide the resulting files to Bandfield. Now that the government is aware of Bandfield's concerns, it will work with him to facilitate his review of the electronic evidence obtained from Belize.

In sum, Bandfield's gross mischaracterization of the size of the electronic evidence obtained from the Belize searches and complaint about the manner in which it was produced fatally undermine his argument that the Court should suppress the evidence obtained from the Belize searches. Accordingly, the Court should deny his motion.

**IV.    The Government Did Not Delay in Reviewing and Producing Evidence
From the Belize Searches and Discovery Produced after May 18, 2015**

In his motion, Bandfield argues that the Court should suppress the evidence obtained from the Belize searches and any discovery produced after May 18, 2015 because of the

34

government's alleged unreasonable delay in reviewing and producing the materials.  (Bandfield Br. at 25-32).  For the reasons set forth below, Bandfield's arguments are meritless.

### A.      Applicable Law

Rule 16(d)(2) of the Federal Rules of Criminal Procedure states that "[i]f a party fails to comply with this rule, the court may: (A) order that party to permit the discovery or inspection; specify its time, place and manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances."  A district court has broad discretion in fashioning a remedy for a government's violation of Rule 16.  See, e.g., United States v. Salameh, 152 F.3d 88, 130 (2d Cir. 1998).  "In deciding what remedy is appropriate under Rule 16(d)(2), the district court should consider, inter alia, whether the defendant was prejudiced by the government's delay in disclosing the evidence in question."  United States v. Sanchez, 912 F.2d 18, 21 (2d Cir. 1990) (citations omitted).  "[T]he extreme remedy of blanket suppression should only be imposed in the most extraordinary cases."  United States v. Shi Yan Liu, 239 F.3d 138, 142 (2d Cir. 2000) (quoting United States v. Foster, 100 F.3d 846, 852 (10th Cir. 1996)).

### B.      The Evidence Obtained from the Belize Searches

In yet another attempt to suppress the evidence from the Belize searches, Bandfield asserts that the government provided the evidence to him in discovery approximately eight months after he was arrested – but prior to the Court's discovery deadline – and that the government has not complied with the terms of the Belize search warrant in reviewing the electronic evidence obtained from the Belize searches.  (Bandfield Br. at 29).  As detailed above, Bandfield was initially represented by the Federal Defenders in this case, who informed the government early in its representation of Bandfield that Bandfield wanted to retain new counsel

in this matter.   While the government made initial discovery productions to the Federal Defenders, it waited to produce the materials obtained from the Belize searches because a large number of hard drives was needed from defense counsel to complete the production.   To provide the hard drives to the Federal Defenders at taxpayers' expense, instead of waiting until Bandfield retained counsel in the case, would have been an unnecessary expenditure of resources and efforts.   Additionally, once Bandfield finally retained his current counsel in late February/early March 2015 (five months after his arrest), the government requested the needed hard drives from defense counsel, and then produced the materials obtained from the Belize searches in advance of the Court's May 18, 2015 discovery deadline.   In sum, any perceived delay in the government's production of the evidence obtained from the Belize searches is largely attributable to Bandfield himself.

In his motion, Bandfield argues that U.S. law enforcement agents are somehow bound by the Belize search warrant – which the government does not have in its custody and the U.S. agents have never seen – in their review of the evidence obtained from the Belize searches. This premise is false.   As set forth above, the Belizean authorities were not under the direction or control of U.S. law enforcement when they obtained a search warrant for IPC Corp's, Titan's, Legacy's and Unicorn's offices in Belize, and U.S. authorities were neither consulted about nor participated in the searches themselves.   Belizean law enforcement later made the materials obtained pursuant to the searches available to U.S. law enforcement for review and copying.   The Belize search warrant and supporting materials were never shared with U.S. agents, and there has been no expectation that U.S. law enforcement is bound by the terms of a Belizean search warrant obtained by Belizean authorities in executing searches of Belize-based locations.   Thus, Bandfield's reliance on United States v. Ganias, 755 F.3d 125 (2d Cir. 2014), and United States

36

v. Metter, 860 F. Supp. 2d 205 (E.D.N.Y. 2012), is misplaced because, in both of those cases, law enforcement agents were limited in their review of the electronic evidence seized by the domestic search warrants obtained in those cases.  No such limitation applies here.

Bandfield also alleges that the government "has not completed (and may not have begun) its review" of the evidence obtained from the Belize searches.  (Bandfield Br. at 29).  Bandfield's assertion is inaccurate.   Unlike in the Metter case, in which agents seized a voluminous amount of computer evidence pursuant to a search warrant and then retained the images of the electronic evidence without any review of the data, 860 F. Supp. 2d at 211, law enforcement began processing and reviewing the evidence obtained from the Belize searches as soon as they returned from Belize.  As set forth above, the FBI's CART began processing the computers/electronic media as early as October 2014, and subsequently sent it, on a rolling basis, to the FBI's computer forensics laboratory in Washington, D.C. for uploading into the BIDMAS system.  As early as February 2015, files began being uploaded into the BIDMAS database and law enforcement agents were able to and proceeded to conduct searches and review relevant documents electronically.  Thus, Bandfield's allegations that the government has no plan for review of the electronic evidence obtained from Belize and has not begun its review of that evidence are without merit.

C.     **Discovery Produced After May 18, 2015**

Additionally, Bandfield argues that the Court should suppress any discovery that was produced after the Court's May 18, 2015 deadline as untimely.  (Bandfield Br. at 32).  Bandfield's argument is unpersuasive.  The government has an ongoing obligation to produce Rule 16 discovery that it acquires as it continues to investigate the charged crimes.  If the government receives documentary evidence from a cooperating witness after the discovery

deadline, as it did here, the government is not relieved of its duty to produce that evidence as Rule 16 discovery because of the Court's May 2015 discovery deadline.  Additionally, as set forth below, the government undertook an extensive firewall process regarding evidence received from another cooperating witness, who is an attorney.  Once the firewall process had been completed, and the investigative team had an opportunity to review the non-privileged materials it had obtained from the cooperating witness, it provided that evidence to Bandfield in discovery.  Regarding the Undercover Agent's recordings, the government realized after the discovery deadline that it had inadvertently failed to produce some of the recordings (which have little to no evidentiary value) and, realizing its oversight, produced an entire set of the undercover calls to supplement its prior discovery production.  Also, Mulholland's computer and phones were obtained during his June 23, 2015 arrest and searched thereafter pursuant to a search warrant.  Surely the Court's May 18, 2015 discovery deadline does not preclude the government's production of evidence obtained during an arrest of Bandfield's co-defendant that occurred <u>after</u> the deadline.

Bandfield also alleges that the government committed a flagrant discovery violation by producing Bandfield's and his wife Glenna Bergey's computers approximately 13 months after the electronic materials were obtained.  As courts have noted, a delay in searching electronic evidence pursuant to a search warrant must be reasonable, but there is no constitutional upper limit on reasonableness.  <u>See</u> <u>United States v. Burns</u>, No. 07-CR-556, 2008 WL 4542990, *8-9 (N.D. Il. Apr. 29, 2008) (finding a ten-month delay in the issuance of a warrant and the searching of computer equipment previously seized reasonable because of the lack of impact the delay had on the probable cause to search the computer, the absence of apparent bad faith or substantial prejudice to the defendant, and because suppression is an

extraordinary remedy); United States v. Gorrell, 360 F. Supp. 2d 48, 55 n.5 (D.D.C. 2004) (finding a delay of ten months in processing computer data to be lengthy, but not so long as to "take the data outside the scope of the warrant such that it needs to be suppressed").

Here, while the delay in searching the computer equipment at issue was lengthy, it was not unreasonable such that this Court should order such an extreme remedy as suppression. Notably, Bandfield has not asserted that the time lapse affected the probable cause to search the evidence, or that he has been prejudiced in any way. Considering that the electronic evidence at issue are Bandfield's and his wife's own computers, Bandfield cannot claim that he has to undertake an extensive review of the computers to determine their evidentiary value in this case.[23]

Also, Bandfield alleges bad faith on the part of the agents merely because of the agents' awareness of the suppression of computer evidence in the Metter case. (Bandfield Br. at 31 n.9). Bandfield fails to note, however, that Metter is distinguishable from this case in that Metter involved the government's failure, after fifteen months, to undertake a review of an extensive amount of electronic evidence, including 61 computer hard drives, obtained pursuant to search warrants. Such is not the case here. Also, Bandfield fails to explain how the agents' knowledge of suppression of evidence in the Metter case means that the agents acted with nefarious intent here.

Importantly, with respect to every instance cited by Bandfield regarding the government's production of discovery after the May 18, 2015 deadline, Bandfield does not and

---

[23]     Additionally, the government has arranged for the return of Glenna Bergey's computer to her (the government was not aware that she was waiting for her computer to be returned prior to the submission of her affidavit). Also, Bergey's concern that the U.S. law enforcement accessed her computer prior to obtaining a search warrant is unfounded – the government has confirmed that it did not access Bergey's computer prior to obtaining a search warrant in May 2015.

cannot argue that he has been prejudiced in any way, especially considering that a trial date has not yet been set in this case.   Bandfield urges this Court to resort to an extreme measure – suppression of evidence – to punish the government for actions that simply do not warrant such a disproportionate remedy.   Accordingly, Bandfield's motion to suppress should be denied.

## POINT THREE

## THE REQUEST FOR A BILL OF PARTICULARS SHOULD BE DENIED

Bandfield and Mulholland argue that a bill of particulars, as detailed below, is necessary to prepare their defense and prevent unfair surprise and prejudice at trial.

Bandfield requests a bill of particulars identifying the following: (i) all co-conspirators and the time periods of their individual involvement in each of the three charged conspiracies; (ii) the identities of the cooperating witnesses and the dates they began cooperating; (iii) the identity of John Doe 1; (iv) the identities and other information relating to the Corrupt Clients; (v) particulars concerning the 5,000 allegedly "sham" or "fraudulent" companies; (vi) any available information concerning the "Unidentified Individual" referenced in paragraph 50(j) of the superseding indictment; (vii) details concerning CANA, VLNX and CYNK stocks; (viii) specific information concerning the scheme and securities at issue in Count One; (ix) all companies that IPC Corp created for Mulholland or the Mulholland Group; (x) the allegedly fraudulent W-8BEN forms referenced in Count Two; (xi) the source of and the manner in which Bandfield participated in or supported the laundering of funds; and (xii) details developed in support of the Undercover Agent's identity and background.  (Bandfield Br. at 35-43).

Mulholland requests a bill of particulars identifying the following: (i) the names of shell companies the government maintains were used for "a pump and dump scheme"; (ii) the attorney escrow accounts and the holders thereof allegedly used to commit the crimes charged; (iii) the names of IBCs which were created for purposes of committing the crimes charged in the indictment, the beneficial owners of said IBCs and the "true" owners of the IBCs; (iv) the nominees claimed by the government to have controlled each of the companies that the

government claims were used for the pump and dump scheme; (v) the names of any "sham" companies claimed by the government to have been used to "park shares"; (vi) each "penny stock" alleged by the government to have been used by the defendants to facilitate the crimes charged; (vii) the wash trades made by the defendants or by others acting on their behalf, when said wash trades were executed, by whom they were executed and the manner in which these particular trades furthered the conspiracy as related to each company; (viii) for each company [stock] charged as part of this conspiracy, the companies or individuals who controlled the shares; (ix) details of the securities transactions connected to the alleged pump and dump schemes; (x) details about the fraudulent promotional activity associated with the alleged pumps and dump schemes; (xi) the manner in which the defendants impeded the IRS from conducting its functions of revenue collection; (xii) the relevant parts of the FATCA statute that are applicable to the defendants and that they sought to violate; (xiii) the monetary transactions and fraudulent sales of securities that form the basis for these charges; and (xiv) the precise documents used before the Grand Jury which were gained from the cooperating witness with whom Mulholland or Legacy can claim an attorney-client privilege.  (Mulholland Br. at 38-43).

For the reasons set forth below, the defendants' request for a bill of particulars should be denied.

## I.   <u>Applicable Law</u>

Under Federal Rules of Criminal Procedure 7(c), an indictment need only set forth a "plain, concise and definite written statement of the essential facts constituting the offense."  Additional details, in the form of a bill of particulars, are not appropriate unless the indictment is too vague to inform the defendant of the nature of the charges to allow the preparation of a defense, or if necessary to avoid unfair surprise or allay double jeopardy

concerns.  See United States v. GAF Corp., 928 F.2d 1253, 1260 (2d Cir. 1991); United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990).  If the information sought by the defendant is provided in the indictment or through some other means, a bill of particulars is not warranted.  See United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999); United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987).

In order to obtain a bill of particulars, a defendant must show a need for each of the particulars demanded and explain how the denial of each one will prevent him from identifying the specific crimes with which he is charged.  The ultimate test of the appropriateness of a bill of particulars is whether the information is necessary, not whether it would be helpful to the defendant.  See United States v. Aliperti, 867 F. Supp. 142, 148 (E.D.N.Y. 1994); United States v. Weinberg, 656 F. Supp. 1020, 1029 (E.D.N.Y. 1987).  In fact, a bill of particulars is only required when the charges in the indictment are so general that they fail to apprise the defendant of the specific acts of which he is accused.  See Torres, 901 F.2d at 234; see also Bortnovsky, 820 F.2d at 574; United States v. Salazar, 485 F.2d 1272, 1277 (2d Cir. 1973) (finding sufficient "indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms").

There are three basic reasons for these restrictions on the use of bills of particulars. First, their use "is not comparable to discovery in civil [cases] because of the nature of the issues, the danger of intimidation of witnesses, and the greater danger of perjury and subornation of perjury." United States v. Persico, 621 F. Supp. 842, 868 (S.D.N.Y. 1985) (internal quotations and citations omitted).  Second, the government must not be compelled "to give a preview of its evidence and legal theories lest the defendant tailor his testimony to explain away the Government's case." United States v. Jimenez, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) (citations

43

omitted).  Finally, the government should not be stopped from "using proof it may develop as the trial approaches."  Id. (citation omitted).

A motion for a bill of particulars should be denied where it would "unduly restrict the Government's ability to present its case."  United States v. Baez, 62 F. Supp. 2d 557, 559 (D. Conn. 1999).

## II.     Discussion

### A.     Information Provided To the Defendants Provides Them with Sufficient Notice of the Pending Charges

First, the charges in the superseding indictment provide the defendants with the necessary information to apprise them of the charges to allow them to prepare a defense, avoid unfair surprise and preclude double jeopardy.  See GAF Corp., 928 F.2d at 1260.  In fact, "indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms" are sufficient.  See Salazar, 485 F.2d at 1277.  But the government has done more here.  In a 28-page and 59-paragraph "speaking" indictment, the government has provided the defendants with information about the defendants and their entities, information about co-defendants and their entities, information about relevant regulatory principles and information about the fraudulent scheme, including specific examples of how the scheme was executed and the roles played by Bandfield and Mulholland in the scheme.

Second, there can be no dispute that the government has provided the defendants with extensive Rule 16 discovery, which it has been providing to the defendants, as it receives it, on a rolling basis.  Additionally, as a courtesy and prior to the scheduling of any trial date, the government hereby agrees to specify the manipulated stocks upon which it intends to rely at trial.  The government expects to rely substantively on 10 stocks (or fewer) at trial and expects to provide the defendants with the vast majority, if not all, of the selected stocks by the end of January 2016.

Moreover, the government can confirm that two of these stocks will be VLNX and CYNK, as charged in the indictment.

Collectively, the superseding indictment, the government's discovery and the government's agreement to specify the manipulated stocks upon which it intends to rely at trial provide the defendants with more than adequate detail regarding the crimes with which they are charged, and distinguish this case from those situations where "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." Torres, 901 F.2d at 234.   Under these circumstances, no further disclosure is necessary or justified.   See Walsh, 194 F.3d at 47 (explaining that if information sought by the defendant is provided in the indictment or through some other means, a bill of particulars is not warranted); Bortnovsky, 820 F.2d at 574; Urso, 369 F. Supp. 2d at 271.

## B.    The Defendants' Requests Lack Merit

A defendant must establish why he needs each of the particulars demanded and explain how the denial of each will prevent him from identifying the specific crimes with which he is charged.   Therefore, the question is not whether the information would be helpful to the defendant, but rather whether the information is necessary.   United States v. Gotti, 784 F. Supp. 1017, 1019 (E.D.N.Y. 1992) (bill of particulars is necessary only if "directed to curing defects in an indictment; that is [only if it] clarifies the charges against the defendant") (emphasis in original).

Except as noted below, the defendants' requests appear to be an attempt to have the government do the work of defense counsel because the answers to a number of questions are provided in the superseding indictment or are easily found in the discovery.   Additionally, the government is concerned that the defendants are using this bill of particulars request to restrict the government's proof at trial.   As the Court is aware, a bill of particulars is not designed to support or

45

further such motives. See, e.g., United States v. Larracuente, 740 F. Supp. 160, 163 (E.D.N.Y. 1990) ("A bill of particulars is not to be viewed as a discovery device to seek and compel disclosure of the Government's evidence prior to trial . . . ."); United States v. Ianniello, 621 F. Supp. 1455, 1478 (S.D.N.Y. 1985) ("To require most of the further disclosure the defendants seek would do little more than restrict the government's proof at trial, which is not the purpose of a bill of particulars.")

      1.     Bandfield's Specific Requests

Bandfield argues that he "is faced with a vague indictment that does not clearly set forth the Government's theory as to [his] role in the charged conspiracies, or what alleged conduct makes him liable for securities fraud in connection with the purchase or sale of securities that he had no involvement in purchasing or selling." (Bandfield Br. at 35). Bandfield is wrong. As explained above, Bandfield has been provided with, and has access to, information and documents that, collectively, allow him to understand the charges against him and prepare a defense. See GAF Corp., 928 F.2d at 1260. Additionally, it is preposterous that Bandfield needs additional information about the specifics of his conduct that makes him liable for securities fraud. As the mastermind of the fraudulent Belize operation who admitted on video to creating offshore brokerage firms that worked in tandem with IPC Corp to enable U.S. citizens and residents to evade securities and tax laws, it boggles the mind that it is Bandfield who now claims to be "in the dark" as to the conduct that makes him liable for securities fraud. (See SI ¶¶ 2-5, 24-30). The law is clear. Bandfield need not be the trader executing the purchases and sales of securities to make him liable; not when he was the mastermind of the entire fraudulent operation that concealed the stockholders' true beneficial ownership and facilitated the fraudulent purchases and sales of securities through nominee accounts. (See id.; SI ¶ 50(k) ("During a telephone call on or about April 29, 2014 between Bandfield and Corrupt Client 8 . . .

, Bandfield stated, in part, "right now, most of our work is securities, surprisingly enough.  We see a lot of IPOs and lot of penny stock, OTC stock, pink sheets and all that.  We trade a lot of it through companies we set up.  Probably 99 percent of our business or 98 percent right now is this kind of stock.").   Accordingly, Bandfield's list of particulars is baseless and should be rejected.  Nevertheless, the government will briefly address each request below.

First, Bandfield is not entitled to a list of all co-conspirators and the time periods of their individual involvement in each of the charged conspiracies.  (Bandfield Br. at 35-36).  Bandfield has been charged in the three conspiracies with a number of co-defendants, so there is no doubt that Bandfield has been provided direct notice of some of his co-conspirators.  Additionally, the superseding indictment clearly indicates that the government considers IPC Corp's corrupt clients to be co-conspirators.  Information about IPC Corp's clients has been provided to the defendants in discovery.  Thus, no further particulars are necessary.  See Torres, 901 F.2d at 234 (bill of particulars is not properly used to provide "evidentiary detail" about the government's case; the government has no duty to disclose the precise manner in which the crimes alleged in the indictment were committed or to preview its evidence or legal theory); United States v. Cephas, 937 F.2d 816, 823 (2d Cir. 1991) (bill of particulars not required to identify the specific acts by which defendant furthered conspiracy); Jimenez, 824 F. Supp. at 363 (observing that requests for "whens," "wheres" and "with whoms" are routinely denied) (citing cases).

Second, Bandfield is not entitled to the identities of cooperating witnesses and the dates they began cooperating pursuant to a request for a bill of particulars.  (Bandfield Br. at 36).  It is therefore not surprising that Bandfield provides no legal basis for this request.  It bears noting, however, that the discovery and circumstances make clear the identities of the two

47

cooperating witnesses referenced as CW-1 and CW-2, although the dates that they began cooperating may not be evident.  Regardless, as set forth above, this information is not obtained through a request for a bill of particulars.

Third, under clearly-established law, Bandfield is not entitled to the identity of John Doe 1.[24]  (Bandfield Br. at 36-37).  The identity of John Doe 1 is not essential to Bandfield to enable him to prepare a defense, avoid unfair surprise and preclude double jeopardy.  See GAF Corp., 928 F.2d at 1260.  Nor does it assist Bandfield in clarifying charges against him.  See Gotti, 784 F. Supp. at 1019.  Notwithstanding any legal requirement to do so, the government hereby alerts Bandfield that John Doe 1 has been named in the government's wiretap affidavits and email search warrants and has been named on page 4 of Mulholland's brief.

Fourth, Bandfield's request for the identities and other information relating to the Corrupt Clients will be clarified by a second superseding indictment that the government intends to seek shortly.  (Bandfield Br. at 37-38).  As further clarification, the government is alleging that all of Bandfield's clients – both U.S. and non-U.S. clients – who utilized IPC Corp's fraudulent IBC structure were in fact "corrupt" and the government considers them to be co-conspirators in the same manner that it considers members of the Mulholland Group to be co-conspirators.  Any identities of the Corrupt Clients known to the government have been provided in the discovery produced to the defendants, and the reason the government believes them to be corrupt is clearly stated in the superseding indictment.  Specifically, the clients were "corrupt" because they were concealing their identities and beneficial ownership of stock through nominee

---

[24]     John Doe 1 was an employee of the now-defunct Bahamas-based broker-dealer Gibraltar Global Securities, Inc. who advised the Undercover Agent that Legacy and Titan could establish an IBC for him to facilitate his stock promotion business, and provided him with the contact information of co-defendant Kelvin Leach.  (SI ¶ 24).

accounts that were set up by Bandfield and IPC Corp so that they could engage in fraudulent stock manipulation schemes, launder those fraudulent proceeds through attorney escrow accounts and unidentifiable debit cards, and then evade paying taxes on those fraudulent proceeds.  (See SI ¶¶ 35-37).  Contrary to Bandfield's baseless request, he is also not entitled to summaries of information concerning the eight Corrupt Clients that were provided to the grand jury.  If anything, this information would be provided as Jencks material.  Finally, the government agrees that some of the eight Corrupt Clients identified in the superseding indictment are not U.S. citizens, and the government will supplement the list previously provided with the nationalities and residences of each of the eight Corrupt Clients.

Fifth, Bandfield is not entitled to any additional particularization as to why each of the 5,000-plus companies created by Bandfield was a sham or fraud.  (Bandfield Br. at 38).[25] Bandfield's claim that this information cannot be known to the government is belied by his own words to the Undercover Agent, when he assured the Undercover Agent that he could provide him with the means to conceal his identity and evade U.S. securities and tax laws.  (See SI ¶ 28). Finally, it is untrue that only U.S. clients are subject to U.S. securities laws; the securities laws are equally applicable to foreign nationals who trade in the U.S. markets.  Thus, Bandfield's request is grounded neither in fact nor law and should be denied.

Sixth, the government has provided all known information about the "Unidentified Individual" in paragraph 50(j) of the superseding indictment.  If the government learns the identity of this individual, it will provide that information to both defendants. However, the government disagrees with Bandfield's baseless argument that the government should be prohibited from offering evidence of this individual's trading in CANA at trial if it is

---

[25]      It bears noting that the only mention of "5,000" sham companies created by Bandfield is in paragraph 28 of the superseding indictment and not the 12 paragraphs cited by Bandfield.

unable to establish the identity of the individual.  The trading information and the intercepted telephone call are highly probative because they establish the fact that co-defendant Rohn Knowles, the head securities trader at Titan, was involved with selling shares of CANA during the relevant period.  Through this request, Bandfield is essentially asking the Court to give him the benefit of his fraudulent IBC structure and prevent the government from introducing evidence of fraud in instances where he was successful in concealing his corrupt client's identity. Thus, this request should be denied.

Seventh, the government has provided and will be shortly providing additional details about the trading of VLNX and CYNK, the stocks that form the basis for the substantive securities fraud counts.  The government has also provided and will provide any additional details that it obtains about the 10 stocks (or fewer) that it intends to rely on substantively at trial. Bandfield's claim that the superseding indictment does not allege the nature of the scheme to manipulate these stocks is belied by the plain words in the indictment.  (Bandfield Br. at 39). The superseding indictment alleges that the defendants, together with others, devised and engaged in a scheme whereby they agreed to "defraud investors and potential investors in various U.S. publicly traded companies through, inter alia, the fraudulent concealment of the true beneficial ownership interests in the various U.S. publicly traded companies, and the engineering of artificial price movements and trading volume in the stocks of the various U.S. publicly traded companies."  (SI ¶ 21).   Later, the indictment alleges that the Corrupt Clients, including Mulholland, "utilized IPC Corp's fraudulent IBC and LLC structure and brokerage accounts in the names of the IBCs at offshore brokerage firms such as Legacy, Titan and Unicorn to facilitate pump and dump schemes involving hundreds of microcap or penny stocks."  (SI ¶ 38). The indictment then goes on to describe the manner in which CANA, VLNX and CYNK were

manipulated.  (SI ¶¶ 39-47).  Again, in light of the overwhelming evidence and discovery that clearly establish Bandfield's role as the mastermind of the Belize operation designed to facilitate these stock manipulation schemes, it defies logic that Bandfield asks how he is "connected to the three schemes."  The government has never claimed nor does it now claim that Bandfield was directly involved in executing securities transactions, drafting false and misleading press releases, or engaging in matched trades or wash trades.  However, the government does allege in the indictment, and the evidence produced in discovery clearly establishes, that Bandfield set up his fraudulent IBC structure to enable his clients to conceal their identities and evade law enforcement and created offshore brokerage firms to execute securities transactions, and that he did this with knowledge that his clients intended to manipulate stocks in the U.S. markets.

Eighth, Bandfield requests specific information concerning the securities fraud conspiracy and the securities at issue in Count One.  (Bandfield Br. at 39-40).  Bandfield completely ignores the indictment and the evidence produced in discovery when he claims that the indictment lacks any allegation that he "was aware of or understood the objective of the alleged securities fraud conspiracy."  (Id.).  The indictment clearly details the securities fraud conspiracy between Bandfield, Godfrey, Knowles, Leach, De Wit, Psyllakis and Can and their clients.  For example, Bandfield's involvement in the securities fraud conspiracy is evident during the meetings with the Undercover Agent when Bandfield and Godfrey together explain the means by which the Undercover Agent can achieve his goals to manipulate stocks.  (SI ¶ 29).  It is well established that a conspiracy charge does not require a showing that the unlawful objectives of the conspiracy be accomplished.  United States v. Feola, 420 U.S. 671, 694 (1975).  Moreover, "the crime of conspiracy does not require that the object of the unlawful agreement be capable of fruition."  United States v. Parker, 165 F. Supp. 2d 431, 454 (W.D.N.Y. 2001).  As

Bandfield notes, the government will provide him shortly with a list of ticker symbols that were manipulated as part of the charged conspiracy.  But as stated above, as a courtesy and prior to the scheduling of any trial date, the government will provide both defendants, by the end of January 2016, with a list of 10 stocks (or fewer) to be introduced at trial.  These stocks will be a subset of the stocks that were manipulated by the Mulholland Group through the use of the sham companies and offshore brokerage firms associated with Bandfield.

Ninth, information about the IBCs and LLCs that IPC Corp created for the Mulholland Group and other clients has been provided in discovery.  (See Bandfield Br. at 40).  As a courtesy, the government will provide both defendants with one such document: an Excel spreadsheet, which has been provided in discovery, that lists over 5,000 entities and the client names associated with those entities.  However, as noted above, the government will provide the defendants with a list of 10 stocks (or fewer), which will narrow the parameters of the defendants' review of this list.

Tenth, Bandfield's claim that he is entitled to know the universe of the fraudulent W-8BEN Forms that he will have to defend against is not the standard for a bill of particulars.  (See Bandfield Br. at 41).  Essentially, Bandfield is demanding the government's trial exhibits, which is not appropriate.  See Torres, 901 F.2d at 234 (bill of particulars is not properly used to provide "evidentiary detail" about the government's case; nor is the government under a duty to disclose the precise manner in which the crimes alleged in the indictment were committed or to preview its evidence or legal theory).  The government has provided the defendants with the fraudulent W-8BEN Forms that it intends to rely on in discovery, and has even gone so far as to offer to identify the Bates ranges associated with some of the fraudulent W-8BEN Forms.  Under

these circumstances, Bandfield's demand for a bill of particulars based on his need to have the government identify each of the W-8BEN Forms is wholly without merit.

Eleventh, given the clearly-established standard for a bill of particulars, as set forth above, it is preposterous that Bandfield claims that the money laundering conspiracy charge in the superseding indictment is "particularly vague" as to him and that he "is not on notice as to what he is alleged to have done to be guilty of agreeing to launder money." (Bandfield Br. at 41-42). A quick review of the superseding indictment reveals the following: (i) Bandfield and Godfrey explained to the Undercover Agent that IPC Corp would soon offer its clients prepaid MasterCards that allowed for transfers up to $50,000 per month, adding, "we can make it so it's not attached to you." (SI ¶ 28); (ii) on or about December 4, 2013, Leach sent an email to Bandfield informing Bandfield that "a client requested that $75,000 be wire transferred from a brokerage account to a law firm in the United States." (SI ¶ 36); and (iii) on or about December 16, 2013, Knowles sent an email to Bandfield, copying Leach, in which he forwarded an email from Corrupt Client 2 "requesting six wire transfers totaling $1.9 million for various IBCs." (SI ¶ 36). The government has already provided the defendants with the relevant bank records that form the basis of the government's allegations. Here, the defendant is requesting not just the government's trial exhibits but summary charts based on trial exhibits, which as is established above, is not an appropriate basis for a bill of particulars. Finally, the government will fix the date ranges in the forthcoming second superseding indictment.

Twelfth, yet again, without any legal or factual basis, Bandfield demands that the government identify details developed in support of the Undercover Agent's identity and background and claims that this information is essential to assessing Bandfield's knowledge of the alleged intent of the Undercover Agent's purported scheme to defraud. (Bandfield Br. at 42-

43).  This claim too is wholly without merit.  Again, it is difficult to comprehend how details that were not provided by the Undercover Agent to Bandfield are essential to assessing Bandfield's knowledge of the alleged intent of the Undercover Agent's purported scheme to defraud.  Bandfield's knowledge of the Undercover Agent's purported scheme to defraud is evident in their video-recorded meetings in Belize because, in those meetings, the Undercover Agent explicitly described the manner in which he wanted to execute his purported fraudulent scheme.  Put simply, there is no Rule 16 failure here, and any additional details about the Undercover Agent's identity and background are, at best, <u>Jencks</u> material.

2.   <u>Mulholland's Specific Requests</u>

Under the guise of a demand for a bill of particulars, Mulholland essentially seeks the government's trial exhibits.  Mulholland does this even as he concedes that a bill of particulars is not designed to elicit evidentiary material or compel the government to reveal its case or the evidence it hopes to adduce at trial.  (Mulholland Br. at 38).  Moreover, Mulholland makes his demands even as he concedes that the government has offered to assist the defense in identifying documents within the discovery and produced discovery in searchable format.  (Mulholland Br. at 40).  Upon applying the law in this Circuit and factoring in the government's decision to restrict the substantive securities fraud evidence adduced at trial to 10 stocks (or fewer), which it has agreed to identify by the end of January 2016, it is clear that Mulholland is not entitled to a bill of particulars.

Other cases cited by the defendants, including <u>United States v. Bin Laden</u>, 92 F. Supp. 2d 225 (S.D.N.Y. 2000), similarly do not support the defendants' position.  For example, while <u>Bin Laden</u> acknowledges that "sometimes, the large volume of material disclosed . . . necessitates a bill of particulars," the Court stated this proposition in the context of describing

54

cases where the indictments contained only general allegations.  See Bin Laden, 92 F. Supp. 2d at 234 (explaining, among other things, that Bortnovsky required a bill of particulars because the government "impermissibly shifted the burden of proof to the defendants" when it provided "mountains of documents" to the defense and the indictment only contained general allegations of fraud).  Here, by contrast, the allegations provide a detailed description of the defendants' scheme.  Accordingly, the basis for Mulholland's list of particulars is baseless and should be rejected.  Nevertheless, the government will briefly address each request below.

First, Mulholland requests a bill of particulars identifying the "names of shell companies the government maintains were used for a pump and dump scheme."  (Mulholland Br. at 41).  As an initial matter, it bears noting that Mulholland is alleged to have engaged in more than 40 pump and dump schemes, not "a pump and dump."  As noted supra, information about the IBCs and LLCs that IPC Corp created for the Mulholland Group and other clients have been provided in discovery and the government will provide both defendants with an Excel spreadsheet that lists over 5,000 entities and the client names associated with those entities.

Second, Mulholland requests a bill of particulars identifying the "attorney escrow accounts and the holders thereof allegedly used to commit the crimes charged."  (Mulholland Br. at 41).  The government has provided clearly identifiable bank records, including the relevant attorney escrow accounts, that it currently has in its possession.  If necessary, the government can direct Mulholland to these records.  Additionally, the government has learned that there may be additional bank records that it is seeking to obtain and produce to the defendants.

Third, Mulholland requests a bill of particulars identifying the "names of IBCs which were created for purposes of committing the crimes charged in the indictment, the beneficial owners of said IBCs and the "true" owners of the IBCs."  (Mulholland Br. at 41).  This

request is duplicative of the first request since the IBCs are the shell companies that were used to execute the pump and dump schemes.  As noted above, this information is provided in the discovery and the government has agreed to provide both defendants with an Excel spreadsheet, also previously provided in discovery, that lists over 5,000 entities and the client names associated with those entities.  The owners or nominees for these accounts were typically IPC Corp employees or other Belizean citizens, and this information is also contained in the discovery.

Fourth, Mulholland requests a bill of particulars identifying the "nominees claimed by the government to have controlled each of the companies that the government claims were used for the pump and dump scheme."  (Mulholland Br. at 41).  Again, this is duplicative of the third request, and the government's response is set forth above.

Fifth, Mulholland requests a bill of particulars identifying the "names of any 'sham' companies claimed by the government to have been used to park shares."  (Mulholland Br. at 42).  Again, this is duplicative of the first and third requests above, and thus, no further response is necessary.

Sixth, Mulholland requests a bill of particulars identifying "each 'penny stock' alleged by the government to have been used by the defendants to facilitate the crimes charged."  (Mulholland Br. at 42).  The government will provide both defendants shortly with a list of approximately 100 ticker symbols that were manipulated, primarily by the Mulholland Group, as part of the charged conspiracy.  But as stated above, as a courtesy and prior to the scheduling of any trial date, the government will provide both defendants, by the end of January 2016, with a list of 10 stocks (or fewer).  These stocks are a subset of the stocks that were manipulated by the Mulholland Group through the use of the sham companies and offshore brokerage firms

56

associated with Bandfield.  Further, the government can confirm that 2 of the 10 stocks will be VLNX and CYNK, the stocks that are the basis for the substantive securities fraud counts.

Seventh, Mulholland requests a bill of particulars identifying the "'wash trades' made by the defendants or by others acting on their behalf, when said wash trades were executed, by whom they were executed and the manner in which these particular trades further the conspiracy as related to each company."  (Mulholland Br. at 42).  As noted above, a bill of particulars is not the vehicle by which to get specific evidence that the government will adduce at trial.  However, as noted above, given that the government will provide the defendants with a list of 10 stocks (or fewer), it will narrow the parameters of the defendants' review of any wash trades or lack thereof to those stocks, which is far fewer than the more than 40 alleged pump and dump schemes orchestrated by the Mulholland Group.

Eighth, Mulholland requests a bill of particulars identifying "for each company [stock] charged as part of this conspiracy, the companies or individuals claimed to have controlled the shares."  (Mulholland Br. at 42).  Once again, this request is duplicative of the third request which requests the identities of the true beneficial owners of the IBCs.  Thus, no further response is necessary.

Ninth, Mulholland requests a bill of particulars identifying details of the securities transactions connected to the alleged pump and dump schemes.  (Mulholland Br. at 42).  This request overlaps with the sixth and seventh requests above, and thus, no further response is necessary.

Tenth, Mulholland requests a bill of particulars identifying details about the fraudulent promotional activity associated with the alleged pumps and dumps.  (Mulholland Br. at 42).  The government will provide information associated with VLNX and CYNK shortly and

will provide additional information once it narrows its list of manipulated stocks to the 10 (or fewer), as indicated above.

Eleventh, Mulholland requests a bill of particulars identifying the "manner in which the defendants impeded the IRS from conducting its functions of revenue collection." (Mulholland Br. at 42).  The superseding indictment sufficiently notifies Mulholland of the manner in which the defendants impeded the IRS from conducting its functions of revenue collection.  For example, the superseding indictment alleges that Godfrey explained to the Undercover Agent that IPC Corp could establish an LLC and an IBC for the Undercover Agent and designate IPC Corp's employees as the nominees, and that the IBC, which opened the Undercover Agent's brokerage account at Titan, would be owned by the LLC and the Undercover Agent's name would not be associated with either entity.  (SI ¶ 26).  Additionally, the indictment also alleges that during the November 6, 2013 meeting, Bandfield and Godfrey explained to the Undercover Agent, in great detail, how IPC Corp assisted U.S. clients, like Mulholland and the Undercover Agent, in evading U.S. laws and regulations, including the IRS's reporting requirements, by establishing sham IBCs and LLCs.  (SI ¶ 28).  In that same paragraph, the superseding indictment alleges that Bandfield then suggested means by which the Undercover Agent could circumvent the IRS's reporting requirements by having a nominee sign IRS Forms W-8BEN for the Undercover Agent's IBCs and LLCs.  (Id.).  Obviously, if the identity of the true account holder, who happens to be a U.S. citizen or resident, is concealed by a nominee designated by IPC Corp, who completed a Form W-8BEN on behalf of the U.S. citizen or person, then the IRS is impeded from collecting taxes on those fraudulent proceeds. The indictment then provides specific examples in paragraphs 37 and 53 (overt acts).  Based on the foregoing, it is inconceivable how Mulholland can claim that he lacks sufficient information

about the manner in which the defendants, including him, impeded the IRS from conducting its functions of revenue collection.

Twelfth, Mulholland requests a bill of particulars identifying the relevant parts of the FATCA statute that are "applicable to the defendants and that they sought to violate." (Mulholland Br. at 42). Although it is obvious from the information provided in the indictment, the government can confirm that the relevant parts of the FATCA statute that are applicable to the defendants and that they sought to violate are: (i) the non-reporting by U.S. taxpayers about certain foreign financial accounts and offshore assets; (ii) the non-reporting by foreign financial institutions about financial accounts held by U.S. taxpayers or foreign entities in which U.S. taxpayers hold a substantial ownership interest; and (iii) causing the non-reporting and the non-withholding (30% on certain U.S. source payments made to foreign entities) by U.S. financial institutions based on material misrepresentations about the beneficial owners of the foreign accounts.

Thirteen, Mulholland requests a bill of particulars identifying the monetary transactions and the fraudulent sales of securities that form the basis for these charges. (Mulholland Br. at 42). This request overlaps with the second, sixth, seventh and ninth requests above, and thus, no further response is necessary.

Fourteenth, Mulholland requests a bill of particulars identifying the "precise documents used before the Grand Jury which were gained from the cooperating witness with whom Mulholland or Legacy can claim an attorney-client privilege." (Mulholland Br. at 42). Although clearly not a basis for a bill of particulars, the government can confirm that the government relied on only one document obtained from its cooperating witness in its presentation before the Grand Jury and is willing to identify this document for Mulholland.

59

\*        \*        \*

For the foregoing reasons, the defendants' request for a bill of particulars should be denied.

## POINT FOUR

## THE REQUEST FOR A SEVERANCE SHOULD BE DENIED

Bandfield seeks severance from co-defendant Mulholland for three reasons: (i) the indictment fails to allege common securities fraud and money laundering conspiracies as between Bandfield and Mulholland; (ii) the severe risk of spillover prejudice is substantial and unfair; and (iii) any delay in waiting for Mulholland to be ready for trial will prejudice Bandfield's constitutional right to a speedy trial.  (Bandfield Br. at 44).  As discussed in detail below, severance in this matter is not warranted based on the plain language of Federal Rules of Criminal Procedure 8(b) and 14, applicable Second Circuit case law and the allegations contained in the superseding indictment.   Accordingly, the Court should deny Bandfield's motion for severance.

## I.      Applicable Law

### A.      Rule 8(b)

Where an indictment charges multiple defendants with multiple offenses, joinder is governed by Rule 8(b) of the Federal Rules of Criminal Procedure.  United States v. Turoff, 853 F.2d 1037, 1043 (2d Cir. 1988).  This Rule provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).

Joinder of defendants under Rule 8(b) is proper "where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a

61

common plan or scheme." United States v. Rittweger, 524 F.3d 171, 177 (2d Cir. 2008) (quoting

United States v. Cervone, 907 F.2d 332, 341 (2d Cir. 1990) and United States v. Attanasio, 870

F.2d 809, 815 (2d Cir. 1989)) (internal quotations omitted); see also United States v. Rucker, 32

F. Supp. 2d 545, 548 (E.D.N.Y. 1999).

        "There is a preference in the federal system for joint trials of defendants who are

indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993). "Joint trials play a vital

role in the criminal justice system.  [They] promote efficiency and serve the interests of justice

by avoiding the scandal and inequity of inconsistent verdicts." Id. (internal quotations omitted).

"This preference is particularly strong where . . . the defendants are alleged to have participated

in a common plan or scheme." Salameh, 152 F.3d at 115.  Indeed, "a non-frivolous conspiracy

charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b)." United States

v. Nerlinger, 862 F.2d 967, 973 (2d Cir. 1988).

        The Second Circuit applies "a commonsense rule to decide whether, in light of the

factual overlap among charges, joint proceedings would produce sufficient efficiencies such that

joinder is proper notwithstanding the possibility of prejudice . . . ." Rittweger, 524 F.3d at 177.

Indeed, this Circuit has routinely upheld joinder of defendants charged in an indictment that

alleges multiple schemes, so long as the schemes share a substantial identity of facts or

participants, or arise out of a common plan or scheme.  See, e.g., Rittweger, 524 F.3d at 177-179

(affirming joinder where two schemes shared common plan and key participants,

notwithstanding that certain defendants were not alleged to have been aware of or participated in

each other's schemes); United States v. Feyrer, 333 F.3d 110, 114-115 (2d Cir. 2003) (affirming

joinder where separate conspiracies shared common plan and participants, notwithstanding that

certain defendants were not alleged to have participated in all conspiracies); Turoff, 853 F.2d at

1043-1044 (affirming joinder of defendants where indictment charged one scheme that "stemmed from" the other); Cervone, 907 F.2d at 341 (rejecting defendant's improper joinder claim under Rule 8(b) even though "the link" between the defendant and other defendants was "somewhat tenuous"); Attanasio, 870 F.2d at 814-815.

## B.    Rule 14

Rule 14 of the Federal Rules of Criminal Procedure provides that a district court may grant a severance or "provide any other relief that justice requires," if "the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant . . . ."  "A defendant raising a claim of prejudicial spillover bears an extremely heavy burden."  United States v. Friedman, 854 F.2d 535, 563 (2d Cir. 1988).  The decision of whether to grant a motion for severance under Rule 14 is "confided to the sound discretion of the trial court."  Feyrer, 333 F.3d at 114 (citations omitted).  A defendant must show that he suffered prejudice so substantial that there would be a "miscarriage of justice."  United States v. Yousef, 327 F.3d 56, 150 (2d Cir. 2003).  "The principles that guide the district court's consideration of a motion for severance usually counsel denial."  United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993).

The Supreme Court has held that severance should only be granted pursuant to Rule 14 when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence."  Zafiro, 506 U.S. at 539.  As the Second Circuit has recognized, "joint trials serve the public interest in economy, convenience, and the prompt trial of the accused." Turoff, 853 F.2d at 1039 (citing United States v. Lane, 474 U.S. 76, 79-80 (1986)).

Even where the risk of prejudice is high, less drastic measures – such as limiting instructions – often suffice as an alternative to granting a Rule 14 severance motion.  Zafiro, 506

U.S. at 539; see also Feyrer, 333 F.3d at 114.  Indeed, courts have repeatedly recognized that any

potential prejudice caused by a joint trial can be effectively mitigated by instructions to the jury

that it must consider separately each individual defendant and each charge, and consider only the

evidence that has been admitted against each defendant.  See Zafiro, 506 U.S. at 540-41; United

States v. Hernandez, 85 F.3d 1023, 1029-30 (2d Cir. 1996); United States v. Romero, 54 F.3d 56,

60 (2d Cir. 1995).

## II.   Discussion

### A.   The Superseding Indictment Alleges a Common Scheme and Participants

Joinder of the defendants is proper because all counts of the superseding

indictment arise out a common plan and scheme and are tied together by substantial identity of

facts and participants.  Rucker, 32 F. Supp. 2d at 548.  Bandfield's arguments in favor of

severance suffer from a tortured construction of the superseding indictment and have no merit.

As an initial matter, Bandfield argues that the government fails to allege that he and Mulholland

engaged in the charged conspiracies.  Bandfield is wrong because the indictment plainly and

sufficiently alleges that Bandfield and Mulholland engaged in the charged conspiracies.

Importantly, for purposes of joinder, whether or not the government has adequately alleged

conspiracy is not the standard.  The government need only allege that the schemes share a

substantial identity of facts or participants, or arise out of a common plan or scheme.  See, e.g.,

Rittweger, 524 F.3d at 177-179.

With respect to Count One, the superseding indictment plainly alleges a common

plan and participants:  IPC Corp., an entity controlled by Bandfield, set up a corporate structure

in the form of IBCs which was designed to circumvent the SEC's reporting requirements by

concealing an individual's beneficial ownership of more than 5 percent of a public company's

stock and that company thereafter was used as a vehicle to engage in securities manipulation. (SI ¶ 28). As alleged, Bandfield through IPC set up IBCs for individuals working directly at Mulholland's behest, including, among others, Philip Kueber. (SI ¶¶ 23, 33, 38). These IBCs opened brokerage accounts at Belizean-based brokerage firms, including Legacy, Titan and Unicorn, which in turn had been created by Bandfield. (SI ¶ 5). Mulholland utilized these IBCs and brokerage accounts to commit securities fraud.

In one such alleged stock manipulation scheme, approximately 100 million shares of VLNX were issued to ten different IBCs created by Bandfield through IPC Corp. Mulholland paid for and controlled nine of the ten IBCs. (SI ¶ 42). Thus, Mulholland was able to conceal from the SEC and the investing public that he controlled the vast majority of VLNX's free trading stock. The nine IBCs controlled by Mulholland sold more than 83 million shares of VLNX almost exclusively through Legacy, a brokerage firm created by Bandfield and eventually owned by Mulholland, resulting in a $21 million dollar windfall. (SI ¶ 43). The superseding indictment further alleges that in a similar stock manipulation scheme involving CYNK, IBCs involved in the scheme were established by IPC and paid for by Mulholland. (SI ¶ 45).

Bandfield argues that "Count [One] itself fails to allege any overt acts that involve both Mr. Bandfield and Mulholland," (Bandfield Br. at 45). Not surprisingly, Bandfield cites to no authority in support of this baseless contention. He does not because he cannot. It is clear from the superseding indictment and the evidence provided in discovery that Mulholland contacted IPC Corp, Bandfield's company, to set up the fraudulent structure necessary to conceal his fraudulent manipulation. Nonetheless, Bandfield ignores that Count One alleges that Mulholland called Godfrey, Bandfield's right-hand man, on May 9, 2014 and stated, in part, "just chasing down to see if you have any more names for those IBCs that we bought . . . we

65

talked and you had five or so." (SI ¶ 50(m)). Count One further alleges that Kueber, Mulholland's associate, called Godfrey on May 6, 2014 to "get a couple of accounts opened up." (SI ¶ 50(l)).

Further, Bandfield's contention that the superseding indictment does not "allege that Mr. Bandfield knew anything about Mulholland's intentions" (Bandfield Br. at 45), strains credulity. Indeed, Bandfield and an IPC employee proudly boast to the Undercover Agent that his IBC corporate structure allowed for individuals to circumvent the SEC's reporting requirements as well as FATCA. (SI ¶¶ 28, 30). Bandfield was also intercepted on a judicially-approved wiretap revealing to a corrupt client that "right now, most of our work is securities, surprisingly enough. We see a lot of IPOs and lot of penny stock, OTC stock, pink sheets and all that. We trade a lot of it through companies we set up. Probably 99 percent of our business or 98 percent right now is this kind of stock." (SI ¶ 50(k)). Put simply, a number of Mulholland's stock manipulation schemes would not have come to fruition if not for Bandfield's fraudulent corporate structure. Thus, severance is not warranted.

With respect to Count Three, Bandfield once again incorrectly argues that the government fails to adequately allege that Bandfield and Mulholland conspired to commit money laundering. As discussed above, this is not the standard to determine whether joinder is proper. Nonetheless, the government does allege that both individuals were engaged in a common scheme to launder money. While Bandfield argues that Mulholland "passed $300 million in proceeds from unlawful securities through 5 offshore law firms – *not* IPC," (Bandfield Br. at 45), he conveniently omits the fact that the money laundered through these various law firms was transferred by the brokerage firms formed by Bandfield. (SI ¶¶ 30, 37). Additionally, Bandfield is captured on a recording informing the Undercover Agent that wiring money through law firm

escrow accounts was an effective method of moving money back into the United States. Additionally, during one intercepted call, Bandfield informs the Undercover Agent that his "slick" IBC structure was designed to counter U.S. President Barack Obama's new laws, a reference to FATCA.  (SI ¶ 30).  Accordingly, joinder with respect to Count Three is appropriate.

### B.    Joinder Of The Defendants Is Not Prejudicial to Bandfield

Bandfield argues that his trial should be severed from Mulholland's due to the risk of prejudicial spillover from: (i) the alleged fraudulent manipulation of over 40 U.S. publicly traded securities; (ii) the alleged earning of outrageous profits from unlawful trading activities; (iii) the alleged laundering of over $300 million by Mulholland alone; and (iv) Mulholland's previous trouble with the SEC.  (Bandfield Br. at 46-47).  Bandfield's arguments are without merit and he falls far short of meeting the heavy burden for severance under Rule 14.

In light of the fact that Bandfield is charged in the same counts as Mulholland, including conspiracy, it is hard to fathom why any of the evidence pertaining to the stocks manipulated by the Mulholland Group, the outrageous profits from unlawful trading activities and the alleged laundering of more than $300 million by Mulholland would not be admissible against Bandfield.  See United States v. Spinelli, 352 F.3d 48, 55-56 (2d Cir. 2003) ("much of the evidence about [one defendant's] crimes would have been admissible at a separate trial of [the other], since it was relevant to proving the nature and scope of the conspiracy in which both were, to differing degrees, involved"); United States v. Carson, 702 F.2d 351, 367 (2d Cir. 1983) (the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance); United States v. Carpenter, 689 F.2d 21, 27 (2d Cir. 1982) ("A certain amount of prejudice to a defendant is regarded as acceptable given the judicial economies that result from joinder.").  The fact that no single overt act involves both Bandfield and

Mulholland is of no consequence and Bandfield does not and cannot point to any authority in which severance was granted on these grounds.  It is particularly outlandish that Bandfield attempts to claim serious and improper spillover prejudice when he was the mastermind of the entire fraudulent Belize operation and facilitated and provided the infrastructure to clients, such as Mulholland, to violate U.S. securities and tax laws.

Indeed, the superseding indictment specifically alleges that Bandfield and his Belizean co-conspirators were engaged in a conspiracy with more than 100 clients, including Mulholland, to evade U.S. securities and tax laws and conceal their fraudulent activity and illegal proceeds through IPC Corp's fraudulent IBC structure.  (SI ¶ 35).  And as explained above, Bandfield bragged about his fraudulent structure and explicitly stated in his meeting with the Undercover Agent that he set up these "slick" corporate structures to enable U.S. persons to circumvent U.S. securities and tax laws and that his designated nominees would sign any stock purchase agreements on behalf of the IBCs at the Undercover Agent's direction.  (SI ¶¶ 28, 30). The Mulholland Group's fraudulent manipulation of more than 40 U.S. publicly traded companies that earned them more than $300 million is merely a fraction of the manipulations that Bandfield knowingly facilitated for his clients.  For example, another one of Bandfield's large clients was involved in the execution of the fraudulent trades with respect to the CANA manipulation alleged in the superseding indictment.  Thus, there is no prejudice to Bandfield from Mulholland, let alone "a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539.

Finally, as courts have routinely found, a limiting instruction with respect to Mulholland's past SEC charges is more than adequate to protect Bandfield from the danger of

taint.  See United States v. Coffey, 361 F. Supp. 2d 102, 120 (E.D.N.Y. 2005) (limiting instruction sufficient to protect defendant from danger of prejudicial spillover from evidence admissible only against co-defendant).  It is well established that well-crafted jury instructions are a sufficient safeguard against the risk of prejudice.  Zafiro, 506 U.S. at 539.  Here, it is difficult to comprehend how evidence of Mulholland's past troubles with the SEC would compromise Bandfield's specific trial "rights . . . or prevent the jury from making a reliable judgment about guilt or innocence."  Id.  But even if the Court does find a risk of prejudice based on Mulholland's prior SEC troubles, it is left to the Court's discretion to tailor the relief to the situation.  See United States v. Harwood, 998 F.2d 91, 95 (2d Cir. 1993).

### C.      Severance Is Not Warranted To Protect Bandfield's Speedy Trial Right

Bandfield's final argument with respect to severance is pegged to his constitutional right to a speedy trial under the Sixth Amendment.  (Bandfield Br. at 47).  This argument is also unavailing.

As an initial matter, Mulholland filed his pre-trial motions one week after Bandfield.  Thus, there is nothing to suggest that Mulholland's defense team "appears unlikely to be in a position to proceed to trial as expeditiously as Mr. Bandfield."  (Bandfield Br. at 48).  Additionally, Mulholland's counsel has not informed either the Court or the government of any impediment to standing trial on the date that the Court orders.  Any assertion to the contrary is rank speculation.

Bandfield's assertion that he is "not involved in the securities-related charges" is patently false.  (Bandfield Br. at 48).  Bandfield is charged in every count of the superseding indictment including both the substantive securities fraud counts and the securities fraud conspiracy count.  Thus, severance in this matter would lead to two lengthy trials containing

duplicative documentary evidence and witness testimony.   This surely would not promote judicial efficiency.   See United States v. Panza, 750 F.2d 1141, 1149 (2d Cir. 1984) ("The defendant seeking a severance must shoulder the difficult burden of showing that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").

In sum, each of Bandfield's arguments in favor of severance falls far afield of the Federal Rules of Criminal Procedure and prevailing Second Circuit case law.   Accordingly, his motion should be denied.

**POINT FIVE**

**THE REQUEST FOR STRIKING SURPLUSAGE
IN THE INDICTMENT SHOULD BE DENIED**

Bandfield moves to strike the following references in the superseding indictment as "surplusage": (i) reference to the term "nominee" in the "securities fraud context"; (ii) reference to penny stocks being easily manipulated and enabling control groups to manipulate the stocks; (iii) reference to "sham" or "fraudulent" companies and structures; (iv) reference to "Corrupt" Clients; (v) reference to "inter alia" and "among others"; and (vi) the assertion that Bandfield created Titan, Legacy and Unicorn.  (Bandfield Br. at 49-52).

Mulholland moves to strike paragraph 14 of the superseding indictment, which describes FATCA, as surplusage arguing that this paragraph makes sweeping conclusions of law that invade the Court's province to determine the applicable law and instruct the jury.  (Mulholland Br. at 43-44).

As discussed in detail below, the defendants' requests for striking surplusage in the superseding indictment are without merit and should be denied.

**I.     Applicable Law**

A defendant's motion to strike surplusage from an indictment should not be granted unless "the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." United States v. Mulder, 273 F.3d 91, 99 (2d Cir. 2001) (quoting United States v. Scarpa, 913 F.2d 933, 1013 (2d Cir. 1990)); see also United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir. 1996).  Thus, even language deemed prejudicial may not be stricken "if evidence of the allegation is admissible and relevant to the charge." Scarpa, 913 F.2d at 1013; see also United States v. Mahaffy, 466 F.Supp.2d 115, 118 (E.D.N.Y. 2006)

(Glasser, J.).  "Given this exacting standard, such motions [to strike] are rarely granted."  <u>Coffey</u>, 361 F. Supp. 2d at 123.

II.    <u>Discussion</u>

    A.    **Bandfield Fails to Satisfy the Exacting Standard**
             **For Striking Surplusage in the Superseding Indictment**

        As described below, none of Bandfield's requests come close to satisfying the clearly-established exacting standard set forth in this Circuit.

        <u>First</u>, Bandfield moves to strike the word "fraud" in the phrase "securities fraud context" and the phrase "[t]he use of nominees and nominee accounts was designed to conceal the true ownership interest of the customer" in paragraph 17 of the superseding indictment. (Bandfield Br. at 49-50).  In support of his motion, Bandfield argues that the above term and phrase are misleading and prejudicial because: (i) the term nominee is used throughout the securities context with lawful meaning and is not necessarily designed to conceal ownership; and (ii) neither Bandfield nor his counsel are aware of any regulatory framework or definitions that apply only in the "securities *fraud* context."   (<u>Id.</u>).  The government does not disagree that the term "nominee" is used through the securities and other industries in perfectly legitimate ways. Indeed, it is therefore necessary to specify that the term as described in the superseding indictment pertains specifically to its use in the context of securities law violations, <u>i.e.</u>, a person or firm into whose name securities or other properties were transferred in order to facilitate transactions, while concealing the customer as the actual owner.  Similarly, the phrase "[t]he use of nominees and nominee accounts was designed to conceal the true ownership interest of the customer" is in the context of the government's allegations in this case, which is the essence of an indictment, and hence should not be struck.  Notably, the description of the term "nominee" in the superseding indictment will be admissible at trial as "relevant to the crime charged."  <u>See</u>

Mulder, 273 F.3d at 99; Scarpa, 913 F.2d at 1013.  Thus, Bandfield's request fails to meet the exacting standard and should be denied.

Second, Bandfield moves to strike the phrase "microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks" in paragraph 18 of the superseding indictment as overly broad and misleading.  (Bandfield Br. at 49-50).  As an initial matter, the superseding indictment reads slightly differently than suggested by Bandfield.  Specifically, the full sentence reads as follows:  "Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks."  (SI ¶ 18) (emphasis added).  Importantly, this is placed in the context of the previous sentence that "microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that traded on notable exchanges."  (Id.).  The above statements are not just accurate but will be introduced as evidence at trial as relevant to the crime charged.  See Mulder, 273 F.3d at 99; Scarpa, 913 F.2d at 1013.  Moreover, Bandfield is wrong when he states that the fact that the stocks at issue are penny stocks has no bearing on whether the defendants manipulated the stocks in the manner alleged in the indictment.  To the contrary, the fact that the stocks are penny stocks, i.e., cheap, thinly traded stocks, is what made these stocks attractive to individuals looking to manipulate their price and trading volume.  Thus, Bandfield's request to strike this phrase should be denied.[26]

---

[26]     Additionally, it bears noting that Bandfield is wrong that the stock of Citigroup may have met the definition of a penny stock in 2008 and 2009 because it traded below $5.  Indeed, Citigroup would never have qualified as a penny stock or microcap stock because market capitalization is calculated by multiplying the number of shares outstanding by their current price per share, and the extremely large number of outstanding shares would not qualify it as a microcap or penny stock.

Third, Bandfield moves to strike references to "sham" and "fraudulent" companies in the indictment. (Bandfield Br. at 51). In support of this motion, Bandfield argues that these terms are "misleading in the broad manner in which they are used" and that "[n]umerous lawful reasons exist for the creation and use of offshore entities." (Id.). To the contrary, these terms are appropriately used because the fraud perpetrated by Bandfield was in fact broad and evidence that these companies were sham and fraudulent will be introduced at trial as relevant to the crime charged. See Mulder, 273 F.3d at 99; Scarpa, 913 F.2d at 1013. Indeed, as alleged in the indictment, Bandfield explicitly stated in his meeting with the Undercover Agent that he set up these "slick" corporate structures to enable U.S. persons to circumvent U.S. securities and tax laws and that his designated nominees would sign any stock purchase agreements on behalf of the IBCs at the Undercover Agent's direction. (SI ¶¶ 28, 30). Thus, Bandfield's request to strike these phrases should be denied.

Fourth, Bandfield moves to strike references to the word "Corrupt" in the phrase "Corrupt Clients." (Bandfield Br. at 51). In support of this motion, Bandfield argues that "until the government has proven that the 100-plus clients referenced in the indictment are indeed 'corrupt,' the term is prejudicial, misleading, and permits the assumption that Bandfield is guilty simply because his clients may have been engaged in unlawful or unsavory activity." (Id.). As noted above, it defies logic that the mastermind of the fraudulent Belize operation who was captured on video detailing his fraudulent scheme suggests that he would be found guilty simply because his clients may have engaged in unlawful or unsavory activity. Put simply, Bandfield should be more concerned about his own deeds and statements than the deeds of his clients. Indeed, as noted supra, Bandfield explicitly stated in his meeting with the Undercover Agent that he set up these "slick" corporate structures to enable U.S. persons to circumvent U.S. securities

74

and tax laws.  (SI ¶¶ 28, 30).  The government expects to introduce evidence at trial that the primary, if not only, reason that U.S. persons would utilize Bandfield's IBC structure would be to conceal their ownership of stock and other assets and thus evade U.S. securities and tax laws. Thus, Bandfield's request to strike the word "Corrupt" has no basis in fact or law.  See United States v. Weaver, No. 13-CR-120, 2014 WL 259504, *3 (E.D.N.Y. Jan. 10, 2014) (denying defendants' motion to strike surplusage when they had not demonstrated that the terms were irrelevant, inflammatory, prejudicial or inadmissible).

Fifth, Bandfield moves to strike references to the phrases "inter alia" and "among others" in the superseding indictment.  (Bandfield Br. at 51-52).  In support of this motion, Bandfield relies exclusively on United States v. Pope, 189 F. Supp. 12, 25-26 (S.D.N.Y. 1960) and United States v. Mango, No. 96-CR-327, 1997 WL 222367, *16-17 (N.D.N.Y. 1997) to argue that courts have recognized that the inclusion of phrases like "among other" and "inter alia" creates a danger that the jury may infer that the defendant is accused of crimes beyond those actually charged.  (Id.).  Put simply, Bandfield misstates the law and conveniently ignores cases that are directly on point.  Specifically, in United States v. Kassir, No. 04-CR-356, 2009 WL 995139, *3 (S.D.N.Y. Apr. 9, 2009), the court explained that the "problem identified in Pope only arises, however, if the broadening language appears in a charging paragraph." (emphasis added).  Indeed, the court in Kassir made clear that it is well established in this Circuit that use of terms like "inter alia" and "among others" are permissible when they are contained, as is the case here, in sections alleging the means and methods by which the defendant committed the charged offense and when they are used in conjunction with setting forth overt acts in a conspiracy.  Kassir, 2009 WL 995139, *3-4 (citing United States v. Mayo, 230 F. Supp. 85, 86 (S.D.N.Y. 1964)); see also United States v. Haldeman, 559 F.2d 31, 126 & n. 265 (D.C. Cir.

1976); United States v. Washington, 947 F. Supp. 87, 90 (S.D.N.Y. 1996) ("[W]hen a means paragraph, which refers to the matter of proof to sustain the charges, contains surplusage, a court should not strike the language."); United States v. Chovanec, 467 F. Supp. 41, 46 (S.D.N.Y. 1979); United States v. DePalma, 461 F. Supp. 778, 798-99 (S.D.N.Y. 1978); United States v. Booth, No. 99-CR-378, 1999 WL 1192317, at *11 (S.D.N.Y. Dec. 14, 1999).  Thus, Bandfield's baseless request to strike these phrases should be denied.

Sixth, Bandfield moves to strike references in paragraphs 5 and 28 of the superseding indictment that Bandfield claimed to have created Titan, Legacy and Unicorn as inaccurate, misleading, irrelevant and prejudicial.  (Bandfield Br. at 52).  In support of this motion, Bandfield argues that while Bandfield may have assisted in forming the corporate entities that became Titan, Legacy and Unicorn, he did not exercise any degree of ownership or control over those entities.  (Id.).  Bandfield's arguments have no merit.  The language is neither misleading nor inaccurate and is based on statements by Bandfield and described as such in the superseding indictment.  As such, these statements will be introduced at trial as relevant to the crimes charged.  See Mulder, 273 F.3d at 99; Scarpa, 913 F.2d at 1013.  Thus, Bandfield's request to strike this accurate and admissible phrase should be denied.

### B.    Mulholland Fails to Satisfy the Exacting Standard For Striking Surplusage in the Superseding Indictment

Mulholland essentially moves to strike paragraph 14 of the superseding indictment, which describes FATCA, as surplusage, arguing that this paragraph makes sweeping conclusions of law that invade the Court's province to determine the applicable law and instruct the jury.  (Mulholland Br. at 43-44).  In support of his motion, Mulholland mischaracterizes the language in the superseding indictment.  For example, Mulholland claims that the superseding indictment states that FATCA "came into effect" in 2010.  (Id.).  In fact, the superseding

76

indictment does not use the phrase "came into effect" but accurately states that FATCA was "enacted in March 2010." (SI ¶ 14). Thus, the information contained in paragraph 14 is accurate. The fact that enforcement of FATCA did not go into effect in 2010 is of no consequence since the charged crime is conspiracy to commit tax fraud and not substantive tax fraud. As such, it is legally and factually proper because the evidence clearly demonstrates that the defendants devised a scheme to circumvent FATCA's reporting and withholding requirements that they knew were going to go into effect in the near future. Thus, Mulholland's request ignores the facts and the law and does not come close to satisfying the exacting standard for striking surplusage in an indictment.

*     *     *

For the foregoing reasons, the defendants' requests for striking surplusage in the superseding indictment are without merit and should be denied.

77

## POINT SIX

## THE GOVERNMENT'S FIREWALL PROCESS WAS
## SUFFICIENT TO PROTECT ANY APPLICABLE PRIVILEGE

Mulholland requests that the government specify the procedures it utilized to safeguard his attorney-client privilege with respect to documents provided by a cooperating witness who has in the past represented Mulholland and other indicted entities.  (Mulholland Br. at 35).  As an initial matter, Mulholland correctly notes that the government utilized a "firewall team" (alternatively referred to in case law as a "taint team" or "Chinese wall") consisting of individuals who were completely uninvolved in the investigation and prosecution of this matter. As discussed more fully below, the use of walled-off review teams has been sanctioned by the Second Circuit and is a common practice in many investigations.

### I.      Applicable Law

The Second Circuit has previously found the use of firewall teams to be sufficient to protect various forms of privilege and to segregate investigations.  See, e.g., United States v. Padilla, 203 F.3d 156, 158-59 (2d Cir. 2000) (Chinese wall sufficient to segregate separate investigations); In re Grand Jury Subpoena of Ford, 756 F.2d 249, 251 (2d Cir. 1985) (erection of Chinese wall sufficiently protected spousal privilege).  Indeed, district courts in the Second Circuit routinely sanction the use of firewall teams to protect various types of privilege, including the attorney client privilege.  See, e.g., United States v. Simels, No. 08-CR-640 (JG), 2008 WL 5383138, at *2 (E.D.N.Y. Dec. 18, 2008); United States v. Winters, No. 06-CR-54, 2006 WL 2789864, at *2 (S.D.N.Y. Sept. 27, 2006); United States v. Grant, No. 04-CR-207, 2004 WL 1171258, at *2-3 (S.D.N.Y. May 25, 2004); but see United States v. Kaplan, No. 02-CR-883, 2003 WL 22880914, at *10-12 (S.D.N.Y. Dec. 5, 2003).   One factor in permitting firewall teams is whether the Sixth Amendment is implicated in the case.  As Judge Barbara

Jones noted in <u>Grant</u>, "[t]he seized documents were not in the files of a criminal defense lawyer, and relate to civil, not criminal, litigation that predates the indictment in this case." <u>Grant</u>, 2004 WL 1171258, at *3.  Moreover, in cases where there are large amounts of documents, the use of a firewall team reduces the "burden that magistrates and district court judges would face if they were to routinely review lawfully-seized documents in every criminal case in which a claim of privilege was asserted." <u>Id.</u> (citing <u>United States v. Zolin</u>, 491 U.S. 554, 571 (1989)).

## II.     The Government's Firewall Process

As set forth above, a cooperating witness in this case has previously served as an attorney to Mulholland as well as certain other indicted entities.  Thus, the government was acutely aware that any materials provided by the cooperating witness may be subject to the attorney-client privilege.  Accordingly, and prior to any member of the investigation/prosecution team reviewing any of the materials provided by the cooperating witness, the government formed a firewall team consisting of experienced Assistant United States Attorneys from a separate unit (including separate support staff) and an experienced FBI special agent to collect and review all materials for privilege.  Prior to commencing its review, the firewall team reviewed a memorandum that provided an overview of the case, identified potential legal issues and detailed the process by which the firewall team would review the evidence obtained from the cooperating witness.  As per the memorandum, a firewall special agent was designated to collect all evidence from the cooperating witness.  These materials were maintained separately from the investigation/prosecution team, and the investigation/prosecution team did not have access to them.  Two firewall Assistant United States Attorneys then reviewed all of the materials from the cooperating witness.  As part of that review, the firewall team met with the cooperating witness on multiple occasions and reviewed each item of evidence with him.  The firewall team then

79

made an independent determination as to any issue of privilege for each item of evidence.  The firewall team was instructed not to engage with any members of the investigation/prosecution team regarding the substance of materials that they had reviewed.

For the evidence that the firewall team determined did not contain privileged communications, the firewall team concluded that at least one of the following categories applied: (1) the document contained communications between the cooperating witness and an individual who was not the cooperating witness's client; (2) the document contained communications between the cooperating witness and a client, but the presence of a third party on the communication broke the privilege; (3) the document did not pertain to the provision of legal advice (e.g., the execution of a wire transfer); and (4) "the communications with counsel were intended in some way to facilitate or to conceal [ ] criminal activity."  In re Grand Jury Subpoenas Duces Tecum, 798 F.2d 32, 34 (2d Cir. 1986).  To the extent that the firewall team concluded that any materials were potentially privileged, they segregated and retained those materials and disclosed them to the defendants in discovery at the appropriate time.  (See Docket Entry No. 42.)  The non-privileged materials were provided to the investigation/prosecution team for their review and production to the defendants.

Finally, the government notes that Mulholland did not identify a single document that he believes the firewall team improperly provided to the investigation/prosecution team.  Accordingly, he fails to demonstrate how the government's use of a firewall team has caused him prejudice.

## POINT SEVEN

## OTHER DISCOVERY AND EVIDENTIARY
## REQUESTS SHOULD BE DENIED

### I.      The Government Has Not Identified Any Brady Material

To date, the government has not identified any Brady material that it believes it is required to produce.  In his brief, Bandfield identifies a 2013 Canadian securities enforcement action which he believes may contain Brady material.  (Bandfield Br. at 53).  The government has reviewed its files and does not believe the documentation relating to that action contains exculpatory evidence.  Nevertheless, in an abundance of caution, the government will turn over all files relating to the aforementioned Canadian securities action as soon as practical.

### II.     The Government Will Comply With Its Jencks and Giglio Obligations

Bandfield requests that he should receive Giglio material and Jencks witness statements 120 days before the trial date.  (Bandfield Br. at 54).  This request finds no support in either Second Circuit case law or the plain language of 18 U.S.C. § 3500.  With respect to Jencks materials, it well settled that a district court does not have the statutory authority to compel disclosure of witness statements prior to trial.  See, e.g., United States v. Gluzman, 154 F.3d 49, 51 (2d Cir. 1998) ("the government is only required to provide such materials before cross examination, not in advance of opening statements"); United States v. Sebastian, 497 F.2d 1267, 1268-69 (2d Cir. 1974) ("Clearly, the literal wording of the Act supports the Government's position that it may not be forced to give defendants statements of prosecution of witnesses before the actual trial");  United States v. Percevault, 490 F.2d 126, 129 (2d Cir. 1974) (Jencks materials "represents a legislative determination that access to a witness' statements could be useful in impeaching a witness but was not intended to be utilized in preparation for trial").  Nevertheless, courts have advocated that the government turn over Jencks material prior to trial

as part of cooperative discovery between the prosecution and defense counsel.  See Sebastian, 497 F.2d at 1270, United States v. Richards, 94 F. Supp. 2d 304, 314 (E.D.N.Y. 2000).  In that spirit of cooperation and in keeping with this Office's standard operating procedure for complex cases, the government will turn over Jencks material two weeks prior to the start of trial.

With respect to its obligation to disclose impeachment material pursuant to Giglio v. United States, the government likewise will turn over all Giglio material two weeks prior to trial.  It is well settled that that the government need not disclose impeachment material prior to trial.  See United States v. Nixon, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial.").  Indeed, absent special circumstances, "impeachment material may be used effectively even if it is provided during the trial." United States v. Vondette, 248 F. Supp. 2d 149, 156 (E.D.N.Y. 2001).   While the government does not dispute that certain issues in this case are complex, those issues by themselves do not remove this case from the heartland of  fraud cases and certainly do not represent "special circumstances."

## III.    The Government Will Timely Disclose Rule 404(b) Evidence

Mulholland seeks disclosure of Rule 404(b) evidence sixty days prior to trial. (Mulholland Br. at 45).  Rule 404(b) allows the admission of evidence of other crimes, wrongs or acts for purposes including "proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b)(2).  The Rule requires that the prosecution in a criminal case must "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and do so before trial – or during trial if the court, for good cause, excuses lack of pretrial notice."  Id.  The government is cognizant of the provisions for pretrial notice in Rule 404(b), and hereby agrees to provide the defendants with

notice of its Rule 404(b) evidence one month prior to trial, unless otherwise ordered by the Court.

## IV.  **The Government Will Timely Disclose Expert Witness Information**

Mulholland also moves for an order, pursuant to Rule 16, directing the government to produce the identity of any expert witness and any and all information, studies and reports upon which any expert witness will base his opinion reasonably in advance of trial. (Mulholland Br. at 58).  As previously indicated to Mulholland, the government will comply with the notice provisions of Rule 16 and will disclose the information no later than thirty days prior to trial or, alternatively, at the appropriate date ordered by the Court.

## V.  **The Government Will Timely Disclose Its Witness List**

The government will timely produce its witness list at the appropriate date ordered by the Court.

## **CONCLUSION**

For the foregoing reasons, the government respectfully submits that the defendants' pre-trial motions should be denied.

Dated:  Brooklyn, New York
January 4, 2016

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney
Eastern District of New York


_____/s/_____
Jacquelyn M. Kasulis
Winston M. Paes
Michael T. Keilty
Assistant U.S. Attorneys
(718) 254-6103 (Kasulis)


Cc:    Clerk of the Court (ILG)
Defense Counsel (By ECF)